Ahmed M. Elmokadem, Esq
4919 Hidden Dune Court
San Diego, CA 92130
Telephone: (858) 361-0803
Facsimile: (858) 793-1739
Email: aelmok@elmokademlaw.com

Attorney for Plaintiffs
Dr. Ahmed Bahgat, Global One Limited,
Dina A. Bahgat, Omar A Bahgat, and
Shahd A. Bahgat

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| 1. Dr. Ahmed Bahgat | § | |
| 2. Global One Limited | § | |
| 3. Dina A. Bahgat | § | CIVIL ACTION NO. _____ |
| 4. Omar A. Bahgat and | § | |
| 5. Shahd A. Bahgat | § | |
| | § | |
| Plaintiffs | § | **ORIGINAL COMPLAINT** |
| | § | NON-JURY TRIAL DEMANDED |
| vs. | § | |
| | § | |
| 1. Arab Republic of Egypt | § | |
| 2. National Bank of Egypt | § | |
| | § | |
| Defendants | § | |
| | § | |
| | § | |
| | § | |

## <u>PLAINTIFFS' ORIGINAL COMPLAINT</u>

Dr. Ahmed Bahgat ("**Dr. Bahgat**"), Global One Limited ("**Global One**"), Dina A. Bahgat, Omar A. Bahgat, and Shahd A. Bahgat (collectively, Dina, Omar, and Shahd hereinafter referred to as "the **Bahgat Children**") file this Original Complaint complaining of the Arab Republic of Egypt ("**Egypt**") and the National Bank of Egypt ("**NBE**") and would show the Court as follows:

## I.     Jurisdiction and Venue

1.     This Court has jurisdiction pursuant to 28 U.S.C. § 1330(a) because Egypt is a foreign state and NBE is a foreign state agency or instrumentality pursuant to the Foreign Sovereign Immunities Act, 28 U.S.C. § 1601 *et seq.* At least two exceptions to sovereign immunity apply, namely §1605(a)(2) and (3), commonly referred to as the "commercial activities exception" and the "expropriation exception" respectively. The commercial activities exception applies because this case relates to acts by foreign sovereign abroad which had an immediate effect in the United States, and because it relates to acts in the United States which had commercial effect abroad. The expropriation exception applies because this case relates to Defendants' taking in violation of international law of Plaintiffs' property abroad, and that property is owned or operated by an agency or instrumentality of that foreign state which is engaged in commerce in the United States.

2.     This Court also has jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiffs allege violations of a treaty of the United States, namely the Treaty Between the United States of America and the Arab Republic of Egypt Concerning the Reciprocal Encouragement and Protection of Investments, and violations of a federal statute, namely the Racketeer Influenced and Corrupt Organizations Act 18 U.S.C. § 1961.

3.      This Court also has pendent jurisdiction pursuant to 28 U.S.C. § 1367 because all of Plaintiffs' claim arise from the same set of operative facts.

4.      Venue is appropriate in this judicial district pursuant to 28 U.S.C. § 1391(f)(3) because Defendants are licensed in and are doing business in this district. Venue is also appropriate in this judicial district pursuant to the pendent venue doctrine because Plaintiffs claims against all Defendants arise from the same set of operative facts.

5.      All conditions precedent to instituting this action have been met or waived.


## II.    Parties

6.      Plaintiff, Dr. Ahmed Bahgat, a United States citizen, is an individual currently residing in 6th of October City, Egypt.

7.      Plaintiff, Global One Limited, is a company established pursuant to the International Business Companies Act of the Commonwealth of the Bahamas with its principal place of business at P.O. Box N-3023, Nassau, New Providence, Commonwealth of the Bahamas.

8.      Plaintiff, Dina Bahgat, a United States citizen, is the daughter of Dr. Ahmed Bahgat and currently resides in Santa Monica, California.

9.      Plaintiff, Omar Bahgat, a United States citizen, is the son of Dr. Ahmed Bahgat and currently resides in 6th of October City, Egypt.

10.      Plaintiff, Shahd Bahgat, a United States citizen, is the daughter of Dr. Ahmed Bahgat and currently resides in Santa Monica, California.

11.    Defendant, Arab Republic of Egypt, is a foreign sovereign state located in North Africa.

12.    Defendant, National Bank of Egypt, is a commercial bank wholly owned by the Government of the Arab Republic of Egypt, headquartered at 24 Sherif Street, Cairo, Egypt and maintains a full-fledged branch in Manhattan, New York at 40 East 52nd Street, New York, NY 10022.

### III.    Statement of the Case

13.    Plaintiff, Global One Limited, a Bahaman entity, and Plaintiffs Dr. Ahmed Bahgat, Dina A. Bahgat, Omar A. Bahgat, and Shahd A. Bahgat, all American citizens, are investors in and owners of several business ventures and assets in Egypt. These businesses operate primarily in real estate, manufacturing, and media. In several of these investments, Defendant NBE was Plaintiffs' partner, reflected in part, by NBE's ownership of a substantial portion of the businesses and by the participation of NBE employees on the Boards of Directors of some of the companies.

14.    Defendant Egypt, through a pattern of systematic and repeated coercion, deception, and a series of other illegal and unauthorized acts, in concert with Defendant NBE and other agencies and instrumentalities of the Egyptian government, has seized possession and control of substantially all of Plaintiffs' Egyptian assets for the purpose of suppressing freedom of expression and perceived political dissidence. Such taking was without proper authorization, was not for a public purpose, and was without compensation. Many of these predicate acts occurred in the United States or had a substantial legal effect in the United States. In the course

of these acts, Defendants Egypt and NBE breached various applicable laws and duties owed to the Plaintiffs, including, without limitation, violations of customary international law, the Treaty Between the United States of America and the Arab Republic of Egypt Concerning the Reciprocal Encouragement and Protection of Investments, and the Racketeer Influenced and Corrupt Organizations Act 18 U.S.C § 1961. NBE has deprived, and continues to deprive, the Plaintiffs of the continued use and enjoyment of these assets. Defendants Egypt and NBE are liable to the Plaintiffs for all damages incurred as a result of their acts and unauthorized taking of Plaintiffs' assets as well as damages for violations of various duties owed to the Plaintiffs.


## IV.    Facts Common to All Causes of Action

*The Arab Republic of Egypt*

15.    Defendant Arab Republic of Egypt is a sovereign state located at the northeastern tip of Africa. It is the most populous nation in the Middle East and among the region's largest trade partners of the United States. Egypt is the second largest recipient of United States foreign aid worldwide. Egypt maintains an embassy in the District of Columbia, consulates in New York, Texas and California, as well as a permanent diplomatic mission at the United Nations in New York.

16.    Egypt is, and was at all times relevant hereto, directly and through its various state owned enterprises, engaged in billions of dollars of commerce annually with United States persons. Its multibillion dollar annual commercial activities in the United States include, *inter alia*: purchases of heavy defense equipment and armaments; basic commodities such as wheat and grains; aircraft; professional services and training; and electronic equipment and software.

17.    Additionally, several of Egypt's state owned enterprises hold direct commercial activities catering primarily to the large Egyptian and Arab population in the United States. Among those state owned enterprises, the NBE is licensed as a foreign bank and holds offices in New York. Additionally, Egyptian state owned television broadcasts to nearly 100,000 subscribers in the United States, and state owned newspaper Al Ahram circulates to thousands of readers in the United States.

18.    Following the terrorist assassination of President Anwar Al Sadat on October 6, 1981, his Vice President, Mohamed Hosni Mubarak assumed the Presidency of Egypt on October 14, 1981. President Mubarak remained in power as President of Egypt for almost thirty years, until he resigned in response to a popular revolution on February 11, 2011.

19.    In the wake of the violent events upon which he assumed power, President Mubarak immediately announced a national state of emergency, thereby suspending the rule of law and authorizing the use of extra-constitutional measures to combat terrorism and preserve national security. The state of emergency remained in force until his ouster in 2011. Nevertheless, the state of emergency returned in full force on August 14, 2013 in response to yet another threat of terrorism in the country and remains in effect to date.

20.    While the stated purpose of the state of emergency was to combat terrorism, the authorities' extra-constitutional powers reportedly exceeded that scope and were frequently used to suppress political dissidents, journalists, or anyone deemed to undermine the Mubarak regime's hold on power. Pursuant to the emergency laws, state officials were authorized to imprison and confiscate assets of anyone without due process or standing any trial.

21.    Beginning in the late 1980s and early 1990s, the Mubarak regime embraced aggressive measures to liberalize the economy and transition the country from a predominantly state led command economy to a free market capitalist economy. Foremost among those measures, the state increased liquidity and private lending – utilizing the state owned NBE as the primary vehicle for monetary liquidity – to foster private investment; privatized much of the ailing state owned commercial enterprises; offered government land for sale to and development by the private sector; engaged in mass campaigns to attract foreign investment; enacted an immigration law to attract the sizeable Egyptian expatriate community abroad to invest in Egypt and treat their investments as those of foreign nationals; and liberalized the Egyptian currency – the Egyptian Pound – beginning in 2001 which had previously been pegged to the United States Dollar for decades.

22.    Egypt's progressive economic policies were widely blamed for extreme social stratification, concentration of wealth in the hands of a small minority, severe inflation, and deterioration of public services. Beginning in the mid-2000s, the state revoked several of the previously privatized enterprises and land sales, or unilaterally imposed additional ex post facto fees for those transactions.

23.    Two decades into President Mubarak's reign, it appeared to the public and to foreign pundits that no credible successor had emerged – or was allowed to emerge – to assume power following the aging President's long tenure at the presidency. In or about 2001, President Mubarak's youngest son, Mr. Gamal Mubarak, began to emerge on the political scene as a young leader within the ruling National Democratic Party (the "**NDP**"). Shortly thereafter, harsh

resentment ensued among the public for what seemed to be the President's plan to maintain power within the Mubarak family in what became known as the **Succession Plan**.

24.    On January 25, 2011, millions of Egyptians took to the streets of Egypt calling for the ouster of President Mubarak in rebellion against, *inter alia*, oppression of dissidents, abuse of power, and the lack of basic civil rights. 17 days later, President Mubarak stepped down from office on February 11, 2011 and relinquished power to the Egyptian Supreme Council of the Armed Forces.

25.    On June 30, 2012, Dr. Mohamed Morsy, a leader of the Muslim Brotherhood, was sworn into office as Egypt's first democratically elected President. Upon assuming office, President Morsy immediately violated critical orders of the Egyptian Supreme Constitutional Court, unilaterally issued a constitutional declaration which granted immunity from judicial review to all actions of the executive branch, and the Morsy administration launched an aggressive campaign against the judiciary and liberal media outlets.

26.    On June 30, 2013, millions of Egyptians again took to the streets of Egypt calling for the ouster of President Morsy due to his aggressive consolidation of power, his regressive antidemocratic policies, and the rapidly deteriorating state of the national economy. On July 3, 2013, Egypt's Supreme Council of the Armed Forces intervened in response to the masses and deposed President Morsy from office.

27.    On August 14, 2013, the ruling interim government of Egypt, backed by the Supreme Council of the Armed Forces, reinstated the state of national emergency in response to massive civil disturbances which swept the country following the ouster of President Morsy. The state of national emergency was lifted on November 14, 2013.

*The National Bank of Egypt*

28.    Defendant National Bank of Egypt is a foreign corporation organized under the laws of and wholly owned and controlled by the Arab Republic of Egypt. NBE does significant business in the United States, and officially operates in the United States as a foreign bank within the meaning of the International Banking Act. NBE maintains and operates a full-fledged state-licensed branch in New York, New York.

29.    NBE is the largest commercial bank in Egypt with assets in excess of $20 billion. NBE engages in a wide range of commercial banking activities, serving retail and corporate clients in the domestic and international markets. NBE has operations in the United States, Egypt, South Africa, China and the United Kingdom.

30.    NBE has operated in the United States for years pursuant to its equity ownership in Arab American Bank ("**AAB**") which it helped found in 1976. In 1998, NBE received approvals from American banking regulators to purchase the remaining percentage of AAB that it did not previously own. Since that time, NBE has operated in the United States as the National Bank of Egypt after receiving the necessary approvals from both the Federal Reserve Bank of the United States and the New York State Banking Commission.

31.    NBE engages in corporate banking, retail banking, trade finance and investment banking operations. Through these operations and, in particular its New York branch, NBE offers services to clients based in the Middle East doing business in the United States and to American enterprises doing business in the Middle East.

32.     Through its New York branch, NBE also services the large Egyptian-American community in the United States and engages in financing and supporting the international trade and investment activities of these individuals and others. NBE also has equity interests in several hundred companies in a wide range of industries with operations throughout the world that, upon information and belief, transact business in the United States.

_Dr. Ahmed Bahgat and the Bahgat Group of Companies_

33.     Plaintiff Dr. Ahmed Bahgat is a naturalized citizen of the United States of America of Egyptian birth and origins. At all relevant times hereto, Dr. Bahgat maintained residences in the States of Georgia and California, bank accounts in the United States, and actively invested in commercial enterprises throughout the United States. Dr. Bahgat currently resides in 6th of October City, Egypt – a city which he, through his extensive investments, developed from a barren desert land into a thriving suburban community.

34.     Dr. Bahgat holds a Doctorate Degree in Engineering Sciences and Mechanics from Georgia Institute of Technology, which he earned in 1982. As a young entrepreneur and inventor in Georgia, Dr. Bahgat invented several breakthrough devices in collaboration with leading American enterprises, Lockheed Martin Corporation and Coca Cola. His inventions paved the way to Dr. Bahgat to ultimately become one of the most formidable industrial, property, and media entrepreneurs in Egypt.

35.     As a successful entrepreneur in the United States, and in response to Egypt's calls for Egyptians abroad to return and invest in Egypt, Dr. Bahgat met with then President Mubarak in Washington DC in or about 1983 to explore means by which he could invest in Egypt.

Beginning in or about 1989, Dr. Bahgat erected a microwave manufacturing facility as his first enterprise in Egypt, followed in or about 1992 by a television set and VCR assembly plant. From thereon, Dr. Bahgat expanded his enterprises in Egypt into what became known as the Bahgat Group of Companies (the "**Bahgat Group**").

36.     The Bahgat Group is an unincorporated trade name for a group of nearly 20 joint stock companies, each possessing its own separate juridical personhood, all founded and once under the control and management of Dr. Bahgat. The Bahgat Group companies were founded on varying dates in the 1980s and 1990s with investments spanning the real estate, manufacturing, and media sectors. Immediately prior to Defendants' conduct alleged hereunder, the Bahgat Group companies transacted significant business with the United States including procurement of various goods and services. Following Defendants' conduct alleged hereunder, and as a result thereof, the Bahgat Group's transactions with the United States were either materially altered or altogether halted.

37.     Bahgat Group's flagship project is Dreamland for Real Estate Development. It was the first to privately develop a fully integrated suburban community in Egypt, known as Dreamland, on the barren desert lands surrounding the Egyptian capital, Cairo. Dreamland was developed on an area of approximately 2,000 acres which Dr. Bahgat purchased from the state throughout the 1990s. It contains housing units ranging from luxury villas to standard apartments, a 36 hole golf course, a theme park, 4 hotels totaling 930 rooms, conference centers, 3 schools, a shopping mall, a sports club, and subdivisions for hospitals, universities, shops, and office buildings.

38.     Another of the Bahgat Group companies in which Plaintiffs invested, International Electronics, was among the first to privately manufacture consumer electronics, ranging from television sets to home appliances, on a mass scale in Egypt under licenses from American, Asian, and European manufacturers. In or about 1998, International Electronics was offered to the public on the Cairo Stock Exchange, and Dr. Bahgat maintained only 30% of the stock therein.

39.     On the media front, Dream Media SAE, one of the Bahgat Group companies in which Plaintiffs invested, was the first privately owned, politically independent liberal television network launched in Egypt with global viewership, including approximately 50,000 subscribers in the United States. The Bahgat Group also co-founded Al Masry Al Youm, a non-governmental, politically independent daily newspaper which now claims the widest distribution of any news publication in the Egyptian market as well as significant readership globally including in the United States.

40.     While fortifying the Bahgat Group companies as pioneers in the Egyptian economy since the 1980s, Dr. Bahgat suffered, and continues to suffer from a severe heart condition. Dr. Bahgat's heart ailment began to transpire in the early 1990s when he suffered from severe aortic dilatation. In July 1999, while accompanying then President Mubarak on a visit to Washington DC as part of the Presidential Council to meet with then American Vice President Al Gore, Dr. Bahgat's condition deteriorated and he suffered from acute aortic dissection, which required immediate surgery. The surgery was performed at George Washington University Hospital in Washington DC, and Dr. Bahgat remained in recovery at the Intensive Care Unit of George Washington University hospital for a period of approximately 75

days. During the recovery stage, Dr. Bahgat underwent 4 additional surgeries as a result of severe post-surgical complications accompanied by multivisceral organ failure. Egyptian government officials and the NBE were on notice of these procedures.

_The Bahgat Children and Global One_

41.    Following his severe heart ailment, Dr. Bahgat sought to design a succession plan in favor of his three children, Plaintiffs Omar Bahgat, Dina Bahgat, and Shahd Bahgat. The Bahgat Children are all American citizens residing at all times relevant hereto in the State of California.

42.    Upon the advice and counsel of Credit Suisse Trust Services, Dr. Bahgat formed the Genesis Trust, naming himself and his children as beneficiaries thereto. The Genesis Trust is the sole shareholder of Plaintiff Global One Limited, a Bahaman company acting as the holding vehicle for a portion of the Bahgat family's assets in Egypt and in the United States.

43.    In or about the year 2000, Global One and the Bahgat Children acquired approximately 30% of shares in the Bahgat Group real estate companies of relevance hereto.

_NBE and State Owned Bank Involvement in the Bahgat Group Prior to 2002_

44.    In 1998, NBE acquired 15% equity shares in each of 7 of the Bahgat Group real estate companies and received board memberships therein.

45.    In the course of ongoing business, NBE, Banque Misr, and Bank of Alexandria, all state owned and run commercial banks at relevant times under the supervision and management of the Central Bank of Egypt, loaned working capital to several of the Bahgat Group manufacturing companies. Consistent with prevailing trade and project financing

everywhere, these loans were primarily in the form of lines of credit secured only by each debtor company's assets and receivables. None of the loans taken out by any of the Bahgat Group companies were personally guaranteed by Dr. Bahgat, the Bahgat Children, or Global One. Furthermore, no Bahgat Group company made any guarantees or offered any additional security for the debts of any of the other affiliate companies within the Bahgat Group. Several of the credit facilities were denominated in foreign currency including United States Dollars, Japanese Yen, and Deutche Marks.

46.    Beginning in 1999, the manufacturing companies within the Bahgat Group experienced severe losses and defaulted on payments of their debts to NBE. Some of these manufacturing companies' losses neared or exceeded their capital investments and contemplated dissolution. In light of imminent dissolution of the indebted companies, NBE initially expressed support and welcomed negotiations to settle the manufacturing companies' debts and relieve some of their losses, but no final debt restructuring agreement was reached from the commencement of negotiations in 1999 until 2002. Meanwhile, none of the remaining Bahgat Group real estate or media companies was in default of any debt payments.

_The Haikal Episode and State Reaction_

47.    On October 19, 2002, Dream TV, the flagship television channel owned by Dream Media SAE, a Bahgat Group company, broadcasted a show hosted by Mohamed Hassanein Haikal (the "**Haikal Episode**"). Mr. Haikal is a respected political commentator who has been an icon of Egyptian politics since the 1950s.

48.     During the broadcast, Mr. Haikal discussed the twenty-year reign of then President Mubarak and suggested that alternatives to the Mubarak regime should be considered. Mr. Haikal also explicitly criticized the apparent plan for President Mubarak's son, Gamal, to inherit power from his father. Mr. Haikal stated that Egypt was supposed to be a republic, not a monarchy, and that republics do not bequeath elective offices such as the Presidency. At the time, questions of presidential succession were effectively forbidden in Egyptian political life never to be openly addressed in such a public Egyptian forum as a television broadcast.

49.     Immediately following the broadcast, Dr. Bahgat received direct orders from former President Mubarak's office to take necessary corrective action and cause Dream TV to refrain from rebroadcasting the Haikal Episode. Dr. Bahgat also received instructions from former President Mubarak's office to meet with the Governor of Egypt's Central Bank.

50.     At the meeting between Dr. Bahgat and the Governor of the Central Bank, the Governor ordered Dr. Bahgat immediately to pledge various assets in the Bahgat Group as collateral for the debts of the defaulting manufacturing companies – and to accept personal liability for those debts and debts of the non-defaulting Bahgat Group companies – or else face imprisonment. These assets included holdings in the non-defaulting real estate and media companies, even though they had no connection to the debt undertaken by the manufacturing companies, which were entirely separate legal entities.

51.     Moreover, the debts personally assumed by Dr. Bahgat pursuant to this coercive pledge included the totality of debts owed by International Electronics, which was traded publicly on the Cairo Stock Exchange, and Dr. Bahgat and the Plaintiffs owned less than 30% of shares therein.

52.     With a severe heart ailment that the Egyptian healthcare system lacked the technical ability to treat at the time, and faced with an administration that had often placed prominent businessmen and political opposition figures in prison for years pending "investigation" of "possible" malfeasance without due process, Dr. Bahgat felt he had no choice but to sign the pledge. Dr. Bahgat signed the requested pledge on October 22, 2002 on behalf of himself and the Bahgat Children who were then minors.

*Coercive Settlement Negotiations with NBE 2002-2004*

53.     Following Dr. Bahgat's coerced assumption of personal liability for all of the Bahgat Group's debts, NBE resumed settlement negotiations for the outstanding loans. NBE's tone, however, transformed from cooperative, as was the case prior to the broadcasting of Mr. Haikal's show, to dictating unconscionable terms under threat of imprisonment.

54.     NBE proposed to:

a.Temporarily convert all outstanding loans, including non-defaulting loans, into equity by taking controlling shares in each of the Bahgat Group companies. The companies from which NBE proposed to take equity positions included companies that were not in default of any outstanding debts, thereby the non-defaulting companies were treated as guarantors for and assumed the liabilities of defaulting companies when no such guarantees or assumption were originally contemplated at the time debt was taken;

b.     At reaching the debt to equity conversion rate, NBE insisted on using the nominal value of each of the companies' underlying assets

instead of assessing current market value at the time of conversion. Nominal values had been assessed only once in 1998 by the Egyptian Ministry of Investment, and represented only a small fraction of the 2002-2004 fair market values of the companies' underlying assets;

c. NBE grossly miscalculated much of the interest on outstanding loans and currency exchange rate determination for foreign currency lines of credit, thereby inflating the total amounts to be capitalized;

d.    Through the combination of devaluing company assets and inflating outstanding debts, the banks sought to acquire 85% of the Bahgat Group's profitable real estate companies and 49% of the distressed manufacturing companies, diluting the existing shareholders', including the Plaintiffs' stakes by as much;

e. At the same time, NBE would receive a guaranteed annual profit at the rate of 8% per annum for a period of 7 years;

f. Incidental to NBE's proposed acquisition of majority stakes in some Bahgat Group companies and significant stakes in others, NBE would receive majority representation on boards of directors of each of the concerned companies as well as veto powers over day to day operations;

g.    Existing shareholders, including Plaintiffs, were to be prohibited from transacting in their shares or from receiving any dividends for a period of at least 7 years; and

h.    At the expiration of 7 years, the NBE would resell its shares to each of the companies in exchange for the unrecovered loan balances as of the date of signing the settlement in addition to 8% annual interest thereafter. If NBE's balance was not fully paid through operations at the expiration of 7 years, then they would permanently keep their shares on unpaid balances in proportion to the fair market value of those shares' underlying assets as of June 30, 2011 to be independently assessed.

55.    Throughout 2002 and 2003, Dr. Bahgat vehemently insisted that he would not accept NBE's terms.

56.    Meanwhile, the intensity of events beginning with the coercive pledge of assets and personal assumption of debts in 2002, coupled with NBE's unconscionable settlement terms thereafter led to severe deterioration in Dr. Bahgat's heart condition. At the end of July 2003, Dr. Bahgat's heart condition deteriorated to the extent that he required urgent insertion of a special electronic apparatus to regulate the efficiency of his heart muscle function. The apparatus was inserted surgically in Atlanta, Georgia and required adjustment every 3 months which could not properly be performed in Egypt. Failure to make the adjustments would subject Dr. Bahgat to the risk of heart failure and sudden death. NBE and various Egyptian government personnel were on notice of the deterioration of Dr. Bahgat's heart condition and of the procedures and required periodic adjustments.

57.    Confronted with Dr. Bahgat's vehement objections to NBE's proposed settlement, NBE, in collusion with various governmental entities, employed an array of intentional and

extortionate measures to coerce Dr. Bahgat and Plaintiffs to accept NBE's proposed settlement terms. Among those measures, the Central Bank of Egypt, at NBE's request, enlisted the assistance of Egypt's Attorney General. The Central Bank, aware of Dr. Bahgat's deteriorating heart condition and requisite periodic travel for necessary medical follow-up, complained to the Attorney General that Dr. Bahgat "was not serious about accepting NBE's proposed settlement" and requested the Attorney General to impose an asset freeze and travel ban on Dr. Bahgat. Immediately, and without any notice or prior hearing, the Attorney General ordered the freezing of Dr. Bahgat's assets in Egypt and imposed upon him a travel ban on November 16, 2003.

58.     Contemporaneously, the New Urban Communities Agency ("**NUCA**"), an Egyptian government agency from which the Bahgat Group had originally purchased approximately 2,000 acres for the development of Dreamland, demanded payment of approximately 500 million Egyptian Pounds (approximately 100 million United States Dollars), representing the unpaid installments of the land's purchase price, or else it would revoke said land in its entirety. The amounts demanded by UCA were grossly inflated and had not in fact yet become due.

59.     By November 2004, NBE and Egypt imposed upon Dr. Bahgat circumstances similar to those surrounding the coercive 2002 pledge of assets and unilateral assumption of personal liability for outstanding debts. With a travel ban imposed upon him while suffering a potentially fatal heart ailment which required constant travel to the United States for critical follow-up that could not be performed in Egypt, as well as the threat of unjustified revocation of the Bahgat Group's most prized asset – its land – Dr. Bahgat, fearing for his life, liberty and

property executed NBE's proposed settlement under extreme coercion, duress, and extortion on 22 November 2004.

60.     Immediately following the coerced execution of the settlement, the Attorney General lifted the asset freeze and travel ban imposed on Dr. Bahgat. Additionally, the NUCA refrained from demanding any payments.

*Post Settlement Coercion and the 2007 Addendum*

61.     The 2004 settlement contained a provision obligating NBE to provide additional financing to certain of the Bahgat Group companies. NBE financed only a fraction of its obligations between 2004 and 2006. On October 9, 2006 Dr. Bahgat initiated arbitral proceedings in Cairo against NBE seeking to compel NBE to honor its financing obligations. Instead of honoring its financing obligations or even responding to the notice of arbitration, NBE sought to impose an addendum to the 2004 settlement agreement. The addendum would permit NBE to sell any of the Bahgat Group's real estate assets 90 days after serving notice upon Dr. Bahgat unless Dr. Bahgat could match or exceed the offered price. Dr. Bahgat rejected the proposed addendum.

62.     On November 2, 2006, less than one month after Dr. Bahgat served notice of arbitration upon NBE, Egypt's Attorney General ordered, yet again, the freezing of Dr. Bahgat's assets and banned him from travel without notice or prior hearing. On November 11, 2006, Dr. Bahgat withdrew the request for arbitration in the hopes that unilaterally waiving his lawful rights would lead to removal of the asset freeze and the ban on his personal freedom to travel and seek medical care. Dr. Bahgat, however, did not agree to NBE's proposed addendum

to the settlement agreement, and the Attorney General lifted neither the asset freeze nor the travel ban.

63.     Pursuant to the pending travel ban, Dr. Bahgat was, once again, prohibited from traveling for necessary medical care. This time, however, Dr. Bahgat's heart condition deteriorated to an almost fatal level as his surgically inserted heart regulating device ceased to function. Dr. Bahgat was registered into Dar El Fouad Hospital in Cairo, Egypt's premier healthcare facility, in November 2006. Hospital cardiologists recommended Dr. Bahgat's immediate travel abroad to undergo a lifesaving heart transplant procedure. Dr. Bahgat's associates petitioned then President Mubarak who, upon hearing of Dr. Bahgat's imminent death if the travel ban remained in force, caused the Attorney General to temporarily lift the travel ban for a period of one month commencing on November 28, 2006. Comatose and in critical condition, Dr. Bahgat was transported on an air ambulance from Cairo, Egypt, to Emory University Hospital in Atlanta, Georgia. Shortly after arrival at Emory, Dr. Bahgat's heart completely failed and stopped beating. After a period of 6 minutes, Emory physicians succeeded in reviving Dr. Bahgat's heart.  Within less than one month after Dr. Bahgat's admission, Emory Hospital was fortunate to locate a compatible heart for transplantation in record time. Dr. Bahgat underwent successful heart transplant surgery on Christmas Day, December 25, 2006. Following the successful heart transplant procedure, Dr. Bahgat remained in recovery at Emory's intensive care unit for a period of approximately 90 days, during which he was heavily sedated.

64.     On January 15, 2007, while still sedated in recovery, Dr. Bahgat received a personal visit at his intensive care bed from a representative of the NBE and Ambassador El

Hosseiny Mohamed El Hosseiny Abdelwahab, Egypt's then Consul General to Houston, Texas. Instead of congratulating Dr. Bahgat on his successful lifesaving heart transplant operation, the NBE's representative and Egypt's Consul presented to Dr. Bahgat a draft of NBE's proposed addendum to the settlement agreement and demanded Dr. Bahgat's signature thereon, threatening Dr. Bahgat with imprisonment upon return to Egypt and confiscation of all of his remaining assets in Egypt if he refused to sign. Dr. Bahgat, sedated after his heart transplant, nearly unconscious, and, once again, threatened with imprisonment and confiscation signed the settlement addendum at his hospital bed on January 15, 2007.

*Forced Sale of Corporate Assets*

65.    In July 2007, Dreamland Health Resort, one of the Bahgat Group real estate companies in which NBE had acquired an 85% stake, received an offer from Al Foteim Group for the purchase of 111 acres for a purchase price of 1,000 Egyptian Pounds per meter. The completion of such sale required approval by the board of directors which NBE controlled. NBE rejected Al Foteim's offer without justification and insisted, in order for the sale to be completed, that Dr. Bahgat sign yet another addendum to the settlement agreement. This second addendum to the settlement agreement to offer 815 acres of land for sale in a public auction. The second addendum specified that Mr. Hussein Sabbour, Chairman of Al Ahly Real Estate Development Company, an affiliate company of NBE, was to manage the auction at his sole discretion. In effect, the second addendum sought to convert Dreamland for Real Estate Development from a property developer and home builder selling specific built up units at a high margin of profit into a land bank wholesaling large plots of land at a lower margin. With

the NBE in majority control of Dreamland for Real Estate Development's shares as well as majority board representation, Dr. Bahgat found no alternative to signing NBE's proposed second addendum on April 3, 2008, and the property sale to Al Foteim was completed thereafter in 2008.

66.    Pursuant to the second addendum, Mr. Sabbour advertised in a national newspaper that Dreamland was offering 815 acres of land for sale in a public auction. Prior to the public advertisement, Dr. Bahgat had objected to the manner by which Mr. Sabbour, NBE's affiliate, sought to offer the sale as the offering of such a large tract of land in one auction was contrary to prudent business practice and would greatly diminish the value of property offered. Immediately upon advertising the auction, over 35 entities purchased the tender documents and inquired about the offered land.

67.    Meanwhile, the Egyptian Parliament held a public outcry to investigate how Dreamland for Real Estate Development came to acquire such a large land holding in the first place. Although Dreamland was ultimately vindicated of any wrongdoing, Parliament's outcry projected the sentiment that Dreamland's assets were distressed. Therefore, although 35 prospective buyers had initially expressed interest, only 2 entities ultimately made any offers for 2 separate parcels.

68.    One of the 2 purchasers, the Egyptian Arab Development Company, is a joint venture between the Egyptian government and the Saudi Arabian government. Unchallenged at the auction, the Egyptian Arab Development Company purchased 37 acres at rates significantly lower than market value for comparable properties.

69.    On June 1, 2010, NBE submitted a proposal to Dreamland for Real Estate Development for the purchase of 81 acres by Al Ahly Real Estate Development Company, NBE's affiliate which Mr. Sabbour, the 2008 auctioneer, chairs. Pursuant to the first addendum to the settlement agreement, Al Ahly's offer was to be deemed accepted if no better offer was made for the same property within 90 days. Believing that NBE's affiliate's offer price was inferior to fair market value, Dr. Bahgat immediately advertised the same property for sale in national newspapers. The day following Dr. Bahgat's advertisement, NUCA placed a general warning in national newspapers that Dreamland's property, including the parcel advertised by Dr. Bahgat, was subject to dispute with NUCA, when in fact no such dispute actually existed. Consequently, Dreamland received no offers for the property, which ultimately was approved for sale to NBE's affiliate company, pursuant to the first addendum, at below market rate.

70.    On March 23, 2011, NBE submitted an offer on behalf of one of its affiliates to purchase all of Bahgat Group real estate companies' assets, including all of their land holdings as well as fixed assets thereon such as hotels and theme park. NBE's affiliate's offer price of 3.16 billion Egyptian Pounds (approximately US$500 million) was lower than the per meter price by which NBE's affiliate purchased vacant land without fixed assets in 2010. Effectively, NBE's affiliate's offer equated to the alleged balance of NBE's loans as of November 2004 in addition to 8% annual interest. Meanwhile, the Bahgat Group companies would be left with no underlying assets, and thus their shares would be rendered permanently worthless.

71.    Pursuant to the coercive first addendum of 2007, the offer was to be deemed accepted if Dreamland received no better offers within 90 days after receipt thereof, i.e. on June 23, 2011. In the midst of Egypt's January 25, 2011 Revolution, and the mass flight of capital

incidental thereto, soliciting such a large investment of US$500 million to match NBE's affiliates poor offer would prove futile.

72.     In April 2012, NBE publicly announced that all assets of Dreamland are now owned by NBE's affiliate, even though no formal transfer of title has yet taken place.


## V.     Causes of Action

### Claim 1: Taking in Violation of International Law

73.     Paragraphs 1 through 72 of this Complaint are realleged and incorporated by reference herein.

74.     Defendant Egypt's and NBE's actions, jointly and severally, constitute a series of actions resulting in a taking in violation of international law because the taking was: discriminatory; or not for a public purpose; or without due process of law; or without just compensation.

75.     Five specific events constitute takings by Defendants in violation of international law:

    a.  Egypt's forcing Plaintiffs Dr. Bahgat and the Bahgat Children to undertake personal liability for the alleged debts of the Bahgat Group companies and the associated pledge of assets for the benefit of NBE on October 29, 2002;

    b.  NBE's coercive acquisition of controlling stakes in the Bahgat Group companies and thereby dilution of all Plaintiffs' shares pursuant to the 2004 settlement agreement;

    c.   NBE's coercion of Dr. Bahgat to relinquish virtually all control he might have had over corporate decisions in the Bahgat Group companies pursuant to the 2007 Addendum;

    d.   Egypt's and NBE's unjustified interference with sales in 2008; and

    e.   NBE's depletion of virtually all corporate assets underlying Plaintiff's shares in the Bahgat Group companies through transferring assets to the NBE's affiliated companies at below market prices.

76.     Defendants Egypt's and NBE's actions were discriminatory as they specifically targeted Dr. Bahgat – a perceived political dissident – and his family.

77.     Defendants Egypt's and NBE's actions were not for any public purpose, but, rather, were retaliatory and oppressive of basic democratic principles of freedom of expression and political discord.

78.     Plaintiffs were not given any due process of law in connection with Defendants' taking of their property. Instead, Dr. Bahgat was frequently denied any opportunity for prior notice or fair hearing, and Egypt unjustifiably interfered with Plaintiffs' attempts to resort to legal channels.

79.     Defendants Egypt and NBE did not provide Plaintiffs with proper compensation because Defendants misstated the value of debts owed by the Bahgat Group companies and did not pay to Plaintiffs fair market value of the assets taken, resulting in a discrepancy of at least US$1,200,000,000.00 (One Billion Two Hundred Million United States Dollars).

**Claim 2: Expropriation in Violation of the Bilateral Investment Treaty Between the United States of America and the Arab Republic of Egypt**

80.    Paragraphs 1 through 79 of this Complaint are realleged and incorporated by reference herein.

81.    Defendants Egypt's and NBE's taking of Plaintiffs' property violates Article III of the Treaty the United States of America and the Arab Republic of Egypt Concerning the Reciprocal Encouragement and Protection of Investments (the "Bilateral Investment Treaty" or "BIT") because the taking of Plaintiffs' assets was: not for a public purpose; or not pursuant to the due process of law; or discriminatory; or not accompanied by prompt and adequate compensation, freely realizable.

82.    Defendants' expropriation of Plaintiffs' property resulted in damages to be proven at trial, but in no case less than US$1,200,000,000 (One Billion Two Hundred Million United States Dollars).

**Claim 3: Breach of the International Minimum Standard of Treatment for Investments in Violation of the Bilateral Investment Treaty Between The United States of America and the Arab Republic of Egypt**

83.    Paragraphs 1 through 82 of this Complaint are realleged and incorporated by reference herein.

84.    Defendants Egypt's and NBE multiple acts of coercion and duress violate the international minimum standard of treatment of investment and national legislation of clause 4 of Article II of the Bilateral investment treaty. *Inter alia*, Defendants:

a. Threatened Dr. Bahgat with imprisonment and confiscation of his and all Plaintiffs' property in order to compel them to sign the 2002 assumption of personal liability for corporate debts and pledge of assets;

b. Threatened Dr. Bahgat with imprisonment and confiscation of his and all Plaintiffs' property in order to sign the 2004 settlement agreement;

c. Imposed an unjustified travel ban upon Dr. Bahgat in 2003, with knowledge of his severe medical condition, in order to compel him and all Plaintiffs to sign the 2004 settlement agreement;

d. Imposed an unjustified travel ban upon Dr. Bahgat in 2006, with knowledge of his severe medical condition, in order to compel him to relinquish his arbitration claim and to sign the 2007 addendum;

e. Threatened Dr. Bahgat with imprisonment and confiscation of his and all Plaintiffs' property in order to compel them to sign the 2007 addendum;

f. Unjustifiably withheld approval for the sale of corporate assets to Al Foteim Group in 2008 in an act of economic duress in order to compel him to sign the 2008 amendment.

85.    Defendants Egypt's and NBE multiple acts unreasonable interference with property sales violate the international minimum standard of treatment of investment and national legislation of clause 4 of Article II of the Bilateral investment treaty. *Inter alia*, Defendants:

a. Interfered with the 2008 proposed auction by falsely accusing Dr. Bahgat of wrongdoing through widely publicized parliamentary hearings;

b.  Interfered for the benefit of NBE's affiliate with the Bahgat Group's attempts to sell property in 2010 when they publicly announced that the property the Bahgat Group advertised for sale was subject to a dispute with NUCA when no such dispute in fact existed.

86.    Defendants' multiple violations of the BIT have resulted in damages to Plaintiffs in an amount to be determined at trial.

**Claim 4: Denial of Justice in Violation of the Bilateral Investment Treaty Between the United States of America and the Arab Republic of Egypt**

87.    Paragraphs 1 through 86 of this Complaint are realleged and incorporated by reference herein.

88.    On multiple occasions, Defendants Egypt's and NBE's actions amounted to denial of justice in violation of Clauses 4 and 7 of Article II of the Bilateral Investment Treaty. *Inter Alia*, Defendants:

a.  Imposed a travel ban upon Dr. Bahgat in 2003 without any prior notice, hearing, or due process of law;

b.  Imposed a travel ban on Dr. Bahgat in 2006 without any prior notice, hearing, or due process of law;

c.  Interfered with Plaintiffs' access to legal channels by imposing a travel ban on Dr. Bahgat in order to compel him to relinquish his arbitration claim in 2006.

89.    Defendants' violations of the BIT have resulted in damages to Plaintiffs in an amount to be determined at trial.

## Claim 5: Theft

90.    Paragraphs 1 through 89 of this Complaint are realleged and incorporated by reference herein.

91.    Defendants NBE and Egypt undertook a series of composite acts between 2002 and 2011 to seize and render worthless assets owned by Plaintiffs. Specifically, Defendants seized Plaintiffs' shares in 18 of the Bahgat Group companies. Defendants have subsequently and continue to 1) make personal use of these assets to the exclusion of Plaintiffs' rights 2) destroy or severely diminish the value of these assets and/or 3) sell these assets for substantially below market value. Defendants' actions were without right or justification. Defendants intended to take Plaintiffs property and did so knowing it was without a legal right to take the property. As a result, Plaintiffs have been damaged in an amount to be proven at trial. Defendants acted maliciously and in bad faith in that Defendants knew or should have known that their actions were wrongful. Accordingly, Plaintiffs are entitled to punitive damages.

## Claim 6: Conversion

92.    Paragraphs 1 through 91 of this Complaint are realleged and incorporated by reference herein.

93.    Defendants NBE and Egypt undertook a series of composite acts between 2002 and 2011 to seize and render worthless assets owned by Plaintiffs. Specifically, Defendants

seized Plaintiffs' shares in 18 of the Bahgat Group companies. Defendants have subsequently and continue to 1) make personal use of these assets to the exclusion of Plaintiffs' right 2) destroy or severely diminish the value of these assets and/or 3) sell these assets for substantially below market value. Defendants' actions were without right or justification. These actions constitute conversion of Plaintiffs' property. As a result, Plaintiffs have been damaged in an amount to be proven at trial. Defendants acted maliciously and in bad faith in that Defendants knew or should have known that their actions were wrongful. Accordingly, Plaintiffs are entitled to punitive damages.

## Claim 7: Economic Duress and Coercion

94.     Paragraphs 1 through 93 of this Complaint are realleged and incorporated by reference herein.

95.     Defendants NBE and Egypt made various threats directed at Dr. Bahgat; NBE had no legal right to perform the threatened acts. The improper threats directed at Dr. Bahgat included, but were not limited to, threats of imminent physical violence, threats of imminent criminal imprisonment, threats of imminent confinement within Egypt, and threats of the imminent complete seizure of property. Plaintiffs took these threats seriously, feared for their personal safety and the safety of their father or beneficiary, and acted to their detriment in a way they otherwise would not have because of the threats. These actions, taken under duress and in imminent fear of harm, resulted in monetary damages to the Plaintiffs in an amount to be proved at trial. Defendants acted maliciously and in bad faith in that Defendants knew or should

have known that their actions were wrongful. Accordingly, Plaintiffs are entitled to punitive damages.

**Claim 8: Extortion**

96.    Paragraphs 1 through 95 of this Complaint are realleged and incorporated by reference herein.

97.    Acting under color of law, Defendants NBE and Egypt made various threats directed at Dr. Bahgat; NBE had no legal right to perform the threatened acts. The improper threats directed at Dr. Bahgat included, but were not limited to, threats of imminent criminal imprisonment, threats of imminent confinement within Egypt, and threats of the imminent complete seizure of property. Plaintiffs took these threats seriously, feared for their personal safety and the safety of their father or beneficiary, and acted to their detriment in a way they otherwise would not have because of the threats. These actions, taken under duress and in imminent fear of harm, resulted in monetary damages to the Plaintiffs in an amount to be proved at trial. Defendants acted maliciously and in bad faith in that Defendants knew or should have known that their actions were wrongful. Accordingly, Plaintiffs are entitled to punitive damages.

**Claim 9: Racketeering**

98.    Paragraphs 1 through 97 of this Complaint are realleged and incorporated by reference herein.

99.    Defendants NBE and Egypt repeatedly engaged over a period of 9 years in a series of predicate acts, including, but not limited to, extortion, duress, coercion, theft, and usury constituting racketeering within the meaning of 18 USC § 1962. Defendants' actions caused damages to Plaintiffs in an amount to be determined at trial. Defendants acted maliciously and in bad faith in that Defendants knew or should have known that their actions were wrongful. Accordingly, Plaintiffs are entitled to punitive damages.

**Claim 10: Participation in a Racketeering Enterprise in Violation of the Racketeer Influenced and Corrupt Organizations Act**

100.    Paragraphs 1 through 99 of this Complaint are realleged and incorporated by reference herein.

101.    Defendants NBE and Egypt, acting together and in concert with various agencies of the Egyptian Government as alleged hereinabove, constitute an enterprise within the meaning of the Racketeer Influenced and Corrupt Organizations Act. Defendants' multiple acts of duress, coercion, extortion, and racketeering were designed to instill fear of physical and economic harm within all Plaintiffs in order to improperly derive economic benefits therefrom. Defendant's racketeering and coercive actions partly took place in the United States by compelling Dr. Bahgat to sign the 2007 Addendum in Atlanta, Georgia. Defendant's remaining activities alleged hereinabove had a direct effect on interstate commerce as they led Plaintiffs and the Bahgat Group companies to materially alter, if not altogether halt, their commercial dealings with enterprises in the United States. Defendants' multiple predicate acts of extortion, duress,

coercion, and racketeering spanned a period of at least 10 years beginning in 2002, and continuing in 2004, 2007, 2008, 2010, and thereafter.

102.    Defendant's participation in a racketeering enterprise caused damages to Plaintiffs in an amount no less than US$1,200,000,000.00 (One Billion Two Hundred Million United States Dollars) to be proven at trial. Plaintiffs are entitled to treble damages pursuant to the Racketeer Influenced and Corrupt Organizations Act of no less than $3,600,000,000.00 (Three Billion Six Hundred Million United States Dollars) to be proven at trial. Defendants acted maliciously and in bad faith in that Defendants knew or should have known that their actions were wrongful. Accordingly, Plaintiffs are entitled to punitive damages.

## Claim 11: Intentional Interference with Economic Prospects

103.    Paragraphs 1 through 102 of this Complaint are realleged and incorporated by reference herein.

104.    Defendants NBE and Egypt, in collusion with various entities of the Egyptian government, undertook actions to prevent Plaintiffs from realizing competitive commercial gains. Defendants' actions were intentional and calculated. Defendants' action caused damages to Plaintiffs in an amount to be determined at trial. Defendants acted maliciously and in bad faith in that Defendants knew or should have known that their actions were wrongful. Accordingly, Plaintiffs are entitled to punitive damages.

## Claim 12: Breach of Fiduciary Duty

105.    Paragraphs 1 through 104 of this Complaint are realleged and incorporated by reference herein.

106.    NBE owed a fiduciary duty to the Plaintiffs. This duty was based on the special relationship of trust and confidence between Dr. Bahgat, the Plaintiffs, and NBE. For example: 1) NBE and Plaintiffs were partners in several Bahgat Group real estate companies – Plaintiffs owned 85% and NBE owned 15%; 2) since NBE's acquisition of shares in Bahgat Group real estate companies, in which Plaintiffs also owned shares, NBE maintained bank officials on the companies' Boards of Directors who approved the actions of those companies, including their corporate borrowings from NBE. Plaintiffs were later forced to authorize the settlement agreement and its addendums which purported to create personal liability for them for these debts.

107.    NBE breached the duty owed to Plaintiffs by inducing them to take various actions, including but not limited to: influencing the Plaintiffs to authorize the settlement agreement, the addendum executed in the United States, and the addendum executed in Egypt in 2008; influencing the plaintiffs to take on personal liability for corporate debt owed to NBE; and transacting with NBE's affiliate companies on below market terms favorable to those affiliate companies and to NBE to the detriment of Plaintiffs.

108.    NBE's breach of fiduciary duty to Plaintiffs resulted in substantial injury to Plaintiffs in amounts to be determined at trial. Defendants acted maliciously and in bad faith in that Defendants knew or should have known that their actions were wrongful. Accordingly, Plaintiffs are entitled to punitive damages.

**Claim 13: Breach of the Duty of Good Faith and Fair Dealing**

109.    Paragraphs 1 through 108 of this Complaint are realleged and incorporated by reference herein.

110.    NBE owed a fiduciary duty to Plaintiffs. As a result of this special relationship, NBE owed the Plaintiffs a duty with regard to certain written and oral agreements. Despite this special relationship and the accompanying duties imposed on NBE as a result, NBE took various actions, as more specifically set forth above, in bad faith and in breach of that duty, thereby resulting in injury to the Plaintiffs in amounts to be determined at trial. Defendants acted maliciously and in bad faith in that Defendants knew or should have known that their actions were wrongful. Accordingly, Plaintiffs are entitled to punitive damages.

**Claim 14: Breach of Constructive Trust**

111.    Paragraphs 1 through 110 of this Complaint are realleged and incorporated by reference herein.

112.    Because NBE has been unjustly enrich at the expense of Plaintiffs, and because of the relationship in existence between NBE and Plaintiffs, a Constructive Trust should be imposed by this Court on the assets of Plaintiffs that have been wrongfully appropriated by NBE as more clearly stated above. Further, NBE, as trustee holding the misappropriated companies and assets in trust for Plaintiff beneficiaries, has breached its duty of trust owed to Plaintiffs by mismanaging the property and allowing substantial depreciation in value. Specifically, the duties of good faith, due care, and the duty to preserve trust assets have been breached by NBE. NBE, as a commercial bank, possessed the special skills necessary to

adequately manage the seized companies and NBE had a duty to use this skill. NBE failed to do so. Because of NBE's various breaches of its duties of trust, it, in equity, should be held liable to Plaintiffs for the losses incurred by them as a result of NBE's wrongful conduct in amounts to be determined at trial. Defendants acted maliciously and in bad faith in that Defendants knew or should have known that their actions were wrongful. Accordingly, Plaintiffs are entitled to punitive damages.

## Claim 15: Usury

113.    Paragraphs 1 through 112 of this Complaint are realleged and incorporated by reference herein.

114.    NBE forced Plaintiffs to assume debt of third parties and charge a rate of interest in excess of the lawful limit. Interest is defined as compensation for the use, forbearance, or detention of money. In addition to the stated percentage rate of interest charged by NBE, other compensation was taken by NBE for the use of its funds. This additional compensation includes, but is not limited to: additional debt of third parties that Plaintiffs were forced to take on and NBE was effectively compensated by valuing assets paid by certain Plaintiffs in satisfaction of their assumed debts at less than market value. Accordingly, Plaintiffs have suffered damages in an amount to be proven at trial. Specifically, NBE purported to require Plaintiffs to pay for the pre-existing debts for which others were obligated. Moreover, NBE's conduct entitles Plaintiffs to recover applicable statutory penalties from NBE.

## Claim 16: Intentional Infliction of Emotional Distress

115.    Paragraphs 1 through 114 of this Complaint are realleged and incorporated by reference herein.

116.    Defendants NBE and Egypt owed a duty care to Plaintiffs. Defendants breached that duty by intentionally taking various actions, as more specifically set forth above, to cause Dr. Bahgat's health condition to deteriorate to the point of near death. Plaintiffs were emotionally distressed by the escalation of Dr. Bahgat's condition. Defendants acted maliciously and in bad faith in that Defendants knew or should have known that their actions were wrongful. Accordingly, Plaintiffs are entitled to punitive damages.

**Claim 17: Negligent Infliction of Emotional Distress**

117.    Paragraphs 1 through 116 of this Complaint are realleged and incorporated by reference herein.

118.    Defendants NBE and Egypt owed a duty of reasonable care to certain Plaintiffs. Defendants breached that duty by negligently taking various actions, as more specifically set forth above, which caused Dr. Bahgat's health condition to deteriorate to the point of near death and resulted in his undergoing lifesaving heart transplant surgery. Plaintiffs were emotionally distressed by the escalation of Dr. Bahgat's condition.

**Claim 18: Unjust Enrichment**

119.    Paragraphs 1 through 118 of this Complaint are realleged and incorporated by reference herein.

120.    Defendants NBE and Egypt have been unjustly enriched by their conduct against Plaintiffs because they acquired financial gains without any color of right or title to the detriment of Plaintiffs in amounts to be determined at trial. Defendants acted maliciously and in bad faith in that Defendants knew or should have known that their actions were wrongful. Accordingly, Plaintiffs are entitled to punitive damages.

## VI.    Prayer

**WHEREFORE**, Plaintiffs respectfully request that this Court enter judgment in their favor and grant the following relief:

(i)    Compensatory damages in an amount equal to the value of the Plaintiffs' property wrongfully taken, including lost profits in an amount not less than $1,200,000,000 (One billion two hundred million dollars)

(ii)    A constructive trust be imposed upon all seized assets and the proceeds of their sale;

(iii)    Punitive damages;

(iv)    Applicable statutory penalties, including treble damages in an amount not less than $3,600,000,000 (three billion six hundred and fifty million dollars)

(v)    Pre-and post-judgment interest;

(vi)    Fees and costs of suit, including attorneys' fees; and

(vii)  Such other relief as may be just and proper.

Dated: December 16, 2013                          Respectfully submitted,


By: _____
AHMED M. ELMOKADEM
*Attorney for all Plaintiffs*