UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
DR. AHMED BAHGAT                          :
GLOBAL ONE LIMITED                        :
DINA A. BAHGAT                            :
OMAR A. BAHGAT and                        :
SHAHD A. BAHGAT,                          :
                                          :
                        Plaintiffs,       :
                                          :
            -v.-                          :      13 Civ. 08894 (AT)
                                          :
                                          :
ARAB REPUBLIC OF EGYPT and                :      ECF Case
NATIONAL BANK OF EGYPT                    :
                        Defendants.       :
-------------------------------------------------------------X


**PLAINTIFFS' [CORRECTED] MEMORANDUM OF LAW
IN OPPOSITION TO
DEFENDANTS ARAB REPUBLIC OF EGYPT'S
AND NATIONAL BANK OF EGYPT'S
MOTION TO DISMISS THE COMPLAINT**

Ahmed M. Elmokadem
Law Offices of Ahmed M.
Elmokadem
4919 Hidden Dune Court
San Diego, CA 92130
Telephone: (858) 361-0803
Fax: (858) 793-1739
aelmok@elmokademlaw.com

Attorney for Plaintiffs

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................................IV

PRELIMINARY STATEMENT ..........................................................................................1

STATEMENT OF FACTS.....................................................................................................2

BURDENS OF PROOF .......................................................................................................10

ARGUMENT .......................................................................................................................11

A. DEFENDANTS ARE NOT ENTITLED TO A PRESUMPTION OF SEPARATENESS..............................11

    *I. Contrary to NBE's Contention, the Presumption of Separateness Applies Only to Questions of Attribution of Liability, Not Jurisdictional Matters Pursuant to the FSIA* .........................................................................................................................................13

    *II. Contrary to Egypt's Contention, Plaintiffs Allege that Egypt Has Directly Engaged in Conduct for Which Relief is Warranted and, Therefore, Egypt's reliance on The presumption of Separateness is Misplaced* ..............................................................................19

    *III. Even If the Presumption of Separateness Controls, that Presumption is Overcome Under the Facts Alleged in the Plaintiffs' Complaint and Supporting Materials* ...................................20

B. THE COURT HAS SUBJECT MATTER JURISDICTION TO HEAR ALL CLAIMS BECAUSE PLAINTIFFS' ALLEGATIONS FALL UNDER BOTH THE COMMERCIAL ACTIVITY EXCEPTION AND THE EXPROPRIATION EXCEPTION TO THE FSIA ......................................................................23

    *I. The Commercial Activity Exception Applies Because Plaintiffs' Claims Arise Upon an Act Performed in the United States in Connection With a Commercial Activity Abroad Pursuant to the Second Clause of the Commercial Activity Exception of §1605(a)(2)* ...............................................................................................................................24

    *II. The Commercial Activity Exception Applies Because Plaintiffs' Claims Arise Upon an Act Abroad in Connection With Commercial Activity Which Causes a Direct Effect in the United States Pursuant to the Third Clause of the Commercial Activity Exception of §1605(a)(2).* ..................................................................................32

    *III. The Expropriation Exception Applies Because Defendants Took Plaintiffs' Property rights in Violation of International Law, and the Property Taken is Owned or Operated By an Agency or Instrumentality of the Foreign State Which is Engaged in Commercial Activity in the United States.* ..........................................................................................33

C. THE COURT HAS PERSONAL JURISDICTION OVER EACH DEFENDANT ........................................53

    *I. The Court has personal jurisdiction over each Defendant because Plaintiffs complied with the statutory requirements of 28 U.S.C. §1330(b).* .............................................................54

    *II. The Court has personal jurisdiction over Egypt because a foreign sovereign is not entitled to the constitutional protections of the Due Process Clause.* .......................................................56

*III. The Court has personal jurisdiction over NBE because an agency or instrumentality of a foreign state is not entitled to the constitutional protections of the Due Process Clause.* ...................................................................................................... 58

*IV. The Court has personal jurisdiction over NBE in this specific case because, with respect to each of Plaintiffs' claims, NBE presumption of separateness must be lifted* ..................................................................................................... 59

*V. The Court has general personal jurisdiction over NBE because NBE's New York branch is its U.S. regional office* ....................................................................................... 59

*VI. The Court has specific personal jurisdiction over each Defendant because some of Plaintiffs' claims arise in connection with Defendants' nationwide contacts with the United States* ................................................................................................................ 61

D. THE CRCICA ARBITRATION AND SUBSEQUENT ANNULMENT PROCEEDINGS DO NOT BAR ANY OF THE CLAIMS OR ISSUES IN THIS LITIGATION ................................................. 61

*I. Defendants failed to articulate a proper standard for claim and issue preclusion applicable to foreign judgments or awards* ...................................................... 62

*II. Defendants failed to meet their burden of proof that comity mandates claim and issue preclusion in the case at bar* ............................................................................ 68

*III. Defendants failed to meet their burden of proof of Egyptian law on claim and issue preclusion* ............................................................................................................. 68

*IV. Defendants failed to meet their burden of proof of federal law on claim and issue preclusion* ............................................................................................................. 69

*V. . The issues in this litigation are different from the issues in the prior proceedings in Egypt* ........................................................................................................................... 70

*VI. The parties to this litigation are different from the parties to the prior proceedings in Egypt* ........................................................................................................................... 76

*VII. Plaintiffs could not have raised in the course of the prior Egyptian proceedings any of the claims asserted in the present litigation* .......................................................... 77

*VIII. The agreement to arbitrate is tainted by duress so the court may refuse to give it any preclusive value* ..................................................................................................... 79

*IX. ... Issue and claim preclusion, in this case, would violate fundamental public policy of the United States* ............................................................................................................. 82

E. PLAINTIFFS HAVE NOT FAILED TO JOIN ANY NECESSARY PARTY ........................... 84

*I. None of the entities referenced by NBE are required parties pursuant to FRCP 19(a)* ............................................................................................................ 85

II.................... *Even if the Entities Referenced by NBE Were Required Parties, This Case May Nevertheless Proceed in Their Absence Under FRCP 19(b)* ........................................................89

F. DISMISSAL IS NOT WARRANTED ON THE BASIS OF *FORUM NON CONVENIENS* .........................90

    *I. Plaintiffs' choice of forum* ........................................................................................................*91*

    *II. Egypt is not an adequate forum* ...............................................................................................*96*

    *III. Public and private interests* ...................................................................................................*100*

G. CONTRARY TO NBE'S CONTENTIONS, RICO DOES APPLY BECAUSE NBE PERFORMED SUFFICIENT PREDICATE ACTS IN THE UNITED STATES TO RENDER THE ALLEGED RACKETEERING SCHEME DOMESTIC, RATHER THAN EXTRATERRITORIAL ................................. 103

H. NEW YORK LAW CLAIMS ............................................................................................................ 106

I. PLAINTIFFS HAVE SUFFICIENTLY ALLEGED REQUISITE RICO INTENT .................................... 107

J. NONE OF PLAINTIFFS CLAIMS ARE TIME BARRED BECAUSE THE APPLICABLE STATUTE OF LIMITATIONS HAS BEEN TOLLED BY THE DOCTRINE OF CONTINUING VIOLATION ................. 110

**CLOSING** ...................................................................................................................................**112**

# TABLE OF AUTHORITIES

**Cases**

*A.I. Trade Fin., Inc. v. Petra Bank*
989 F.2d 76 (2d Cir.1993). ................................................................................................ 11

*A.P. Moller-Maersk A/S v. Ocean Express Miami*
550 F. Supp. 2d 454 (S.D.N.Y. 2008) ................................................................................ 90

*Abdullahi v. Pfizer, Inc.*
562 F.3d 163 (2d Cir. 2009) ............................................................................................. 100

*Abelesz v. Magyar Nemzeti Bank*
692 F.3d 661 (7th Cir. 2012) ....................................................................................... 35, 47

*Aetna Life Ins. Co. v. Tremblay*
223 U.S. 185 (1912) ............................................................................................................ 64

*Aguinda v. Texaco, Inc.*
303 F.3d 470 (2d Cir. 2002) ............................................................................................... 96

*Allen v. McCurry*
449 U.S. 90 (1980) .............................................................................................................. 63

*American Exp. Bank Ltd. v. Banco Espanol de Credito, S.A.*
597 F.Supp.2d 394 (S.D.N.Y. 2009) ............................................................................. 64-66

*Ameropa AG v. Havi Ocean Co.*
No. 10 Civ. 3240 slip op. (S.D.N.Y. 2011) .................................................................... 79-80

*Anglo-Iberia Underwriting Mgmt. Co. v. P.T. Jamsostek*
600 F.3d 171 (2d Cir. 2010) ............................................................................................... 27

*Argentine Republic v. Amerada Hess Shipping Corp.*
488 U.S. 428 (1989) ...................................................................................................... 17, 23

*Arriba Ltd. v. Petroleos Mexicanos*
962 F.2d 528 (5th Cir. 1992) .............................................................................................. 61

*Ashcroft v. Iqbal*
556 U.S. 662 (2009) ............................................................................................................ 82

*Austin Instrument, Inc. v. Loral Corp.*
272 N.E.2d 533 (N.Y. 1971) ........................................................................ 80

*Baglab Ltd. v. Johnson Matthey Bankers Ltd.*
665 F.Supp. 289 (S.D.N.Y. 1987) ................................................................ 21

*Baker v. Morton*
79 U.S. 150 (1870). ...................................................................................... 80

*Ball v. A.O. Smith Corp.*
451 F.3d 66 (2d Cir. 2006) ........................................................................... 63

*Banco Nacional de Cuba v. Chase Manhattan Bank*
658 F.2d 875 (2d Cir. 1981) ....................................................................... 111

*Bank of Credit & Commerce Int'l (Overseas) Ltd. v. Bank of Pakistan*
273 F.3d 241 (2d Cir. 2001) ......................................................................... 98

*Baratta v. Kozlowski*
464 N.Y.S.2d 803 (N.Y.A.D. 2 Dept., 1983) .............................................. 110

*Bartang Bank & Trust Co. v. Caiola*
2006 WL2708453 (S.D.N.Y. 2006) .............................................................. 76

*Bensusan Rest. Corp. v. King*
937 F. Supp. 295 (S.D.N.Y. 1996) ................................................................ 11

*Blonder Tongue Laboratories v. Univ. of Illinois Foundation*
402 U.S. 313 (1971) ...................................................................................... 66

*Bodner v. Banque Paribas*
114 F. Supp. 2d 117 (E.D.N.Y. 2000) ........................................................ 112

*Borich v. BP Prods. N. Am., Inc.*
No 12 C 2367 (N.D. Ill. May 28, 2012) ...................................................... 104

*Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*
531 U.S. 288 (2001) ...................................................................................... 21

*Canadian Overseas Ores Ltd. v. Compania, Ect*
528 F. Supp. 1337 (S.D.N.Y. 1983) ........................................................... 100

*Capital Ventures Int'l v. Republic of Argentina*
552 F.3d 289 (2d Cir. 2009) ......................................................................... 55

*CGC Holding Co. v. Hutchens*

824 F. Supp. 2d 1193 (D. Colo. 2011).................................................................104-106

*Changzhou Amec E. Tools & Equip. CP. V. Eastern Tools & Equip, Inc.*
2012 WL 3106620 (C.D. Cal. July 30, 2012), *aff'd sub nom Xuchu Dai v. E. Tools & Equip.*, 2014 WL 1678002 (9th Cir. Apr. 29, 2014)........................................79-83

*Chasser v. Achille Lauro Lines*
844 F.2d 50 (2d Cir.1988)..................................................................................... 91

*Chevron v. Donzinger*
871 F. Supp. 2d 229 (S.D.N.Y. 2010).............................................................104-105

*Cruz v. United States*
387 F.Supp.2d 105 (N.D.Cal. 2005)....................................................................... 18

*Cullen v. Margiotta*
811 F.2d 698 (2d Cir. 1987)................................................................................... 75

*Cullen v. Paine Webber Group, Inc.*
689 F.Supp. 269 (S.D.N.Y. 1988).......................................................................... 66

*Cunard S.S. Co. v. Salen Reefer Serv. AB*
773 F.2d 452 (2d Cir.1985)..............................................................................64, 82

*Daimler v. Bauman*
134 S. Ct. 746 (2014),.................................................................................53, 60-61

*Dammarell v. Islamic Republic of Iran*
2005 WL 756090 (D.D.C. Mar. 29, 2005)............................................................. 109

*DiStefano v. Carozzi N. Am., Inc.*
286 F.3d 81 (2d Cir. 2001)..................................................................................... 10

*DRC, Inc. v. Republic of Honduras*
2014 WL 5390182 (D.D.C. 2014).......................................................................... 21

*Drexel Burnham Lambert Group, Inc. v. Comm. of Receivers for Galadari*
12 F.3d 317 (2d Cir. 1993)...............................................................................29-32

*Dumitru v. Princess Cruise Lines, Ltd.*
732 F.Supp. 2d 328 (S.D.N.Y., 2010)..................................................................... 93

*European Community v. RJR Nabisco, Inc.*
2014 WL 1613878 (2d Cir. Apr. 29, 2014).............................................................. 104

*Fed. Ins. Co. Safenet, Inc.*

758 F. Supp. 2d 251 (S.D.N.Y. 2010) ............................................................. 85, 87, 89

*First Inv. Corp of Marshall Islands v. Fujian Mawai Shipbuilding, Ltd.*
703 F.3d 742 (5th Cir. 2012) ......................................................................... 18, 59

*First National City Bank v. Banco Para El Comercio Exterior de Cuba,* 462 U.S. 611
(1983) ("*Bancec*") ............................................................................................ passim

*Flores v. Southern Peru Copper Corp.*
343 F.3d 140 (2d Cir. 2003) ................................................................................ 48

*Frontera Resources Azerbaijan Corp. v. State Oil Co. of Azerbaijan Republic*
582 F.3d 393 (2d Cir. 2009) ......................................................................... passim

*Garb v. Republic of Poland*
440 F.3d 579 (2d. Cir. 2006) ....................................................................... passim

*Gibbons v. Udaras na Gaeltachta*
549 F. Supp. 1094 (S.D.N.Y. 1982) .............................................................. 95, 102

*Gordon & Breach Sci. Publishers S.A. v. Am. Inst. of Physics*
905 F. Supp. 169 (S.D.N.Y. 1995) ...................................................................... 68

*GSS Group Ltd. v. National Port Authority*
774 F.Supp.2d 134 (D.D.C. 2011) ...................................................................... 21

*Guirlando v. T.C. Ziraat Bankasi A.S.*
602 F.3d 69, 74 (2d Cir. 2010) ..................................................................... 31-33

*Gulf Oil Corp. v. Gilbert*
330 U.S. 501 (1947) .......................................................................................... 102

*Gusinsky v. Sagi Genger*
No. 31824, slip op. (N.Y. Sup. Ct. 2009) ("*Gusinsky I*") ................................ 79-81

*Guzzello v. Venteau*
789 F. Supp. 112 (E.D.N.Y. 1992) ................................................................. 65, 68

*Hanil Bank v. P.T. Bank Negara Indon.*
148 F3d 127 (2d Cir. 1998) ........................................................................... 56-57

*Hanson v. Denckla*
357 U.S. 235 (1958) ............................................................................................ 76

*Hourani v. Mirtchev*
Civ. No. 10-1618 (D.D.C. May 7, 2013) ............................................................ 104

*In re Drexel Burnham Lambert Grp., Inc.*
161 B.R. 902 (S.D.N.Y. 1993) ................................................................................ 66

*In re Hellas Telecommunications (Luxembourg) II SCA*
2015 WL 373647 (Bankr. S.D.N.Y. Jan. 29, 2015) .................................................. 60

*In re Magnetic Audiotape Antitrust Litig.*
334 F.3d 204 (2d Cir. 2003) ............................................................................. 10-11

*In re S. African Apartheid Litig.*
617 F. Supp. 2d 228 (S.D.N.Y. 2009). ................................................................... 21

*In re Toyota Motor Corp.*
785 F. Supp. 2d 883 (C.D. Cal. 2011) .................................................................... 86

*Industrial Recycling Syst. v. Ahneman Associates, PC.*
892 F. Supp. 547 (S.D.N.Y. 1995) ...................................................................... 110

*Iragorri v. United Technologies Corp.*
274 F.3d 65 (2d. Cir. 2001) ........................................................................... passim

*Jacobson v. Fireman's Fund Ins. Co.*
111 F.3d 261 (2d Cir. 1997) ........................................................................... passim

*Jaser v. New York Prop. Ins. Underwriting Ass'n*
815 F.2d 240 (2d Cir. 1987) .................................................................................. 89

*Jim Beam Brands Co. v. Beamish & Crawford Ltd.*,
937 F.2d 729 (2d Cir. 1991) .................................................................................. 74

*JP Morgan Chase Bank v. Altos Hornos de Mexico, S.A.*
412 F.3d 418 (2d Cir.2005) .................................................................................. 82

*Kalamazoo Spice Extraction Co. v. Provisional Military Government of Socialist Ethiopia*
616 F.Supp. 660 (W.D.Mich 1985) ....................................................................... 36

*Kensington Int'l Ltd. v. Societe Nationale Des Petroles Du Congo*
2006 WL 846351 (S.D.N.Y. Mar. 31, 2006) ........................................................ 109

*Kensington Intern. Ltd. V. Itoua*
505 F.3d 147 (2d Cir. 2007) ........................................................................... passim

*Khandhar v. Elfenbein*
943 F.2d 244 (2d Cir. 1991) ............................................................................ 64-65

*Legnani v. Alitalia Linee Aree Italiane, S. P. A.*
400 F.3d 139 (2d Cir. 2005).........................................................................................passim

*Maersk, Inc. v. Neewra, Inc.*
2010 WL 2836134 (S.D.N.Y. July 9, 2010) ....................................................................... 68

*Manu International, S.A. v. Avon Products, Inc.*
641 F.2d 62 (2d Cir.1981)................................................................................................. 102

*MasterCard Int'l v. Visa Int'l Serv. Ass'n*
471 F.3d 377 (2d Cir. 2006)............................................................................................... 87

*McKesson Corp. v. Islamic Republic of Iran*
52 F.3d 346 (D.C. Cir. 1995).............................................................................................. 21

*Miralda v. Tidewater, Inc.*
CIV.A. No. 11-1170 (E.D. La. Aug. 23, 2012) ............................................................... 98-99

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*
473 U.S. 614 (1985),.......................................................................................................... 93

*Mukaddam v. Permanent Mission of Saudi Arabia*
111 F.Supp.2d 457 (S.D.N.Y. 2000)................................................................................ 108

*Namarian v. Fed. Democratic Republic of Ethiopia*
400 F.Supp.2d 76 (D.D.C. 2005) ("*Namarian I")*.......................................................... 35

*Nemariam v. Fed. Democratic Republic of Ethiopia*
491 F.3d 470 (D.C. Cir. 2007) ("*Nemarian II*").........................................................35, 53

*NML Capital, Ltd. v. The Republic of Argentina*
2011 WL 524433 (S.D.N.Y. 2011)..................................................................................... 21

*Norex Petroleum Ltd. v. Access Indus.*
416 F.3d 146 (2d. Cir. 2005)........................................................................................passim

*Norex Petroleum Ltd. v. Access Industries, Inc.*
540 F. Supp. 2d 438 (S.D.N.Y. 2007)............................................................................. 105

*Parker v. Chrysler Corp.*
929 F. Supp. 162 (S.D.N.Y. 1996)..................................................................................... 80

*Peregrine Myanmar Ltd. v. Segal*
89 F.3d 41 (2d Cir. 1996)................................................................................................... 87

*Peterson v. Clark Leasing Corp.*
451 F.2d 1291 (9th Cir.1971) ................................................................................ 74

*Picard v. Cohmad Sec. Corp. (In re Bernard L. Madoff Inv. Sec. LLC)*
418 B.R. 75 (Bankr.S.D.N.Y.2009) ........................................................................ 11

*Piper Aircraft Co. v. Reyno*
454 U.S. 235 (1981) .................................................................................... passim

*Price v. Socialist People's Libyan Arab Jamahiriya*
294 F.3d 82 (D.C.Cir. 2002) ........................................................................ 57, 59

*Reiss v. Societe Centrale Du Groupe Des Assurances Nationales*
235 F.3d 738 (2d Cir. 2000) ................................................................................ 55

*Republic of Argentina v. Weltover*
504 U.S. 607 (1992) ............................................................................. 29, 32-33

*Republic of Iraq v. ABB AG*
920 F. Supp. 2d 517 (S.D.N.Y. 2013) ......................................................... 104, 106

*Republic of Phil. v. Pimentel*
553 U.S. 851 (2008) .......................................................................................... 89

*Rogers v. Petrole Brasileiro, S.A.*
673 F.3d 131 (2d Cir. 2012); .............................................................................. 33

*S. Ionian Shipping Co. v. Hugo Neu & Sons Int'l Sales Corp.*
545 F. Supp. 323 (S.D.N.Y. 1982) ...................................................................... 69

*Sadat v. Mertes*
464 F.Supp. 1311 (E.D. Wisc., 1979); *affirmed* 615 F.2d 1176 (7th Cir., 1980) .......... 45-46

*Samantar v. Yousuf*
560 U.S. 305 (2010), ........................................................................................ 23

*Saudi Arabia v. Nelson*
507 U.S. 349 (1992) .......................................................................................... 27

*Securities Investor Prot. Corp. v. Bernard L. Madoff Inv. Securities LLC*
480 B.R. 501 (Bankr. S.D.N.Y. 2012) ............................................................ 17, 58

*Siderman de Blake v. Republic of Arg.*
965 F.2d 699 (9th Cir. 1992) ......................................................................... passim

*Smith Rocke Ltd. v. Republica Bolivariana de Venezuela*

2014 WL 288705 (S.D.N.Y. 2014)........................................................................35

*Sosnoff v. Carter*
568 N.Y.S.2d 43 (N.Y. App. Div. 1991) ......................................................... 110

*South Carolina v. Katzenbach*
383 U.S. 301 (1966).............................................................................................57

*Southway v. Cent. Bank of Nigeria*
198 F.3d 1210 (10th Cir.1999)......................................................................... 109

*Steel Co. v. Citizens for a Better Env't*
523 U.S. 83 (1998) .............................................................................................. 11

*Telenor Mobile Communications v. Storm LLC.*
584 F.3d 396 (2nd Cir., 2008)............................................................................ 92

*Texas Trading & Milling Corp. v. Federal Republic of Nigeria*
647 F.2d 300 (2d Cir. 1981)................................................................................57

*The Bremen v. Zapata Off-Shore Co.*
407 U.S. 1 (1972).................................................................................................93

*The Paquete Habana*
175 U.S. 677 (1900).............................................................................................75

*Tradimpex Egypt Co. v. Biomune Co.*
777 F. Supp.2d 802 (D. Del. 2011)............................................................... 98-100

*Transamerica Leasing, Inc. v. La Republica de Venezuela*
200 F.3d 843 (D.D.C. 2000)................................................................................21

*Transmarine Seaways Corp. v. Marc Rich*
480 F.Supp. 352 (S.D.N.Y. 1979).................................................................passim

*U.S. v. Chao Fan Xu*
706 F.3d 965 (9th Cir. 2013).......................................................................104-105

*United States v. Boylan*
620 F.2d 359 (2d Cir. 1980).............................................................................. 109

*United States v. Furey*
*491 F. Supp. 1048 (E.D. Pa.) aff'd sub nom. United States v. Ronald Furey*, 636 F.2d
1211 (3d Cir. 1980) ....................................................................................... 109

*United States v. Rivera–Ventura*

72 F.3d 277 (2d Cir.1995) .................................................................................................... 111

*Veleron Holding, B.V. v. Stanley*
2014 WL 1569610 (S.D.N.Y. Apr. 16, 2014) .......................................................................... 74

*Verlinden B.V. v. Cent. Bank of Nigeria*
461 U.S. 480 (1983) ................................................................................................................ 23

*Wahba v. Nat'l Bank of Egypt*
457 F. Supp. 2d 721 (E.D. Tex. 2006) ............................................................................. passim

*Woods v. Rondout Valley Cent. Sch. Dist. Bd of Educ.*
466 F.3d 232 (2d Cir. 2006) ................................................................................................... 15

*Yukos Capital S.A.R.L. v. OAO Samaraneftegaz*
963 F. Supp. 2d 289 (S.D.N.Y. 2013) .................................................................................... 74

*Zappia v. Middle East Construction Co., Ltd v. Emirate of Abu Dhabi*
215 F.3d 247 (2d Cir. 2000), .................................................................................................. 34

*Zoe G. v. Frederick F.G.*
617 N.Y.S.2d 370 (N.Y. App. Div. 1989) ............................................................................ 110

**Statutes**
18 U.S.C. § 1961 .................................................................................................................. 105
18 U.S.C. §1951 ................................................................................................................... 109
28 U.S.C. § 1332(a)(2) ........................................................................................................... 45
28 U.S.C. § 1350 .................................................................................................................... 48
28 U.S.C. §1330 ............................................................................................................... passim
42 U.S.C. §1983 ..................................................................................................................... 21
Foreign Sovereign Immunities Act ("FSIA")
28 U.S.C. 1601 *et seq* ..................................................................................................... passim
Helms Amendment to the Foreign Relations Authorization Act
22 U.S.C. 2370a(a) ............................................................................................................... 103
Hickenlooper Amendendment to the Foreign Relations Authorization Act
22 U.S.C. §2370(c) ............................................................................................................... 102

**Other Authorities**
H.R.Rep. No. 94-1487 (1976) ......................................................................................... passim

**Treatises**
Restatement (Second) of Contracts §175-176 (1981) ....................................................... 79-80
Restatement (Third) of the Foreign Relations Law of the United States ..................... Passim.

## Egyptian Statutes

Immigration Law No. 111/1983 ............................................................................... 40-41
Arbitration Law No. 27/1994 ...................................................................................... 78

## International Arbitration Cases

*Ayangil and other v. Turkey*
ECHR Application No. 33294/03 ................................................................................. 48

*Champion Trading v. Arab Republic of Egypt*
ICSID Case No. ARB/02/9 ......................................................................................... 44

*Compania de Aguas del Aconquija S.A. and Vivendi Universal S.A. v. Argentine Republic*
ICSID Case No. ARB/97/3 (Award dated 21 November 2000), ¶53 ...................... 76

*Esphahanian v. Bank Tejarat*
2 Iran-U.S. C.T.R 157 (1983) ................................................................................... 44

*Gusinsky v. Russia*
2004-IV Eur. Ct. H.R. ............................................................................................... 79

*Hussein Nouman Souffraki v. United Arab Emirates*
ICSID Case No. ARB/02/7 ......................................................................................... 43

*Khodorkovskiy v. Russia*
ECHR Application No. 5829/04 .................................................................................. 48

*Liechtenstein v. Guatemala (the "Nottenbohn Case")*
1955 I.C.J. 4 ............................................................................................................... 42

*Waguih Elie Siag v. Arab Republic of Egypt*
ICSID Case No. ARB/05/15 ....................................................................................... 43

## Treaties & Conventions

Arab Charter on Human Rights .................................................................................. 50
Cairo Declaration on Human Rights in Islam ............................................................ 51
European Convention on Human Rights ................................................................ 48, 50
New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards
 21 U.S.T. 2517 (U.S. Treaty) ............................................................................... passim
Universal Declaration of Human Rights .................................................................... 52

All Plaintiffs, by and through the undersigned counsel, hereby submit this Memorandum of Law in Opposition to Defendants Arab Republic of Egypt's and National Bank of Egypt's Motions to Dismiss the Complaint.

## PRELIMINARY STATEMENT

Egypt, a friendly foreign sovereign and second largest recipient of US foreign aid, has exceptionally oppressed American citizens investing in its economy. And it chased those American Plaintiffs as far as the intensive care unit of Emory Hospital on U.S. soil in Atlanta, Georgia in furtherance of its oppression. To carry out its punishment of Plaintiffs for their unprecedented exercise of free speech, Defendant Arab Republic of Egypt ("Egypt") acted directly and through its various departments and agents including Defendant National Bank of Egypt ("NBE"), which reaps the benefits of maintaining well established full fledged banking operations in the United States through its North American regional headquarters in New York.

In 1983, former President Mubarak, at the early days of his nearly 30 years reign, found an exceptionally successful young American-Egyptian in Plaintiff Dr. Ahmed Bahgat who, on his own, thrived in the fiercely competitive U.S. economy, and immediately induced him to export his expertise into Egypt. Initially granting that young entrepreneur certain privileges, all was revoked *the day* Dr. Bahgat believed he could exercise in Egypt the most fundamental of American ideals and dared to permit the criticism of a sitting President through his media outlets.

Defendants employed various reprehensible tactics to coerce Plaintiff Dr. Ahmed Bahgat, his children Plaintiffs Dina, Omar, and Shahd A. Bahgat (collectively, Dina, Omar, and Shahd A. Bahgat are referred to hereunder as the "Bahgat Children"; collectively, Dr. Bahgat and the Bahgat Children are referred to as "the Bahgats"), and the Bahaman corporate entity, Plaintiff Global One Limited ("Global One"), into unwillingly relinquishing control of substantially all of their investments in Egypt in unjust retaliation for their exercise of free speech.

Notwithstanding Defendants' repugnant mischaracterization of Plaintiffs as "vexatious" or "frivolous" litigants, or "cronies" of Mubarak's *ancien regime*, Plaintiffs only zealously seek justice for the particularly egregious conduct of that specific regime which they helped depose. As we extensively show hereunder, the compelling foreign policy embodied in the carefully crafted federal jurisdictional statutes which confer jurisdiction over the subject matter of this dispute and the persons of Defendants make this court precisely the proper forum to hear Plaintiffs' grievance. Neither does the Bahgat's holding of Egyptian passports alongside their U.S. nationalities warrant treating them as anything less than full Americans.

## STATEMENT OF FACTS

Plaintiff Dr. Bahgat is a naturalized U.S. citizen, having attained citizenship by residence in 1989, who has enjoyed a successful career as an inventor, entrepreneur, and investor in both the U.S. and Egypt. Complaint ("Comp."), ¶¶ 6, 33-35, Dkt. 1; Declaration of Ahmed Bahgat ("Bahgat Decl.), ¶3. The other Plaintiffs are Dr. Bahgat's three American children, to whom he has bequeathed a large portion of his assets through

establishment of a trust, and Plaintiff Global One Limited, which essentially serves as a holding company for a portion of these assets. Comp. ¶¶ 7-10, 41-43. Throughout his various transactions with NBE, described in detail below, and the events giving rise to this action, Dr. Bahgat acted in a representative capacity on behalf of his children. *See*, *e.g.*, *id.* ¶ 52 ("Dr. Bahgat signed the requested pledge on behalf of himself and the Bahgat Children.").

In 1983, Dr. Bahgat attended a meeting in Washington, D.C. with then-Egyptian president Hosni Mubarak, who invited and encouraged Dr. Bahgat to relocate to Egypt and invest in local businesses and infrastructure. Comp. ¶ 35. Dr. Bahgat accepted this invitation in or around 1985, and accordingly founded and successfully operated nearly twenty Egypt-based companies in the real estate, manufacturing, and media sectors, all of which make up the consortium known as the Bahgat Group of Companies. *Id* ¶36; Bahgat Decl. ¶ 2. These companies include the flagship Dreamland for Real Estate Development ("Dreamland"), which purchased and developed land around major Egyptian cities, and Dream Media SAE ("Dream Media"), which pioneered Egypt's private media industry. Comp. ¶ 33, 37-39. Prior to the events giving rise to this action, many of the Bahgat Group companies transacted extensively with U.S. businesses for the procurement of goods and services. *Id.* ¶ 36.

From the mid-1980s to the late-1990s, Dr. Bahgat continued to grow the Bahgat Group, all while suffering from a chronic heart condition that at various points required hospitalization and periodic follow-up visits to clinics in the U.S. for treatment that was unavailable in Egypt. *Id.* ¶ 40. Both Defendants were well aware of Dr. Bahgat's life-threatening medical condition. *Id.* ¶ 40. After a particularly severe incident in 1999, Dr.

Bahgat designed and executed a succession plan by establishing a trust, which, via Global One Limited, held equity in the Bahgat Group companies. *Id.* ¶¶ 41-43. Dr. Bahgat named himself and his children as beneficiaries of the trust, and the Bahgat Children and Global One later acquired 30% stakes in the Bahgat Group real estate companies. *Id.* ¶ 42.

For its part, Defendant NBE, wholly-owned and controlled by the Egyptian government, became involved with the Bahgat Group companies in 1998, when it acquired 15% ownership stakes and obtained board memberships in each of seven of the Bahgat Group real estate companies and when it also lent working capital to several of the Bahgat Group companies in the manufacturing sector. *Id.* ¶¶ 44-45. Each of the limited credit facilities from NBE were secured only by each borrowing company's respective assets and receivables, and were to no extent whatsoever guaranteed by or secured by the assets of Dr. Bahgat, any of the other Plaintiffs, or any of the other Bahgat Group companies. *Id.* When the manufacturing companies began experiencing losses and then defaulted on loan arrearages to NBE, NBE engaged Dr. Bahgat in negotiations for resolution of these companies' outstanding obligations; these negotiations remained amicable, if ultimately unsuccessful, from 1999 through 2001. *Id.* ¶ 46. Those negotiations culminated in a final debt settlement agreement between NBE and some of the Bahgat Group companies executed on September 18, 2002, extinguishing those companies' debts in exchange for the transfer of specific assets of the companies to NBE. Bahgat Decl. ¶ 6. The settlement agreement did not transfer stock in any of the companies or relinquish control thereof to NBE. *Id.*

The tone of the negotiations changed drastically, however, after Dream Media SAE's October 19, 2002 broadcast of a television program in which local political commentator Mohamed Hassanein Haikel criticized President Mubarak's plan to essentially bestow the Egyptian presidency upon his son and thereby subvert the democratic process ("Haikel Episode"). Comp. ¶¶ 47-53. Immediately following this broadcast, President Mubarak's office warned Dr. Bahgat of the Presidency's anger with the Haikal Episode, and threatened him with imprisonment and confiscation. Bahgat Decl. ¶ 7. In the same call, the President's office ordered Dr. Bahgat to attend a meeting with the Governor of Egypt's Central Bank to avoid the threatened consequences. *Id.*; Comp. ¶ 49. The Governor in turn, reiterated the Presidency's threat and demanded that Dr. Bahgat not only pledge various unrelated assets belonging to Bahgat Group companies as collateral for the debts of the defaulting manufacturing companies, but also assume personal liability for outstanding debt obligations of the Bahgat Group companies. Bahgat Decl. ¶ 8; Comp. ¶ 50. In so doing, the Governor made it clear that Dr. Bahgat's refusal to sign this pledge would result in imprisonment, which was a common coercive tool used by the Mubarak administration against ostensibly uncooperative members of the business community and political dissidents. Comp. ¶ 50, 52. On October 22, 2002, only three days after the Haikal Episode, fearing indefinite incarceration that would effectively cut off his access to U.S. medical care that he needed to treat his heart condition, Dr. Bahgat signed the written pledge on behalf of himself and the Bahgat Children. *Id.* ¶ 52.

In complete disregard for the September 18, 2002 settlement, state-owned NBE took an equally hostile stance toward Dr. Bahgat upon recommencement of the parties'

settlement negotiations in 2002, in what represented a complete about-face from its pre-Haikel Episode disposition. Comp. ¶ 53. Specifically, NBE continually insisted that Dr. Bahgat sign a written settlement providing that, in return for NBE's additional financing of various Bahgat Group companies and its suspension or forgiveness of outstanding loans, many of which were not even in arrears, NBE would assume an 85% ownership stake in the Bahgat Group's profitable real estate companies, a 49% ownership stake in the Group's distressed manufacturing companies in which they had previously owned no equity, and controlling stakes in all other Bahgat Group companies, including those with which NBE had previously had no involvement whatsoever. *Id.* ¶ 54.

Attempting to persuade Dr. Bahgat to agree to NBE's unconscionable terms, various departments of the Egyptian government interfered, and from there on, the settlement negotiations were overseen, facilitated, and directed by various departments of the Egyptian government including, not only NBE, but also the Prime Minister, the Governor of the Central Bank, the Minister of Housing, and the Prosecutor General. Bahgat Decl. ¶¶ 10-22. On at least two occasions Dr. Bahgat submitted settlement proposals, and NBE sent at least the final draft of the settlement agreement, to the Central Bank Governor for his review and approval. Bahgat Decl. ¶¶ 11, 14, 20. At least three meetings were held jointly between Dr. Bahgat, NBE and the Central Bank Governor to discuss the terms of the settlement, including one meeting with the Prime Minister of Egypt, and a final meeting on November 22, 2004 wherein the 2004 Settlement Agreement was ultimately signed. Bahgat Decl. ¶¶ 12, 13, 21.

Confronted with Dr. Bahgat's repeated refusal to sign such an agreement, Defendants turned to coercive measures to procure his cooperation. Comp. ¶¶ 55, 57;

Bahgat Decl. ¶¶ 15-19. On November 11, 2003, both NBE and NUCA, a department of the Ministry of Housing, served two separate legal notices upon Dr. Bahgat. Bahgat Decl. ¶¶ 15-16. In its legal notice, NBE warned Dr. Bahgat that it was in the process of foreclosing on all assets pledged by virtue of the coerced pledge of October 22, 2002. *Id.* ¶15. On the same day, NUCA's notice warned Dr. Bahgat that it would foreclose on 1,950 acres of land which he acquired, and upon which Dreamland was constructed, for alleged non-payment of their purchase price when, in fact, payments had not yet come due. *Id.* ¶16; Comp. ¶ 58. In fact, the Minister of Housing later publicly admitted that, in revoking said property, the Ministry's role was "like a car and [the Ministry] press[es] on the brakes and gas pedal in order to coordinate with the banks" in their settlement endeavors. Bahgat Decl. ¶ 19. Indeed, NUCA halted its endeavor to repossess the land when so instructed by the Prime Minister, at the Central Bank's request, until a final settlement was signed between Dr. Bahgat and NBE. *Id.* ¶ 18.

On a parallel front, within the same week NBE coordinated with the Central Bank of Egypt to solicit assistance from Egypt's Prosecutor General, who, on the day of the banks' request and pursuant thereto, imposed on Dr. Bahgat a complete travel ban. Comp. ¶ 57; Bahgat Decl. ¶ 17. As Defendants were well aware, this travel ban prevented Dr. Bahgat from obtaining essential medical treatment that was not available in Egypt. Comp. ¶ 57. *Id.* The stated reasons for the travel ban were simply that some of the Bahgat Group companies were delinquent on their debts, and Dr. Bahgat was "stubborn towards the bank's proposals" to cure the default, and therefore, he was automatically deemed suspect of a crime of "aggression on public funds." Bahgat Decl. ¶ 17. Without more, the travel ban was issued the day the Prosecutor General received the Central

Bank's complaint, without affording Dr. Bahgat with any opportunity for a prior hearing. *Id*.

Confronting a fierce multi-front attack, and fearing further endangerment to his health and life, imprisonment, and seizure of his property, Dr. Bahgat signed the agreement on November 22, 2004 ("2004 Settlement Agreement"). *Id*. ¶ 59. The settlement was lauded as having been reached under the Central Bank's wise supervision. Bahgat Decl. ¶ 22. Only then did the Attorney General lift the travel ban and asset freeze and only then did NUCA cease demanding increased payments for the land it had sold to the Bahgat Group. Comp. ¶ 60.

In 2006, after Dr. Bahgat initiated arbitral proceedings against NBE to rectify the bank's failure to honor its financing obligations under the 2004 Agreement, state-owned NBE once again employed coercive tactics to compel his cooperation. Comp. ¶ 61. This time, NBE sought Dr. Bahgat's signature on an addendum to the 2004 Settlement Agreement ("2007 Addendum") that would enable NBE to unilaterally sell any of the Bahgat Group's real estate assets unless Dr. Bahgat made an equivalent or higher offer for these assets. *Id*. ¶ 61. As with the 2004 Settlement Agreement, Dr. Bahgat initially refused to acquiesce to what he viewed as an oppressive contractual arrangement, and his steadfastness once again led to the imposition of a complete travel ban and asset freeze. *Id*. ¶ 62.

However, after Dr. Bahgat's health deteriorated to life-threatening levels, the travel ban was temporarily lifted to allow him to obtain medical assistance at Emory University Hospital in Atlanta Georgia. Comp. ¶ 63. On January 15, 2007, while in recovery from a heart transplant operation, Dr. Bahgat received a joint visit at Emory

Hospital from an NBE representative and the Egyptian Consul General to Houston, who were sent at the Central Bank's and NBE's instructions, and demanded that Dr. Bahgat sign the 2007 Addendum. *Id.* ¶ 64; Bahgat Decl. ¶ 23. After the visitors threatened Dr. Bahgat with imprisonment upon his return to Egypt and confiscation of his remaining assets in the country, Dr. Bahgat, who was at the time sedated nearly to the point of unconsciousness, finally signed the 2007 Addendum. Comp. ¶ 65.

Dr. Bahgat's coerced "assent" to this Addendum opened the door for state-owned NBE to essentially plunder the Bahgat Group's assets with support by, and for the benefit of, the Egyptian government. Comp. ¶¶ 65-72. First, NBE began soliciting and receiving offers for the purchase of land owned by the real estate companies in which NBE held controlling stakes. *Id.* ¶¶ 65-69. At the same time, Egyptian government institutions, including the Egyptian Parliament and the NUCA, drew negative attention to the Bahgat Group companies by representing to the public that the companies' assets were distressed and were subject to ownership disputes, resulting in withdrawal of offers from virtually all private bidders. *Id.* ¶¶ 67, 69. The remaining offers, which NBE invariably accepted, were made by various affiliates of the Defendants, such as the Al Ahly Real Estate Development Company, and were all well below the actual market value for the offered assets. *Id.* ¶¶ 68-69.

After systematically dismantling the Bahgat Group real estate companies through these sales, NBE dealt the final blow to these companies in 2011, when it submitted and subsequently accepted an offer to purchase the remaining assets of these companies on behalf of one of its affiliates. Comp. ¶¶ 70-72. The offered assets included fully developed parcels containing hotels and a theme park, yet the purchase price for this

developed land was 4.2 billion Egyptian Pounds (approximately US763 million) below the price that was assessed for vacant land in 2008. *Id.*; Bahgat Decl. ¶ 25. Consequently, the Bahgat Group real estate companies were left with no underlying assets and are now essentially worthless. Comp. ¶ 70. NBE's stated reason for the undervaluation was to protect "public funds". Bahgat Decl. ¶ 25. Meanwhile, NBE continues to maintain controlling stakes in the Bahgat Group companies. Comp. ¶ 54.

As a result of state-owned NBE's actions, which have been taken at the behest of and for the ultimate benefit of Egypt, Plaintiffs have been wrongfully deprived of substantially all of their property. Comp. ¶¶ 54-72.; Bahgat Decl. ¶¶ 7-25

## BURDENS OF PROOF

The law places a heavy burden on defendants seeking to dismiss a complaint under Fed. R. Civ. P. 12(b). In the absence of, or prior to, jurisdictional discovery, the Court presumes the truth of the allegations, construes them in their most favorable light, and resolves all doubt in favor of the plaintiff, who need make only a prima facie showing of jurisdiction based on his own pleadings and any evidentiary submissions to the court. *DiStefano v. Carozzi N. Am., Inc.,* 286 F.3d 81, 84 (2d Cir. 2001). Where, as here, no evidentiary hearing has been held, plaintiff need only make a prima facie showing on the basis of legally sufficient allegations of jurisdiction. *In re Magnetic Audiotape Antitrust Litig.,* 334 F.3d 204, 206 (2d Cir. 2003). In contrast, a plaintiff's modest burden of establishing the existence of personal jurisdiction is satisfied "even when the moving party makes contrary allegations that place in dispute the factual basis of plaintiff's prima facie case." *Bensusan Rest. Corp. v. King*, 937 F. Supp. 295, 298

(S.D.N.Y. 1996) (citations omitted). Thus a motion to dismiss on this ground will fail in the face of nothing more than "legally sufficient allegations of jurisdiction." *In re Magnetic Audiotape*, supra, 334 F.3d at 206.

In this case, although some jurisdictional discovery has been conducted, no questions of jurisdictional fact remain in dispute, as Defendants have withdrawn any such contentions. It remains that Defendants challenges to jurisdiction pertain only to the legal sufficiency of Plaintiffs' allegations. Plaintiffs may, nonetheless, establish jurisdiction by making "a *prima facie* showing 'through its own affidavits and supporting materials' that personal jurisdiction exists." *Picard v. Cohmad Sec. Corp. (In re Bernard L. Madoff Inv. Sec. LLC),* 418 B.R. 75, 79 (Bankr.S.D.N.Y.2009). Since Defendants challenge jurisdiction, submission of supporting affidavits and material is, therefore, proper but not required. When personal jurisdiction is averred on affidavits or declarations, "all allegations are construed in the light most favorable to the plaintiff and doubts are resolved in the plaintiff's favor, notwithstanding a controverting presentation by the moving party." *A.I. Trade Fin., Inc. v. Petra Bank,* 989 F.2d 76, 79–80 (2d Cir.1993).

## ARGUMENT

### A.  Defendants Are Not Entitled to a Presumption of Separateness

Although jurisdiction is the "first and fundamental question" federal courts must answer" when overseeing any case, *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998), we commence our analysis by addressing whether Egypt and NBE are entitled to a presumption of separateness because both defendants raise the issue in the context of

personal and subject matter jurisdiction. Egypt's Mot. at 13-14, 20; NBE's Mot. at 11. NBE asserts that if the presumption of separateness is upheld, then it is entitled to constitutional due process protections with respect to personal jurisdiction, and its acts cannot be deemed sovereign acts for purposes of establishing an exception to immunity and therefore subject matter jurisdiction does not exist under one of Plaintiffs' bases for such jurisdiction. Egypt also asserts that it engaged in no conduct that would trigger an exception to immunity since the acts of NBE are separate from its own.

At the outset, it is uncontested that Egypt is a foreign state, and NBE is an agency or instrumentality of a foreign state within the meaning of §1603 of the Foreign Sovereign Immunities Act ("FSIA"). 28 U.S.C. 1601 *et seq*. It is also uncontested that a foreign state, its political subdivisions, and their agencies and instrumentalities are presumptively immune from suit in the United States pursuant to §1604 thereof. Finally, it is uncontested that a federal court may only exercise subject matter jurisdiction in any case in which a foreign state, its agencies or instrumentalities is a defendant, as in this case, if, and only if, an exception to immunity applies pursuant to §§1605-1607 of the FSIA. 28 U.S.C. §1330(a). Furthermore, as discussed *infra*, 28 U.S.C. §1330(b) is the FSIA's federal long-arm statute which provides personal jurisdiction over a foreign state, its agencies and instrumentalities when subject matter jurisdiction exists and proper service is made pursuant to the FSIA.

Defendants' assertion of separate identity necessarily fails because: **(I)** the presumption of separateness applies only to questions of attribution of liability, not to jurisdictional matters pursuant to the FSIA; **(II)** Plaintiffs allege that Egypt has directly engaged in conduct for which relief is warranted and, therefore, Egypt's reliance on the

presumption of separateness is misplaced; and **(III)** even if the presumption of separateness controls, that presumption is overcome under the facts alleged in the Complaint.


I.      **Contrary to NBE's Contention, the Presumption of Separateness Applies Only to Questions of Attribution of Liability, Not Jurisdictional Matters Pursuant to the FSIA**

Both Defendants correctly point to authorities citing *First National City Bank v. Banco Para El Comercio Exterior de Cuba*,  462 U.S. 611 (1983) ("*Bancec*") for the proposition that "government instrumentalities established as juridical entities distinct and independent from their sovereign should normally be treated as such." *Bancec,* 462 U.S. at 626-627.

In *Bancec*, the Supreme Court addressed a situation where a plaintiff sought to set off, as a counterclaim in an action against a Cuban state-owned bank, the value of assets seized by the Cuban government. *Bancec*, 462 U.S. at 613. The issue in that case was, therefore, whether defendant, a separate judicial entity, could be held liable for its parent state's unlawful expropriation. *Id*. Cuba, defendant's parent, was not a co-defendant in the case, and the court did not address any jurisdictional questions emanating from defendant's separate personhood.

Critically, the court concluded that the FSIA does not apply to its analysis on attribution of liability. *Id*. at 621. In reaching its conclusion, court noted that the House Report on the FSIA specifically stated that the FSIA is not "intended to affect ... the attribution of responsibility between or among entities of a foreign state; for example,

whether the proper entity of a foreign state has been sued, or whether an entity sued is liable in whole or in part for the claimed wrong." *Id.* at 620-621, quoting H.R.Rep. No. 94-1487, p. 12 (1976). The court then specifically relied on §1606 of the Foreign Sovereign Immunities Act (the "FSIA"), 28 U.S.C. §1601 *et seq.*, mandating that once the foreign sovereign's immunity is lifted, the foreign state shall be liable "in the same manner and to the same extent as a private individual under like circumstances....". *Bancec,* 462 U.S. at 620. Applying §1606, the court then proceeded to analyze the defendant "in the same manner…as a private individual" to hold that a non-immune foreign state instrumentality is entitled to a rebuttable presumption of separateness. *Id.* at 624-631.

As *Bancec* applied the presumption of separate personhood to matters of liability and attribution in line with express congressional intent and statutory language, congressional intent and statutory language similarly mandate that the presumption of separateness does not apply to jurisdictional questions pursuant to the FSIA. The specific *per se* grant of immunity to foreign state-owned corporations pursuant to §1604, subject to the FSIA's exceptions to immunity of §1605, standing alone, manifests a strong congressional intent to treat those enterprises as the foreign state itself for jurisdictional purposes, rather than as a "private person" pursuant to §1606 for attribution of liability purposes.

By their own terms and applicable jurisprudence, neither §1604 nor §1605 distinguishes between the state and its agencies or instrumentalities in the manner by which immunity is granted or lifted. Both provisions apply to a "foreign state" without any distinction between "foreign state" and "agency or instrumentality of a foreign state".

As that term is defined in §1603(a), "foreign state" includes "an agency or instrumentality of a foreign state". Therefore, any agency or instrumentality of the foreign state, defined under §1603(b) to include a separate legal person, corporate or otherwise, the majority of whose shares is owned by a foreign state or political subdivision thereof that is not a citizen of any State of the United States nor created under the laws of any third country, is presumptively immune pursuant to §1604. No further showing that the "agency or instrumentality's" acts were attributable to the state is required in order to invoke immunity. Indeed, NBE in the present case invokes its sovereign immunity while challenging that its acts are attributable to Egypt. NBE's Mot. at 25.

By contrast, no private enterprise nor any domestic municipal corporation or entity owned by the United States Government or any of the States of the Union are entitled to similar sovereign immunity pursuant to the Eleventh Amendment of the Constitution absent a showing its acts are attributable to the government. *Woods v. Rondout Valley Cent. Sch. Dist. Bd of Educ.*, 466 F.3d 232, 237 (2d Cir. 2006) ("governmental entity invoking the Eleventh Amendment bears the burden of demonstrating that it qualifies as an arm of the state entitled to share in its immunity.") It is clear, then, that the FSIA intended to treat foreign state agencies and instrumentalities as the juridical equals of the foreign states which own them for all questions pertaining to immunity, regardless of their formal juridical separateness or any showing that their acts are attributable to the foreign state.

That Congress intended for litigation against foreign state agencies and instrumentalities as the equals of not only the foreign states which own them, but the

equal of the United States Government itself is further cemented by §1330(a)'s revocation of a plaintiff's Seventh Amendment right to jury trial in those cases. The explicit congressional intent in revoking the right to jury trial was to treat those proceedings the same "[a]s in suits against the U.S. Government" in order to "promote uniformity in decision were foreign governments are involved". H.R. Rep. 94-1487, at p.12.

Disregarding the formal separateness of a foreign state-owned enterprise, and treating it as the juridical equal of its parent state, embodies compelling foreign policy considerations of the United States. Therefore, when Congress enacted 28 U.S.C. §1330(b), the FSIA's long-arm statute granting personal jurisdiction over foreign states, their political subdivisions, agencies and instrumentalities *alike* where a §1605 exception to immunity applies and where service of process is proper, without more, the House Report on the FSIA reasoned that §1330(b) "render[s] unnecessary the practice of seizing and attaching the property of a foreign government" and "ease[s] the conduct of foreign relations by the United States and help eliminate the necessity for determinations of claims of sovereign immunity by the State Department." H.R. Rep. 94-1487, at p.12.

It is well established and uncontested that §§1604-1605 are jurisdictional in nature, and that a §1605 exception to immunity is the sole means by which a federal court may confer subject matter jurisdiction in an action where the defendant is a foreign sovereign state, its political subdivision, its agency or instrumentality. Similarly, the FSIA's long arm statute of §1330(b) is the sole source for obtaining personal jurisdiction over a foreign sovereign state, its political subdivisions, its agencies and instrumentalities. *Argentine Republic v. Amerada Hess Shipping Corp.,* 488 U.S. 428,

434, (1989) ("FSIA be the sole basis for obtaining jurisdiction over a foreign state in our courts").

Since all jurisdictional provisions of the FSIA specifically provide identical treatment for foreign state-owned enterprises as they do for their parent state itself, and congressional intent clearly reflects compelling foreign policy considerations in their enactment, there is no space for arguing that a presumption of separateness applies to jurisdictional questions under the FSIA. *Bancec* itself acted only within the permissive language of the FSIA's §1606 and congressional intent, which mandate that a foreign sovereign is to be treated as a private individual only with respect to liability and attribution and, therefore, the Supreme Court honored a foreign state enterprises' separate personhood only within the limits of the FSIA.

Notwithstanding the above, the specific question whether a foreign state agency or instrumentality may receive treatment different from its parent state in the context of constitutional scrutiny of personal jurisdiction remains unanswered by substantially all circuits. Indeed, one Second Circuit court addressing the issue found the answer to be "far from obvious" and remanded to the district court to determine, in part, whether the defendant in that case – a foreign state agency or instrumentality – was entitled to due process protections different from the foreign state itself. *Frontera Resources Azerbaijan Corp. v. State Oil Co. of Azerbaijan Republic,* 582 F.3d 393, 401 (2d Cir. 2009). The question remains unresolved in the Second Circuit. *Securities Investor Prot. Corp. v. Bernard L. Madoff Inv. Securities LLC*, 480 B.R. 501, 515-516 (Bankr. S.D.N.Y. 2012).

NBE points to *First Inv. Corp of Marshall Islands v. Fujian Mawai Shipbuilding, Ltd.*, 703 F.3d 742 (5th Cir. 2012), to wrongly reach the conclusion that the Fifth Circuit has resolved the question by finding that a foreign state agency or instrumentality, unlike its parent state, is entitled to constitutional due process to confer personal jurisdiction. NBE's Mot. at 11. NBE's reference to *Fujian* is entirely misplaced because the specific question was not before the court. The *Fujian* court's only relevant analysis pertained to the question whether the defendant in that case was factually an alter ego of a foreign state pursuant to *Bancec*, therefore not entitled to constitutional due process. The court did not address, and apparently was not asked to address, the specific and yet unresolved question of whether a foreign state agency or instrumentality is entitled to any constitutional due process rights different from those denied to its parent state in light of *Frontera*.

One court which directly addressed the precise question held that foreign state agencies or instrumentalities, like their parent states, are not "persons" entitled to due process protections. *Cruz v. United States*, 387 F.Supp.2d 105 (N.D.Cal. 2005). While the *Cruz* decision is not binding on this court, the court's rationale is compelling.

*Cruz* commenced its analysis by acknowledging that corporations, including foreign state-owned enterprises, are traditionally afforded separate judicial status from their owners, and that privately owned foreign enterprises are protected by the Due Process Clause. The court then focused on three elements to determine whether a foreign state agency or instrumentality is entitled to due process protections. *First*, the court adopted the *Price* approach that foreign states are analogous to States of the Union, and noted that domestic state agencies and instrumentalities are not treated as distinct entities

under the Constitution.  *Second*, focusing on the status of foreign sovereigns within the constitutional framework, the court noted that foreign state-owned corporations are shielded from suit by the same sovereign immunity and comity protections as their sovereign parents. *Third*, the court noted that the separate juridical status of a foreign corporation is ignored in cases in which a foreign government so extensively controls the corporation that a principal-agent relationship is created.

Relying solely on the three aforementioned factors, the *Cruz* court held that Mexican state owned banks, as agencies or instrumentalities of the Mexican government, were not entitled to due process protections as a matter of law, without applying any principal-agent analysis, as they are indistinguishable from the state.

II.     **Contrary to Egypt's Contention, Plaintiffs Allege that Egypt Has Directly Engaged in Conduct for Which Relief is Warranted and, Therefore, Egypt's reliance on The presumption of Separateness is Misplaced**

Egypt contends that Plaintiffs did not plead any act by Egypt itself, separate from NBE, so as to warrant jurisdiction or liability. Egypt's Mot. at 13-4, 20. Contrary to Egypt's allegations, Plaintiffs allege sufficient direct conduct by Egypt subjecting it to the court's jurisdiction and liability. Plaintiffs amply allege that Egypt's Presidency, its Central Bank, its Prime Minister, its Minister of Housing, it Prosecutor General, NUCA, as well as its Consul General to Houston all directly partook in the coercive conduct leading to Plaintiffs' relinquishing their property to NBE. See pp. 4-10 *supra*; Bahgat Decl. ¶¶10-22.

Relying on *First Fidelity Bank N.A. v. Government of Antigua & Barbuda-Permanent Mission*, 877 F.2d 189, 193-194 (2d Cir. 1989) ("an ambassador's actions

under color of authority do not, as a matter of law, automatically bind the state that he represents"). Apparently acknowledging that a diplomat's act is binding upon the state he represents if the act is within the scope of his authority, *Id.* at 193, Egypt argues that the Plaintiffs failed to show that the Consul was authorized in his visit to Dr. Bahgat at Emory Hospital. Egypt's Mot. at 20. Plaintiffs moved for jurisdictional discovery to seek evidence of the Consul's authority. In response, Egypt stipulated that the Ambassador was, in fact, authorized. Transcript, November 25, 2014 Conference, at p.8 ("MR. HERMINA:  Your Honor, we would concede that the consul was at Emory, that he was there to perform notarization.") The point is, therefore, moot.

**III.    Even If the Presumption of Separateness Controls, that Presumption is Overcome Under the Facts Alleged in the Plaintiffs' Complaint and Supporting Materials**

Even if the *Bancec* presumption of separateness controls, that presumption is rebuttable, and Plaintiffs allege facts sufficient to overcome it. When the presumption controls, *Bancec* found that it may be overcome when the corporate entity was so controlled that a relationship of principal and agent is created, or when regarding the entity as distinct from the state or from another state instrumentality would work a fraud or injustice. *Bancec*, 462 U.S. at 629. The Supreme Court, however, refused to apply any "mechanical formula for determining the circumstances under which the normally separate juridical status of a government instrumentality is to be disregarded," but, rather the inquiry was "the product of the application of internationally recognized equitable principles to avoid…injustice". *Id.* at 633

Applying *Bancec*, federal courts found that the presumption of separateness may be overcome if: the state "exerted great influence" on the instrumentality's behalf, *GSS Group Ltd. v. National Port Authority*, 774 F.Supp.2d 134, 140 (D.D.C. 2011); the state "participated at least to some degree in the events giving rise to the action", *Baglab Ltd. v. Johnson Matthey Bankers Ltd.*, 665 F.Supp. 289, 295 (S.D.N.Y. 1987); "the state-controlled corporation implements state policy" with respect to the acts giving rise to the dispute, *McKesson Corp. v. Islamic Republic of Iran*, 52 F.3d 346, 352 (D.C. Cir. 1995); a sovereign otherwise unjustly enriches itself through the instrumentality, *Transamerica Leasing, Inc. v. La Republica de Venezuela,* 200 F.3d 843, 854 (D.D.C. 2000); "an instrumentality has been cloaked with the apparent authority of the sovereign, and the complaining party reasonably relies upon that manifestation of authority", *DRC, Inc. v. Republic of Honduras*, 2014 WL 5390182, at *12 (D.D.C. 2014); "the sovereign has directed the instrumentality to act on its behalf, and the instrumentality has done so," *NML Capital, Ltd. v. The Republic of Argentina*, 2011 WL 524433, at *6 (S.D.N.Y. 2011); or the state ratified, adopted, acquiesced, or failed to dissent to the acts of the instrumentality; *In re S. African Apartheid Litig.*, 617 F. Supp. 2d 228, 273 (S.D.N.Y. 2009).

The FSIA standard, therefore, is substantially identical to the federal standard for holding a private person to have engaged in state-action under 42 U.S.C. §1983 denial of constitutional rights claims, including for unlawful expropriation. Similar to *Bancec*, "what is fairly attributable is a matter of normative judgment, and the criteria lack rigid simplicity." *Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001). Surveying relevant case law, state-attribution is found if: challenged activity

results from the State's exercise of "coercive power," when the State provides "significant encouragement, either overt or covert;" when a private actor operates as a "willful participant in joint activity with the State or its agents;" or when it is "entwined with governmental policies". *Id.* at 296.

By any measure, NBE's conduct in this case is clearly attributable to Egypt, and its separate personhood must be disregarded. The facts recited in pp. 2-8, *supra*, and Bahgat Decl. ¶¶ 10-22 provide ample evidence that Dr. Bahgat, when dealing with NBE from October 22, 2002 onwards, was effectively dealing with Egypt itself.

At the very least, NBE was "entwined with governmental policies" when Egypt used it to implement the Mubarak regime's policy of suppressing free speech, then siphoned substantially all of the Bahgat Group companies' assets to an NBE affiliate at a US763 million dollar discount, not for economic gain, but to protect the "public funds". Clearly, NBE and Egypt were "willful participants in a joint activity" and Egypt "participated at least to some degree in the events giving rise to the action" when representatives of both parties visited Dr. Bahgat at Emory Hospital to obtain his signature to the 2007 Addendum. Egypt "exerted great influence" when the Ministry of Housing took on the role of a "car…press[ing] on the brakes and gas pedal", when in coordination with the Prime Minister and the Central Bank it threatened to seize Dreamland's land holdings then abandoned that endeavor, in order to "coordinate with the banks" in effecting the 2004 Settlement Agreement. The state unjustly exercised its "coercive powers" when the Central Bank Governor, unquestionably heeding to NBE's request, petitioned the Prosecutor General to impose a travel ban on Dr. Bahgat, without any prior hearing, simply because some of the Bahgat Group companies were delinquent

on NBE's loans, and passingly because Dr. Bahgat "exhibited stubbornness" in rejecting NBE's unconscionable settlement proposals with the knowledge that the ban would have severe health effects upon him. Certainly, the state provided "significant encouragement" when the Prime Minister attended the settlement negotiations and the Central Bank compelled the 2002 Pledge, sponsored the settlement, reviewed its proposals, and "accepted" its final draft.

**B. The Court Has Subject Matter Jurisdiction to Hear All Claims Because Plaintiffs' Allegations Fall Under Both the Commercial Activity Exception and the Expropriation Exception to the FSIA**

Both defendants invoke their status as foreign sovereigns in order to assert immunity from all claims pursuant to the FSIA. Under the FSIA, a foreign state, its political subdivisions, and its agencies and instrumentalities are presumptively immune from jurisdiction in U.S. courts unless a plaintiff demonstrates that at least one of six statutory exceptions applies. 28 U.S.C. §§ 1604-1607; *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434-39 (1989). If the claim does not fall within one of the exceptions to immunity, federal courts lack subject matter jurisdiction. *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 489 (1983).

It is, therefore, well settled that a plaintiff must show that any one exception to sovereign immunity is available pursuant to §§1605-1607 in order for a court to exercise subject matter jurisdiction in FSIA cases as the sole source of jurisdiction in all cases involving a foreign state, its political subdivisions, and its agencies and instrumentalities. *Samantar v. Yousuf*, 560 U.S. 305, 313-14 (2010), quoting *Argentine Republic v. Amerada Hess Shipping Corp.,* 488 U.S. 428, 439, (1989); *Kensington Intern. Ltd. V. Itoua*, 505 F.3d 147, 154 (2d Cir. 2007). Once a plaintiff shows that an exception to the

FSIA applies, then the defendant sovereign is liable to the same extent as a private defendant. 22 U.S.C §1606.

Plaintiffs admit, and Defendants acknowledge, that Egypt is a foreign state and NBE is an agency or instrumentality of Egypt, both presumptively entitled to immunity and the protections of the FSIA. Based on the Complaint and supporting materials, however, important exceptions to immunity apply. The court, therefore, has subject matter jurisdiction over all claims pursuant to both the commercial activity exception and the expropriation exception to the FSIA because: **(I)** Plaintiffs' claims arise upon an act performed in the United States in connection with a commercial activity abroad pursuant to the second clause of the commercial activity exception of §1605(a)(2); **(II)** Plaintiffs' claims arise upon an act abroad in connection with commercial activity which causes a direct effect in the United States pursuant to the third clause of the commercial activity exception of §1605(a)(2); and **(III)** Defendants took Plaintiffs' property rights in violation of international law, and that property is owned or operated by an agency or instrumentality of the foreign state which is engaged in a commercial activity in the United States pursuant to the expropriation exception of §1605(a)(3);

I. **The Commercial Activity Exception Applies Because Plaintiffs' Claims Arise Upon an Act Performed in the United States in Connection With a Commercial Activity Abroad Pursuant to the Second Clause of the Commercial Activity Exception of §1605(a)(2).**

The commercial activity exception bars immunity in any one of three distinct circumstances. To successfully overcome the presumption of sovereign immunity, a plaintiff need only demonstrate that at least one of these three circumstances applies. *Kensington Intern. Ltd. v. Itoua,* 505 F.3d 147, 154 (2d Cir. 2007). The first of those

circumstances is inapplicable to the present case. The second enumerated circumstance of the commercial activity exception, however, is applicable, and bars immunity where the plaintiffs' action is based upon "an act performed in the United States in connection with a commercial activity of the foreign state elsewhere." ("clause 2"). 28 U.S.C. §1605(a)(2).

In arguing that Plaintiffs' reliance on this clause must fail due to a lack of domestic commercial activity by Defendants, Defendants oversimplify what is a highly technical statute requiring more nuanced analysis. NBE's Mot. at 31-34. As we show in the following sub-sections, clauses 2 does not even require the U.S.-based commercial activity that Defendants repeatedly discuss; rather, they require a complex string of connections among the plaintiff's action, the defendant's acts, whether commercial or non-commercial, and the defendant's commercial activity *abroad*. *See*, *e.g.*, *Kensington Intern.*, 505 F.3d at 157 ("The second prong…'is generally understood to apply to *non-commercial* acts in the United States that relate to commercial acts abroad."). Plaintiffs' Complaint sufficiently alleges all of these requisite connections, and Defendants are therefore unable to maintain sovereign immunity under the FSIA.

While Defendants correctly identify the existence of a common framework for assessing clause 2 of the commercial activity exception, they drastically mischaracterizes this framework to an extent that is simply unsupportable by the FSIA and relevant case law. NBE's Mot. at 31-31. The proper framework for assessing clause 2 of the commercial activities exception, as we explain in the following sub-sections, involves three independent showings: **(1)** a domestic act, whether *commercial or non-commercial*, upon which the action is based; **(2)** commercial activity *abroad* in which the foreign

sovereign is engaged; and **(3)** a significant nexus between the domestic act and foreign commercial activity. *See Garb v. Republic of Poland*, 440 F.3d 579, 586 (2d. Cir. 2006). Here, Plaintiffs can make all three showings.

> **1. Defendants Performed a Domestic Act When Their Representatives Coerced Dr. Bahgat to sign the 2007 Addendum at Emory Hospital in Atlanta, Georgia**

As a threshold matter, the court must determine whether the defendant foreign state or instrumentality has performed an "act" within the U.S., rather than, as Defendants contend, whether the defendant has engaged in "commercial activity" there. *Garb*, 440 F.3d at 586 ("As a threshold step in assessing plaintiffs' reliance on the 'commercial activity' exception, we must identify the act of the foreign sovereign State that serves as a basis for plaintiffs' claims."). Various federal courts have made clear that this act need not be commercial in nature, and may encompass general tortious behavior. *Kensington Intern.*, 505 F.3d at 157; *Siderman de Blake v. Republic of Argentina*, 965 F.2d 699, 710 (9th Cir. 1992) (holding that the conduct underlying torts of conversion, fraud, and breach of fiduciary duty constitute sufficient acts for clause 2 purposes).

NBE, in contending that "courts will examine whether the action involves a "commercial activity,'" makes an unwarranted attempt to superimpose a "commercial" aspect upon the "act" requirement. NBE's. Mot. at 31-33. This position simply finds no support in the statute or relevant case law. Section 1605, in plain text, instructs courts to assess whether the "action is based upon…an act…*in connection with* commercial activity," rather than upon the commercial activity itself. 28 U.S.C. § 1605(a)(2)

(emphasis added); *see also Saudi Arabia v. Nelson*, 507 U.S. 349 (1992) ("Congress manifestly understood there to be a difference between a suit 'based upon' commercial activity and one 'based upon' acts performed 'in connection with' such activity."). In fact, the Supreme Court has specifically cautioned courts against conflating clause 2 with clause 1, which is what Defendants have inexcusably done here. *See Nelson*, 507 U.S. 349 (1992). Even the case law Defendants themselves offer undermines their own proposition. NBE's. Mot. at 31; *Anglo-Iberia Underwriting Mgmt. Co. v. P.T. Jamsostek*, 600 F.3d 171, 176 (2d Cir. 2010) ("As an initial matter, we note that under both the second and third clauses of the 'commercial activity' exception, Anglo-Iberia must show that its…claim is grounded upon *an act in connection with the commercial activity of Jamsostek and Indonesia elsewhere.*") (emphasis added).

Accordingly, Plaintiffs' demonstration of a U.S.-based, non-commercial act by NBE will suffice for the first step of the clause 2 framework. Plaintiffs allege that Egypt and NBE performed such an act when their representative, while visiting Dr. Bahgat at Emory Hospital "demanded Dr. Bahgat's signature thereon, threatening Dr. Bahgat with imprisonment upon return to Egypt and confiscation of all his remaining assets in Egypt if he refused to sign." Comp. ¶ 64. As NBE itself concedes, this conduct qualifies as a non-commercial act that occurred in the U.S., and is therefore sufficient for clause 2 purposes. NBE's Mot. at 33.

In attempting to further subvert Plaintiffs' clear satisfaction of the "act" requirement, however, NBE characterizes its representative's alleged conduct at the Emory Hospital as an "act of expropriation." NBE's Mot. at 33. Relying on *Garb v. Repub. of Poland*, NBE contends that such an "act of expropriation" cannot provide a

basis for the commercial activity exception because it renders Plaintiffs' action "in essence based on disputed takings of property," which is a "decidedly sovereign – rather than commercial – activity." NBE's Mot. at 32; 440 F.3d at 586, 588.

While we do not question the Second Circuit's reasoning in *Garb*, we nevertheless assert that NBE's reliance on this case is misplaced. Simply put, that case involved completely incomparable facts and circumstances. In *Garb*, the court deemed insufficient, for purposes of the commercial activity exception, plaintiffs' allegations that Poland had first seized their property by force, i.e., the expropriation, and then later sold this seized property for profit, i.e., the commercial activity. *Garb*, 440 F.3d at 581, 586 ("The expropriation of property is, in some sense, 'connected' to any *subsequent* commercial treatment of that property or its proceeds.") (emphasis added). Thus, the court correctly recognized that the true "gravamen" of plaintiffs' complaint, i.e., the act upon which the action was based, was the expropriation, which plaintiffs attempted to superficially shoehorn into the commercial activity exception for purposes of overcoming sovereign immunity. *Id.* at 586.

Here, despite Defendants' contentions to the contrary, the alleged domestic act upon which Plaintiffs' action is based is not an "act of expropriation" a la the outright seizure of property in *Garb*; rather, it was the extortionate use of threats to induce Dr. Bahgat's signature on the 2007 addendum. Comp. ¶ 64. This act *in turn* enabled NBE to engage in, as we discuss below, the decidedly commercial activity of liquidating property in satisfaction of debt obligations, which enabled Defendants to *then* expropriate Plaintiffs' property by permanently transferring it to NBE's affiliates and subsidiaries for below market value. Comp. ¶¶ 65-72, 79. Even if, as Defendants contend, the taking of

Bahgat Group property can be characterized as a defining feature of the action, it is no more a gravamen than are the alleged coercive, extortionate, and ultimately life-threatening measures taken against Dr. Bahgat in retaliation for the Haikal Episode. Compl. ¶¶ 53-64. This is evident in Plaintiffs' inclusion of numerous non-conversion-related claims, including racketeering, intentional infliction of emotional distress, and breach of fiduciary duty. *See* Compl. ¶¶ 83-89, 94-95, 98-120. *See Siderman de Blake v. Republic of Argentina*, 965 F.2d 699, 710 (9th Cir. 1992).

### 2. Commercial Activity Abroad

Per Section 1605, clause 2 requires a showing of "commercial activity elsewhere." 28 U.S.C. § 1605(a)(2) Plaintiffs take no issue with NBE's explanation of commercial activity for FSIA purposes as "private in nature, or…an activity that a private party would do." NBE's Mot. at 32; *Republic of Argentina v. Weltover*, 504 U.S. 607, 614 (1992). Precedential examples of such "private activities" include dealing in private debt instruments, ownership and operation of private businesses, and the liquidation of assets in the private market. *Id.* at 615-17; *Drexel Burnham Lambert Group, Inc. v. Comm. of Receivers for Galadari*, 12 F.3d 317, 329 (2d Cir. 1993); *Siderman*, 965 F.2d at 710.

These are all activities in which, as the Complaint alleges, NBE engaged throughout the relevant period while in Egypt. Plaintiffs allege, for example, that NBE issued loans and working capital to several Bahgat Group manufacturing companies and obtained ownership stakes in all of the Bahgat Group real estate companies, all through Egypt-based transactions. Compl. ¶¶ 44-45. Plaintiffs also allege that NBE managed

these companies to the extent that it unilaterally made decisions affecting the auction of

assets, and later liquidated assets through sales in the Egyptian market. Compl. ¶¶ 65-72.

Therefore, Plaintiffs' sufficiently allege that NBE was engaged in "commercial activity

elsewhere." 28 U.S.C. § 1605(a)(2).

### 3. Defendants' Domestic Non-Commercial Acts Had a Significant Nexus to Their Commercial Activity Abroad Because the Former Enabled the Latter.

Finally, we agree that clause 2's "based upon" language requires demonstration of

a "significant nexus." However, despite Defendants' contentions, this nexus need only be

shown as between a domestic act and the commercial activity abroad. *See Kensington*

*Intern.*, 505 F.3d at 156-57 (applying "requisite nexus" standard to clause 2 of the

commercial activity exception); *Garb*, 440 F.3d at 587. Demonstration of a "causal link"

between the alleged act and a defendant's non-U.S.-based commercial activity will

suffice for this purpose. *Garb*, 440 F.3d at 587; *Drexel Burnham*, 12 F.3d at 329-30;

*Kensington Intern.*, 505 F.3d at 157.

As with the domestic act requirement discussed above, Defendants once again

conflate clause 2 with other clauses of the commercial activity exception. First,

Defendants contend that a plaintiff's cause of action must have a substantial nexus to the

defendant's U.S.-based commercial activities. We need only reiterate that clause 2 of

Section 1605 plainly requires that the action be "based…upon *an act performed in the*

*United States*," whereas it is clause 1 that requires that the action be "based upon a

*commercial activity carried on in the United States*." 28 U.S.C. § 1605(a)(2) (emphasis

added); *Kensington Intern.*, 505 F.3d at 157 (distinguishing between clause 1 and 2 for purposes of the "based upon" standard). Second, Defendants inject a "requisite effect" component into clause 2 that is clearly borrowed, without merit, from clause 3. Not only is there no reference to any "effects" requirement in the plain text of clause 2, but NBE relies for support upon two cases that limit their discussion of the "direct effects" requirement to clause 3. 28 U.S.C. § 1605(a)(2); *Guirlando v. T.C. Ziraat Bankasi A.S.*, 602 F.3d 69, 74 (2d Cir. 2010) ("Only the third clause is at issue here."); *Wahba v. Nat'l Bank of Egypt*, 457 F. Supp. 2d 721, 733-35 (E.D. Tex. 2006).

Therefore, Plaintiffs need only show that Defendants' domestic act bore a causal link to commercial activity abroad. Plaintiffs amply do so, as they allege that the Defendants' representative's coercion of Dr. Bahgat's signature on the 2007 Addendum while at Emory Hospital ultimately enabled the NBE's subsequent liquidation of the Bahgat Group companies' assets. Comp. ¶¶ 64-65. In essence, Defendants could not have engaged in this commercial activity but for Dr. Bahgat's signature on the 2007 Addendum. That this was a crucial step for Defendants is nowhere more evident than in their continuous exertion of pressure upon Dr. Bahgat from 2006 to 2007 and their refusal to move forward with the liquidation prior to obtaining his signature on the document. Comp. ¶¶ 61-65.

Accordingly, Plaintiffs' allegations meet the requirements for clause 2 of the commercial activity exception of the FSIA and, on these grounds alone, overcome Defendants' invocation of sovereign immunity.

II.     **The Commercial Activity Exception Applies Because Plaintiffs' Claims Arise Upon an Act Abroad in Connection With Commercial Activity Which Causes a Direct Effect in the United States Pursuant to the Third Clause of the Commercial Activity Exception of §1605(a)(2).**

Similar to clause 2, clause 3 requires a commercial or non-commercial act, although one that occurs abroad, as well as commercial activity abroad and a significant nexus between the foreign act and foreign commercial activity. 28 U.S.C. § 1605(a)(2); *see Garb*, 440 F.3d at 586; *Drexel Burnham*, 12 F.3d at 329-30; *Kensington Intern.*, 505 F.3d at 157 ("The phrase 'based upon' applies equally to all three prongs of the commercial activities exception."). Unique to this clause is the additional requirement that the plaintiff must demonstrate that the act "causes a direct effect in the United States." 28 U.S.C. § 1605(a)(2).

Because we discuss the first three requirements of clause 3 at length in the preceding sub-section, we simply note that Plaintiffs' allegations sufficiently allege the requisite foreign act, foreign commercial activity, and substantial nexus between the two. For example, Plaintiffs allege that Defendants, operating in Egypt, arranged for a life-threatening travel ban upon Dr. Bahgat and for the freezing of Plaintiffs' assets. Compl. ¶¶ 57-60. Defendants took these actions so as to induce Plaintiffs' entering into the 2004 Settlement Agreement, which in turn enabled NBE to assume managerial roles in several of the Bahgat Group companies. Comp. ¶ 55.

As to Defendants' contention that their alleged acts in Egypt did not cause sufficient direct effects in the United States, Defendants generally, if somewhat imprecisely, state the correct rule, but ultimately fails to accurately apply it. We agree with the Defendants that, per the Supreme Court's decision in *Republic of Argentina v. Weltover, Inc.*, an effect is "direct" for clause 3 purposes if it follows "as an immediate

consequence of the defendant's…activity." 504 U.S. 607, 618 (1992); NBE's Mot. at 35. We also agree that "a showing of financial loss to a U.S. resident alone is not enough to establish direct effects." NBE's. Mot. at 35; *Kensington Intern.*, 505 F.3d at 157. However, as Defendants fail to mention, financial injury may indeed be sufficient where it flows directly from a so-called "legally sufficient act" in the U.S., such as the breach of contractual obligations requiring payment or performance there. *Weltover*, 504 U.S. at 618-19 Kensington *Intern.*, 505 F.3d at 158-59; *Rogers v. Petrole Brasileiro, S.A.*, 673 F.3d 131, 138-39 (2d Cir. 2012); *Guirlando*, 602 F.3d at 75-77.

Under this standard, Plaintiffs have met their burden of pleading. Plaintiffs allege, and NBE even concedes, that NBE's takeover of the company was followed by the cessation of transactions between the Bahgat Group companies and U.S.-based counterparties. Comp. ¶ 36; NBE's Mot. at 35. This cessation directly and negatively impacted the U.S.-based counterparties, who were, through NBE's actions, deprived of a heretofore-consistent revenue stream from the transactions. Comp. ¶ 36. Hence, Plaintiffs do not allege mere incidental financial injuries, but rather, they allege direct financial loss specifically accruing from NBE's legally sufficient acts of contract breach.

For these reasons, Plaintiffs have sufficiently satisfied the commercial activity exception requirements and overcome NBE's invocation of sovereign immunity under the FSIA.

III.     **The Expropriation Exception Applies Because Defendants Took Plaintiffs' Property rights in Violation of International Law, and the Property Taken is Owned or Operated By an Agency or Instrumentality of the Foreign State Which is Engaged in Commercial Activity in the United States.**

The court also has subject matter jurisdiction because neither Defendant is immune pursuant to the expropriation exception enumerated in §1605(a)(3) to the FSIA. Both defendants correctly point to *Zappia v. Middle East Construction Co., Ltd v. Emirate of Abu Dhabi*, 215 F.3d 247, 251 (2d Cir. 2000), to distill the four elements required for the expropriation exception to apply. Egypt's Mot. at 23; NBE's Mot. at 28. Those four elements are: 1) that rights in property are at issue; 2) that the property was "taken"; 3) that the taking was in violation of international law, and 4) that one of the two nexus requirements is satisfied.

Neither Defendant seems to challenge that one of the nexus requirements is satisfied. Defendants, however, challenge that none of the remaining three elements of the expropriation exception are available to Plaintiffs. Defendants' challenges must fail because: **(1)** "rights in property" are at issue because Defendants' took a controlling stake in Plaintiffs' companies, depriving Plaintiffs thereof; **(2)** Plaintiffs' property was "taken" by an agency or instrumentality of a foreign state deprived of any presumption of separateness, and the taking was without authorization or prompt and effective compensation, and was not for a public purpose; **(3)** Plaintiffs' property was taken "in violation of international law" because international law applies to foreign enterprises as well as dual citizens of the United States and Egypt; and **(4)** the nexus requirement is met because Plaintiffs' property is owned or operated by NBE, and NBE is engaged in a commercial activity in the United States.

1. **"Rights in property" are at issue because Defendants' took a controlling stake in Plaintiffs' companies, depriving Plaintiffs thereof.**

NBE does not challenge that rights in property are at stake. Egypt commences its challenge by conceding that the Complaint appears to meet this element, Egypt's Mot. at 23, but then, curiously, argues that "most courts maintain that the expropriation exception applies when property at issue is tangible". Egypt's Mot. at 24, citing *Namarian v. Fed. Democratic Republic of Ethiopia*, 400 F.Supp.2d 76, 83 (D.D.C. 2005) (hereinafter, "*Namarian I*"). Interestingly, Egypt failed to mention that the same case forming the foundation of its argument was appealed to the D.C. Circuit. On appeal, the Circuit Court *reversed* the District Court's conclusion on the subject and, specifically found that "[the plain language of section 1605(a)(3)—as well as its legislative history—does not limit its application to tangible property. Moreover, there seems to us to be no reason to distinguish between tangible and intangible property when the operative phrase is 'rights in property.' We therefore conclude that the expropriation exception applies to the appellants' bank accounts." *Nemariam v. Fed. Democratic Republic of Ethiopia*, 491 F.3d 470, 479-80 (D.C. Cir. 2007) (hereinafter, "*Nemarian II*").

*Nemarian II* was recently endorsed by the S.D.N.Y. Citing *Nemarian II* and *Abelesz v. Magyar Nemzeti Bank,* 692 F.3d 661, 673 (7th Cir.2012) ("'rights in property' element of the FSIA's expropriation exception applies to both tangible and intangible property"), the court in *Smith Rocke Ltd. v. Republica Bolivariana de Venezuela*, 2014 WL 288705, at *6 (S.D.N.Y. 2014) concluded that "taking of property in violation of international law applies to intangible, as well as tangible, property". Egypt's argument, is therefore, strikingly unfounded.

Whether NBE's unlawful taking of a controlling stake in Plaintiffs' investments in Egypt implicates the taking of tangible or intangible property is an unnecessary inquiry

in any event. At least one court specifically held the assumption of a controlling interest in a corporation triggered the expropriation exception. *Kalamazoo Spice Extraction Co. v. Provisional Military Government of Socialist Ethiopia,* 616 F.Supp. 660, 663 (W.D.Mich 1985); see also *Siderman de Blake v. Republic of Arg.*, 965 F.2d 699, 703-704, 712 (9th Cir. 1992) (expropriation exception if foreign state seized plaintiffs' company). The *Kalamazoo* court determined that a controlling interest in the corporation's stock was no different from the corporation's physical assets because "[i]n either case, the foreign state has expropriated control of the assets and profits of the corporation." *Kalamazoo,* 616 F.Supp. at 663.

As in *Kalamazoo*, Plaintiffs allege that Egypt, acting through NBE, seized a controlling stake in Plaintiffs' investments, depriving them thereof. Plaintiffs have, therefore, sufficiently alleged that an interest in property is at issue.

> **2. Plaintiffs' property was "taken" by an agency or instrumentality of a foreign state deprived of any presumption of separateness, and the taking was without authorization or prompt and effective compensation, and was not for a public purpose.**

NBE asserts that no claim of "taking" can be made against it because only a sovereign can effect a taking, and NBE is presumptively separate from the state. NBE's Mot. at 29. Additionally, NBE argues that because NBE "gave him and his companies" new loans and credit facilities, the taking was not "without proper authorization, was not for a public purpose, and was without compensation." *Id.* at 29-30. Apart from a general denial, Egypt does not provide any specific grounds to challenge the "taking" element of the expropriation exception.

The first part of NBE's challenge is extensively addressed in Section A, *supra*. To recap, NBE's taking of Plaintiffs' property is an act of a sovereign because: (a) with respect to jurisdictional matters such as the takings exception to the FSIA, NBE is not entitled to any presumption of separateness; and (b) even if NBE is entitled to a presumption of separateness, that presumption is overcome by the facts alleged in this case, and its acts are considered state-action attributable to Egypt.

For an expropriation to be unlawful under international law, it must be either (a) not for a public purpose, or (b) discriminatory, or (c) not accompanied by just compensation. Restatement (Third) of the Foreign Relations Law of the United States, at §712(1). Any one of the three prongs suffices to state a claim for unlawful expropriation in violation of international law.

NBE asserts that because NBE purportedly gave loans and credit facilities to "him and his companies," then no expropriation can be asserted. NBE's argument fails for three reasons. *First*, NBE took controlling stake in which each of the five Plaintiffs had majority interest. NBE did not, and cannot allege, that it gave "him," referring to Dr. Bahgat, or any of the other Plaintiffs any loans, credit facilities, or any value in exchange for the expropriated companies. If NBE extended any credit facilities to any of the Bahgat Group companies, then it funded companies which NBE itself owned up to 85% of the shares thereof. In essence, NBE would be deemed to have funded its own companies and compensated itself with those purported loans and credit facilities.

*Second*, NBE does not cite to any authority as to whether loans and credit facilities would be regarded as compensation for expropriated property. Indeed, NBE

only describes debt liabilities rather than assets given in exchange for valuable property. This cannot be deemed just compensation.

*Third,* the standard for compensation in expropriation cases is that the compensation must be just, in an amount equivalent in value of the property taken. Restatement (Third) of the Foreign Relations Law of the United States at §712(1). Compensation is just if it is at "fair market value". *Id.* at §712 cm d. Plaintiffs' allege that NBE took a controlling stake in the Bahgat Group companies in 2004 on the basis of their 1997 "nominal value". Comp. ¶ 54. This standard is vastly different from the fair market value standard. Certainly, Plaintiffs' prayer for US $1.2 billion in damages reflects the discrepancy between the book value employed and the market value which should have applied.

Additionally, Plaintiffs allege that the taking was for the purpose of punishing them for the Haikal Episode and suppressing their freedom of expression. Defendants' Punitive retaliation cannot be regarded as a legitimate public purpose.

**3. Plaintiffs' property was taken "in violation of international law" because international law applies to foreign enterprises as well as to dual citizens of the United States and Egypt.**

Defendants rely extensively on *Wahba*, 457 F. Supp. 2d 721, a Texas district court case by a dual U.S.-Egyptian national, to assert that a dual national is not entitled to international law protections against the acts of one of the states whose nationality he holds.

Contrary to *Wahba,* international law applies to Plaintiffs because: **(a)** international law applies to Global One because it is clearly a foreign enterprise; **(b)** pursuant to Egyptian law, Egypt is estopped from treating the Bahgats' investments in Egypt as investments of Egyptian nationals; **(c)** *Wahba* overlooked well settled principles of international law with respect to dominant and effective nationality, and the Bahgats' are dominantly and effectively United States nationals; and **(d)** international law applies to Egypt's expropriation of the property of its own nationals.

### a. International law applies to Global One because it is clearly a foreign enterprise

In their hasty attempt to paint this litigation as a contractual dispute between NBE and Dr. Bahgat, Defendants conveniently overlook that there are five Plaintiffs to this action. Specifically, when arguing that international law does not apply to Egypt's treatment of Egyptian citizens, while giving no weight to the Bahgats' American citizenship, Defendants completely disregard that Global One, a Bahaman company is also a Plaintiff. In fact, neither Defendant makes any mention of Global One in their argument that international law does not govern this case. It is beyond argument that international law applies to foreign companies. It is also beyond argument that companies are presumptively separate from their beneficiaries. Neither Defendant has made any argument as to why that presumption of separateness between Global One and the remaining Plaintiffs should be overcome. International law, therefore, must apply to Global One's claims. As we show below, international law also applies to the remaining Plaintiffs.

**b. Pursuant to Egyptian law, Egypt is estopped from treating the Bahgats' investments in Egypt as investments of Egyptian nationals**

Defendants are estopped from asserting that the Bahgats' holding of Egyptian citizenship bars them from the protections of international law. Egyptian law specifically provides that persons similarly positioned to the Bahgats are to be treated as foreigners, entitled to the full protections of international law and treaties, with respect to their investments in Egypt.

Egypt's solicitation Dr. Bahgat's investment was part and parcel of a profound state policy to repatriate investments of Egyptians abroad. As such, Egypt enacted Law No. 111 for the year 1983 as its Immigration Law. This law does not regulate immigration into Egypt, but rather facilitates the outbound immigration of Egyptians from Egypt and maintaining links with Egyptians abroad. Specifically, Article 3 of the Immigration law requires the Minister of Immigration, in collaboration with the relevant ministries and agencies, to "study and propose ways to enable Egyptians abroad to participate with their savings in serving development and production projects in Egypt".

More importantly, Article 15 of the Immigration Law No. 111/1983 states that:

> "…Capital by which Egyptian immigrants or other Egyptians working abroad participate in projects or investments in the country [Egypt] shall be treated with all the benefits conferred upon foreign capital working in the same field or national capital, whichever is more favorable, and if more than one treatment

applies depending on the nationality of foreign capital, treatment shall be on the most favorable basis."

The accompanying explanatory memorandum to Article 15 states that:

"this article results in the Egyptian immigrant's capital shall receive the most favored treatment permissible in any law or special agreement [treaty] granting special treatment to a specific nationality of foreign capital without need for a provision [law, clause] granting that special treatment to the Egyptian immigrant's capital."

Clearly, as Egypt's parliament itself explains, when an Egyptian immigrant or other Egyptian working abroad invests in Egypt, then that Egyptian investor is entitled to foreign national treatment, with its pendant treaty and international law protections.

The term "Egyptian immigrant" is defined by Article 9 of Law 111/1983 to include "every Egyptian who makes his regular permanent residence abroad by earning the citizenship of another country or obtained a permit to reside permanently in it or resides a period no less than 10 years shall be regarded a permanent immigrant". The Bahgats unquestionably fall within the definition of "Egyptian immigrants" because Dr. Bahgat is a naturalized citizen of the United States, and the Bahgat children are dual nationals of the United States and Egypt. The Bahgats investments in Egypt, therefore, are regarded as the investments of foreign nationals entitled to international law and treaty protections. Egypt cannot now rescind that promise of alienage treatment and declare the Bahgats' investments as domestic investments.

        c. ***Wahba* overlooked well settled principles of international law with respect to dominant and effective nationality, and the Bahgats are dominantly and effectively United States nationals**

The *Wahba* court's oversimplification of the dual nationality issue looked only to formalities and ignored well over half a century of jurisprudence mandating both United States courts and international tribunals to look beyond formalities and into the dominant and effective nationality of claimant.

The dominant and effect nationality test was most famously pronounced in *Liechtenstein v. Guatemala (the "Nottenbohn Case")* 1955 I.C.J. 4, wherein the International Court of Justice addressed the question of whether Liechtenstein could espouse a claim on behalf of Mr. Nottenbohn, a dual national of Liechtenstein and Germany. Instead of relying on Liechtenstein's formal recognition of Mr. Nottenbohn as one of its nationals, the ICJ looked into Mr. Nottenbohn's actual connections to Liechtenstein. Although courts usually determine dominant nationality by focusing on the dual national's domicile or habitual residence, these factors are not controlling. *Nottenbohn Case*, 1955 I.C.J. 4, 22 ("In order to determine dominant nationality, the international judicial tribunal may consider such factors as the dual national's family ties, his participation in public life, his center of interest, his personal attachment for a certain nation, and any other factors that the tribunal considers important").

*Nottenbohn* was decided under the ambit of the ICJ, wherein a state espouses claims on behalf of its nationals against other sovereign states. Traditionally, claim espousal by the state was the only available means by which an individual could pursue claims for violation of international law against a sovereign state. This naturally resulted

in restrictions on the pursuit of justice due to implications of diplomatic tensions among espousing states and respondent states. In order to promote the pursuit of justice while limiting diplomatic tensions among states, the FSIA, as well as international tribunals such as the International Centre for the Settlement of Investment Disputes ("ICSID") and the US-Iran Claims Tribunal, were enacted to permit individuals and private enterprise to directly pursue their own claims against foreign sovereigns if certain jurisdictional requirements were met.

In the ICSID sphere, holding oneself out as a national of a state was specifically rejected to confer citizenship of a claimant as that of a respondent state. In *Waguih Elie Siag v. Arab Republic of Egypt*, ICSID Case No. ARB/05/15, an ICSID tribunal rejected Egypt's claims that Mr. Siag held himself out as an Egyptian citizen and looked into his conduct to decide that Mr. Siag had relinquished his Egyptian nationality. Mr. Siag was an Italian citizen of Egyptian origin, domiciled in Egypt, maintained an Egyptian passport and national identification card, and owned property that was subject of the dispute located in a region (Sinai) where non-Egyptians are banned from property ownership. The ICSID tribunal concluded that Mr. Siag's subsequent acquisition of Italian nationality without formally declaring his intent to maintain Egyptian nationality constituted relinquishment of Egyptian citizenship.

Similarly, in *Hussein Nouman Souffraki v. United Arab Emirates*, ICSID Case No. ARB/02/7, an ICSID tribunal looked into Mr. Souffraki's conduct to determine whether he was an Italian national entitled to rely on the Italy-UAE Bilateral Investment Treaty. Mr. Souffraki was a dual Italian-Canadian citizen. He invested in the UAE as a Canadian citizen, but filed his ICSID claim as an Italian citizen. Mr. Souffraki produced

4 recent certificates from Italian authorities stating that he was, in fact, an Italian citizen. The tribunal rejected UAE's defense to jurisdiction that by holding himself out as a Canadian citizen in the course of investing in the UAE, Mr. Souffraki was a Canadian citizen. The tribunal, instead, looked into Mr. Souffraki's conduct to determine that he had, pursuant to Italian law, relinquished his Italian nationality when he obtained Canadian citizenship subsequent to his Italian nationality.

In one case, however, an ICSID tribunal found formal recognition of citizenship to be dispositive. In *Champion Trading v. Arab Republic of Egypt*, ICSID Case No. ARB/02/9, a sister case filed by the *Wahba* family, the ICSID tribunal found that Mr. Wahba's maintenance of his Egyptian citizenship barred jurisdiction, rejecting arguments that his dominant and effective nationality was American. This case, however, rested entirely on the specific language of Article 25 of the ICSID Convention, which explicitly bars jurisdiction where a claimant is a dual national of both a foreign country and of the respondent state. *Champion Trading* refused to apply principles of customary international law concerning dominant and effective nationality since the tribunal was governed by the specific terms of the convention governing its jurisdiction to a contrary result.

The dominant and effective nationality standard was fundamental in several cases filed by dual US-Iranian nationals before the US-Iran Claims Tribunal. Foremost among those, the tribunal in *Esphahanian v. Bank Tejarat*, 2 Iran-U.S. C.T.R 157 (1983) found jurisdiction over a claim by a US-Iranian dual national for expropriation of his investment in Iran in the wake of the Iranian Revolution. Mr. Esphahanian was Iranian by birth and upbringing, American by naturalization, maintained and used an Iranian

passport, national identification card, and driver's license, was domiciled in Iran for the 8 years preceding and including the time of expropriation, and relied on his Iranian citizenship to obtain economic benefits reserved only for Iranian citizens. The tribunal looked to Mr. Esphahanian's voluntary acquisition of United States citizenship by his act of naturalization, his children's education in American schools in Tehran, his frequent travels to the United States (approximately 3 months per year), and taking no action that would be deemed to relinquish his United States citizenship to conclude that he was dominantly and effectively a United States national entitled to international law protections.

In United States federal jurisprudence, the dominant and effective nationality test was addressed as a matter of first impression in *Sadat v. Mertes,* 464 F.Supp. 1311 (E.D. Wisc., 1979); *affirmed* 615 F.2d 1176 (7th Cir., 1980), a case concerning alienage jurisdiction pursuant to 28 U.S.C. § 1332(a)(2). Mr. Sadat, a naturalized US citizen of Egyptian origin, commenced an action before the United States District Court, Eastern District of Wisconsin (E.D. Wisc.) asserting alienage jurisdiction in reliance of his Egyptian citizenship. Although he was a resident of Egypt at the time he commenced the action, and Egypt regarded him as a citizen of Egypt, the court denied jurisdiction. The E.D. Wisc. reasoned that "plaintiff is a naturalized United States citizen, who at the time he was naturalized absolutely and entirely renounced all allegiance and fidelity to any foreign state of which he had previously been a subject or citizen. By doing so, he, in effect renounced his Egyptian citizenship. Even though the Arab Republic of Egypt may not recognize plaintiff's expatriation, such a view is not controlling on this Court as far as determination of diversity is concerned." *Sadat,* 464 F.Supp. at 1313.

The 7th Circuit affirmed the lower court's decision, holding that only Mr. Sadat's United States nationality ought to be recognized by application of international legal principles. Recognizing the general rule of nonresponsibility under international law for conduct affecting dual nationals, the court recognized "effective or dominant" nationality as an exception. Despite Mr. Sadat's residing in Egypt, maintaining Egyptian citizenship, relying on it in the proceedings, obtaining an Egyptian passport and driver's license, and Egypt's formal submission that he was an Egyptian citizen, the 7th Circuit still found him to be dominantly American. Applying the rule, the court reasoned that

> "Although at the time of filing of his complaint in 1978 the plaintiff resided in Egypt, his voluntary naturalization in the United States in 1973 indicates that his dominant nationality is not Egyptian. As part of the naturalization process he swore allegiance to the United States and renounced any to foreign states. His actions subsequent to his naturalization evince his resolve to remain a U.S. citizen despite his extended stay abroad. Thus, it cannot be said that he "has taken all reasonably practicable steps to avoid or terminate his status as a national."" *Sadat*, 615 F.2d 1187.

Much like Messrs. Sadat and Esphahanian, Dr. Bahgat is a naturalized U.S. citizen who swore allegiance to this country. Bahgt Decl. ¶3. Despite his extended stays in Egypt, and his ties thereto, Dr. Bahgat has taken no action to renounce or even detach himself from the United States. While in Egypt, he sent his children to a school

dominated by American expatriates living in Egypt. *Id*. ¶4. He and the Bahgat Children all maintain residences in the United States, and ensure their frequent return hereto. *Id.* Accordingly, their Egyptian citizenship is to be disregarded as they are dominantly and effectively American and, therefore, subject of international law.

### d. International law applies to Egypt's expropriation of the property of its own nationals

While *Wahba's* finding that the expropriation exception does not apply to a sovereign's taking of the property of its own nationals is consistent with general presumptions of federal jurisprudence and customary international law, this so-called "domestic taking" rule is not without exception. One such exception is where the dominant and effective nationality of the claimant is that of another country as per the preceding subsection. Assuming, *arguendo*, that the Bahgats are found to be dominantly Egyptian, international law still applies to any expropriation by Egypt of the property of its own nationals.

In *Abelesz v. Magyar Nemzeti Bank* 692 F.3d 661 (7th Cir. 2012), the 7th Circuit found one such exception to the "domestic taking" rule in a situation where Hungary expropriated property of its own nationals in connection with genocide. In that case, the court found that genocide is so universally abhorred that it constituted a *jus cogens* norm of international law, and a taking in connection with genocide preempts the domestic taking rule.

In the international arena, the European Court of Human Rights ("ECHR") regularly holds states accountable to their own nationals for violations of international law that do not amount to *jus cogens* norms, including for uncompensated expropriation, *Ayangil and other v. Turkey*, ECHR Application No. 33294/03, and for procedural due process violations, *Khodorkovskiy v. Russia*, ECHR Application No. 5829/04.

The distinction between, on the one hand, US jurisprudence and customary international law barring application of international law in domestic takings cases and, on the other hand, the ECHR's permissive approach applying international law to domestic takings rests entirely on the specific source of international law the tribunal applies. In the first situation barring application of international law, US courts and international tribunals based their decisions entirely on customary international law, while the ECHR bases its decisions on an international agreement, the European Convention on Human Rights.

Nothing in the language of the takings exception to the FSIA suggest that a court is limited to customary international law when determining if a taking violates international law. By contrast, the Alien Tort Statute ("ATS"), 28 U.S.C. § 1350, is limited in scope to tort claims arising in violation of "the law of nations or a treaty of the United States". The "law of nations" adopted by the ATS has been interpreted to be limited only to customary international law. see *Flores v. Southern Peru Copper Corp.*, 343 F.3d 140 (2d Cir. 2003). With respect to treaties, the ATS is limited only to treaties of the United States and, therefore, excludes treaties to which a respondent state is a party but not the United States. The FSIA's takings exception uses the broader term "in violation of international law", rather than "law of nations" or "treaty of the United

States". A court is, therefore, at liberty to apply any available source of international law to determine whether a taking is "in violation of international law" within the scope of the FSIA exception.

The Restatement (Third) of the Foreign Relations Law of the United States defines the sources of international law in §102 as:

> "(1) A rule of international law is one that has been accepted as such by the international community of states
>
> (a) in the form of customary law;
>
> (b) by international agreement; or
>
> (c) by derivation from general principles common to the major
>
> legal systems of the world"

The plain meaning of the term "or" as employed in §102 means that any one of the three sources listed in (a), (b), or (c), standing alone, suffices to establish a rule of international law. With respect to international agreement, comment (a) to §301 of the Restatement states that "the terminology used for international agreements is varied. Among the terms used are: treaty, convention, agreement, protocol, covenant, charter, statute, act, declaration, concordat, exchange of notes, agreed minute, memorandum of agreement, memorandum of understanding, and modus vivendi. Whatever their designation, all agreements have the same legal status, except as their provisions or the circumstances of their conclusion indicate otherwise."

§102(3) of the Restatement states that "International agreements create law for the states parties thereto and may lead to the creation of customary international law when such agreements are intended for adherence by states generally and are in fact widely

accepted". In the event of conflict between a provision in an international agreement and rule of customary international law, Reporter's Note 4 to §102 resolves the conflict in favor of treaty provisions. *Id*. §102 RN4 ("A subsequent agreement will prevail over prior custom, except where the principle of customary law has the character of jus cogens, but an agreement is ordinarily presumed to supplement rather than to replace a customary law.")

The ECHR applies the European Convention on Human Rights, as an international agreement binding upon its members. The ECHR, therefore, applies Article 1 of the Convention, contrary to customary law, to find that the rights guaranteed thereunder are internationally binding upon a member state vis a vis its own nationals. Article 1 states that, " The High Contracting Parties shall secure to *everyone within their jurisdiction* the rights and freedoms defined in Section 1 of this Convention" (*emphasis added*). By using the term "secure to everyone within their jurisdiction," it has been found that the rights conferred by the Convention apply to nationals and aliens alike.

Similar to the European Convention, Egypt is a party to the Arab Charter on Human Rights as of 2004. Article 3 of the Arab Charter contains similar language to Article 1 of the European Convention. Article 3 of the Arab Charter states that, "Each State Party to the present Charter undertakes to *ensure to all individuals within its territory and subject to its jurisdiction* the right to enjoy all the rights and freedoms recognized herein, without any distinction on grounds of race, color, sex, language, religion, opinion, thought, national or social origin, property, birth or physical or mental disability." (*emphasis added*).

The operative terms in both provisions in the European Convention (everyone within their jurisdiction) and the Arab Charter (all individuals within its territory and subject to its jurisdiction) are synonymous. It is, therefore, sound to conclude that the rights and protections contained in the Arab Charter apply to nationals and aliens alike, similar to the European Convention.

Egypt is also a party to the Cairo Declaration on Human Rights in Islam as of August 5, 1990. Article 15 of the Cairo Declaration states that "(a) *Everyone shall have the right to own property* acquired in a legitimate way, and shall be entitled to the rights of ownership, without prejudice to oneself, others or to society in general. Expropriation is not permissible except for the requirements of public interest and upon payment of immediate and fair compensation." (*emphasis added*). Again, the Cairo Declaration employs the term "everyone" similar to the European Convention and Arab Charter, and presumably includes nationals and aliens alike.

Article 15 of the Arab Charter also pronounces a standard of no expropriation without compensation, applying to everyone, i.e. nationals and aliens alike. The standard for expropriation is similar to its counterpart available in customary international as well as Article 1 of Protocol 1 to the European Convention, based upon which individuals have repeatedly succeeded in obtaining compensation for expropriation from the state of their nationality through the ECHR.

The Arab Charter contains similar property protections, wherein Article 31 states, "Everyone has a guaranteed right to own private property. No person shall under any circumstances be divested of all or any part of his property in an arbitrary or unlawful manner."

Egypt has also been a party to the Universal Declaration of Human Rights since 1945, wherein Article 17 states, "(1) Everyone has the right to own property alone as well as in association with others" and "(2) No one shall be arbitrarily deprived of his property".

The Bahgats are individuals alleging that Egypt has expropriated their property located in Egypt arbitrarily, without compensation, and for no public purpose. As such, Egypt has encroached upon Plaintiffs' property rights in violation of international law, as evidenced by the Universal Declaration, the Arab Charter, and the Cairo Declaration, wherein Egypt undertook an international obligation to refrain from expropriating assets of anyone, nationals or aliens alike, unless the expropriation is for a public purpose, upon fair compensation, and not arbitrarily. Egypt's violation of these international covenants falls squarely within the meaning of a taking "in violation of international law" as contemplated by the broad language of the takings exception to the FSIA.

4. **The nexus requirement is met because Plaintiffs' property is owned or operated by NBE, and NBE is engaged in a commercial activity in the United States.**

Although neither of the Defendants presents any specific challenge to the nexus requirement of the expropriation exception, Plaintiffs submit, nonetheless, that this requirement is likewise satisfied. One of the two possible nexus requirements is if the property taken "is owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is engaged in a commercial activity in the United States." 28 U.S.C. §1605(a)(3).

To establish the "owned or operated" prong of the nexus requirement, Plaintiffs must show that NBE, an agency or instrumentality of Egypt, "possessed or exerted control or influence over" the taken property. *Nemariam II,* 491 F.3d at 481.

Here, Plaintiffs allege that NBE acquired a controlling 85% stake of certain Bahgat Group companies. Comp. ¶54. As such, NBE now owns those shares and controls Plaintiffs' property. NBE is undoubtedly engaged in a commercial activity in the United States. It holds a banking license in New York, maintains a full fledged branch in New York, manages US$1.6 billion in assets, and has engaged in banking activities through its New York branch since 2001. Comp. ¶¶ 28-32; Declaration of Khaled El Ghorab ("El Ghorab Decl.) ¶¶ 5-6. The nexus requirement is satisfied because NBE, an agency or instrumentality of Egypt, owns or operates property taken from Plaintiffs, and is engaged in commercial activity in New York.

## C. The Court Has Personal Jurisdiction Over Each Defendant

Each Defendant challenges the court's exercise of personal jurisdiction on the grounds that they lack minimum contacts with the forum so as to warrant exercise of general personal jurisdiction.

Certainly, the minimum contacts standard, as recently limited by the Supreme Court's holding in *Daimler v. Bauman,* 134 S. Ct. 746 (2014), is a fundamental tenet of general jurisdiction over domestic and foreign *private* defendants. Neither Egypt nor NBE, however, makes any showing that foreign sovereigns – such as Egypt – or their wholly owned and controlled agencies and instrumentality – such as NBE – are at all entitled to protections of the Due Process Clause of the Constitution embodying the

minimum contacts standard. Indeed, neither party references 28 U.S.C. §1330(b) setting forth the exclusive conditions to confer personal jurisdiction over a foreign sovereign, including its wholly owned agencies and instrumentalities.

Personal jurisdiction in this case is particularly warranted over each sovereign Defendant because: **(I)** Plaintiffs have complied with the requirements of 28 U.S.C. §1330(b); **(II)** Egypt, a foreign sovereign, is not entitled to constitutional protections of the Due Process Clause; and **(III)** NBE, an agency or instrumentality of a foreign sovereign, is not entitled to constitutional protections of the Due Process Clause. Alternatively, personal jurisdiction is warranted over NBE because: **(IV)** NBE acted as an agent of Egypt in its dealings with Plaintiffs; **(V)** NBE's New York branch acts as its U.S. regional head office; or **(VI)** Some of Plaintiffs' claims arise directly from NBE's conduct within the United States.

I. **The Court has personal jurisdiction over each Defendant because Plaintiffs complied with the statutory requirements of 28 U.S.C. §1330(b).**

Plaintiffs invoke this Court's personal and subject matter jurisdiction pursuant to the Foreign Sovereign Immunities Act as codified in 28 U.S.C. §1330 and 28 U.S.C. $1601 *et. seq*. Pursuant to §1330:

> "(a) The district courts shall have original jurisdiction without regard to amount in controversy of any nonjury civil action against a foreign state as defined in section 1603(a) of this title as to any claim for relief in personam with respect to which the foreign state is not entitled to

immunity either under sections 1605-1607 of this title or under any
applicable international agreement.

(b) Personal jurisdiction over a foreign state shall exist as to every claim
for relief over which the district courts have jurisdiction under subsection
(a) where service has been made under section 1608 of this title."

Therefore, "Congress has provided that personal jurisdiction over a foreign state
exists when the FSIA permits a suit against that state and the service of process
requirement set forth in 28 U.S.C. § 1608 have been satisfied." *Capital Ventures Int'l v.
Republic of Argentina*, 552 F.3d 289, 293 n.3 (2d Cir. 2009). Indeed, as Egypt itself
acknowledges, personal jurisdiction in FSIA cases "equals subject matter jurisdiction
plus valid service of process." Egypt's Mot. at 12, quoting *Reiss v. Societe Centrale Du
Groupe Des Assurances Nationales*, 235 F.3d 738, at 746 (2d Cir. 2000).

The same standard conferring personal jurisdiction applies whether the defendant
sovereign is the foreign state itself or an agency or instrumentality of that foreign state.
As referenced in §1330, a "foreign state", as defined in §1603(a), "includes a political
subdivision of a foreign state or an agency or instrumentality of a foreign state as defined
in subsection (b)".

Plaintiffs have alleged, with no opposition from Defendants, that Egypt is a
foreign state, and that NBE is an agency or instrumentality of Egypt. The only inquiry,
therefore, for purposes of personal jurisdiction is whether the court has subject matter
jurisdiction over the dispute, and whether Defendants were properly served with process.

On the first prong, subject matter jurisdiction is warranted because Plaintiffs have alleged facts sufficient to show that 2 exceptions to sovereign immunity – namely the commercial activity exception and the expropriation exception – exist. See Section B, *supra*. The second prong of FSIA personal jurisdiction analysis is also satisfied because NBE has not challenged service of process in its Motion, and Egypt specifically withdrew its service of process challenge. Transcript, November 3, 2014 Conference, at p.14 lines 2-9. Personal jurisdiction is, therefore, warranted against each Defendant.

**II.**     **The Court has personal jurisdiction over Egypt because a foreign sovereign is not entitled to the constitutional protections of the Due Process Clause.**

Notwithstanding Egypt's lengthy submission that Plaintiffs have not alleged sufficient minimum contacts as to invoke personal jurisdiction, Egypt failed to cite any valid Second Circuit jurisprudence as to whether a foreign state is entitled to any due process protections. While the Second Circuit long recognized a foreign state's right to constitutional due process analysis for general personal jurisdiction, the very same authority upon which Egypt relies called this principle into serious doubt.

Egypt relies on *Hanil Bank v. P.T. Bank Negara Indon.,* 148 F3d 127 (2nd Cir. 1998) for the proposition that "[t]he analysis as to whether a defendant's contacts with a forum are minimally sufficient, so as to meet the threshold constitutional requirements, extends to foreign States." Egypt's Mot. at 10. Egypt ignores the *Hanli Bank* court's own explicit pronouncement that it was "uncertain whether [its] holding remains good law". *Id.* at 134. In so stating, the Hanli Bank court called into serious doubt the 2nd Circuit's holding in *Texas Trading & Milling Corp. v. Federal Republic of Nigeria,* 647 F.2d 300,

at 313 (2d Cir. 1981), that a foreign state was a "person" within the meaning of the Due Process clause and, therefore, subject to the same constitutional constraints regulating every exercise of personal jurisdiction. Rather than addressing the question, *Hanli Bank,* instead, elected to conduct a minimum contacts analysis, which ultimately rendered a finding of personal jurisdiction in any event.

More than a decade after *Hanli Bank*, the Second Circuit finally addressed the question whether a foreign state is entitled to any due process protections in the course of FSIA litigation before United States Courts. In *Frontera Resources Azerbaijan Corp. v. State Oil Co. of Azerbaijan Republic,* 582 F.3d 393, 399-400 (2d Cir. 2009), the court specifically overruled its prior holding in *Texas Trading*, which was called into doubt by *Hanli Bank*, and held that foreign states are not "persons" entitled to the rights under the Due Process Clause.

In reaching its conclusion that a foreign state is not entitled to Due Process Clause jurisdictional scrutiny, *Frontera* relied extensively on *Price v. Socialist People's Libyan Arab Jamahiriya,* 294 F.3d 82 (D.C.Cir. 2002). In turn, *Price* relied on the United States Supreme Court's holding in *South Carolina v. Katzenbach,* 383 U.S. 301, 323(1966) that "the word 'person' in the context of the Due Process Clause of the Fifth Amendment cannot, by any reasonable mode of interpretation, be expanded to encompass the States of the Union" to hold that "absent some compelling reason to treat foreign sovereigns more favorably than 'States of the Union,' it would make no sense to view foreign states as 'persons' under the Due Process Clause." *Price, 294 F.3d at 96.*

*Frontera*'s holding that a foreign state is not a 'person,' and therefore cannot avail itself of the fundamental safeguards of the Due Process Clause remains binding precedent

in the Second Circuit. *Securities Investor Prot. Corp. v. Bernard L. Madoff Inv. Securities LLC*, 480 B.R. 501, 515-516 (Bankr. S.D.N.Y. 2012). Egypt, a foreign state, is not, therefore, entitled to Due Process Clause safeguards, and its advocacy of a minimum contacts analysis is entirely misplaced. Since Plaintiffs have complied with the requirements of 28 U.S.C. §1330(b) (*see* Section C.I., *supra*), the court's exercise of personal jurisdiction over Egypt is warranted.

III.    **The Court has personal jurisdiction over NBE because an agency or instrumentality of a foreign state is not entitled to the constitutional protections of the Due Process Clause.**

Similar to Egypt's challenge, NBE extensively argues that the court lacks general personal because NBE lacks sufficient minimum contacts with the forum so as to survive Due Process Clause scrutiny. Like Egypt, NBE wrongly presumes, without pointing to any valid Second Circuit authority, that an agency or instrumentality of a foreign state is a 'person' entitled to any Due Process Clause safeguards with respect to jurisdiction.

While *Frontera* explicitly and unequivocally held that a foreign state is not a 'person' within the meaning of the Due Process Clause, the court, as NBE acknowledges, left the question open as to whether an agency or instrumentality of a foreign state is entitled to due process analysis. NBE's Mot. at 11. The *Frontera* court endorsed the view that the answer to this question is "far from obvious" and remanded to the district court to determine, in part, whether the defendant in that case – a foreign state agency or instrumentality – was entitled to the protections of the Due Process Clause. *Frontera*, 582 F.3d at 401. The question remains unresolved in the Second Circuit. *Madoff*, 480 B.R. at 515-516. For the compelling conceptual and policy reasons set forth in Section A.I., *supra*, a foreign state agency or instrumentality should be treated on the same basis as its

parent state for jurisdictional matters. Accordingly, NBE, a foreign state agency or instrumentality, just like the state, is not entitled to due process protection.

IV.    **The Court has personal jurisdiction over NBE in this specific case because, with respect to each of Plaintiffs' claims, NBE presumption of separateness must be lifted**

While substantially all courts since *Frontera* and *Price* have avoided the threshold constitutional issue in Section A.I, *supra*, or were not charged with responding thereto, courts apply the *Bancec* standard of attribution to determine whether an agency or instrumentality is entitled to maintain its presumption of separateness. *see Frontera,* 582 F.3d 393 (2d Cir. 2009); *Fujian*, 703 F.3d 742 (5th Cir. 2012); *Price,* (D.C.Cir. 2002). If the presumption of separateness is overcome, then the agency or instrumentality is to be treated as the foreign state itself and, hence, entitled to no constitutional due process protections. In that event, all that is required is compliance with the FSIA long-arm statute's two requirement pursuant to 28 U.S.C. §1330(b) to confer personal jurisdiction: that subject matter jurisdiction is proper pursuant to an exception to immunity, and that proper service of process is made.

Plaintiffs have extensively shown that the *Bancec* presumption must be lifted in light of the facts of this case. Section A.III., *supra*. Similarly, Plaintiffs have shown that the requirements of §1330(b) are satisfied. Section C.I., *supra*. Therefore, NBE is subject to personal jurisdiction.

V.    **The Court has general personal jurisdiction over NBE because NBE's New York branch is its U.S. regional office**

Even if, notwithstanding any of the above, NBE is entitled to due process protections, NBE has sufficient minimum contacts in New York to warrant general personal jurisdiction. Applying *Daimler*, the S.D.N.Y recently found general jurisdiction over a foreign bank, DB, because it maintained its North American regional head office in New York and had substantial presence in New York. *In re Hellas Telecommunications (Luxembourg) II SCA*, No. 12-10631 (MG), 2015 WL 373647, at *11 (Bankr. S.D.N.Y. Jan. 29, 2015).

In that case, the court commenced its analysis by noting that "[w]hile *Daimler* suggests that a corporate defendant's place of incorporation and principal place of business are two paradigm forums where it would be subject to general jurisdiction, the Supreme Court did not hold that such paradigm forums represent the only places where a defendant may be subject to general jurisdiction." *Id*. It then distinguished that while the minimum contacts at issue in Daimler where those of a *subsidiary* of MBUSA, the foreign corporation in *Hellas* was directly operating a North American regional head office in New York. *Id*. That regional head office had substantial long-term presence in the U.S. and New York, rendering that presence continuous and systematic as to render the foreign bank *essentially at home* in New York. *Id*.

The minimum contacts in New York of the foreign bank in *In re Hellas* are essentially identical to NBE's contacts. NBE operates its North American banking business through its office in New York. El Ghorab Decl. ¶¶ 5-6. Unlike in *Daimler*, NBE's office in New York is a branch rather than a wholly owned subsidiary. *Id*. NBE's branch has been present in New York since 2001. *Id*. From its New York branch, NBE employs personnel and manages $1.6 billion in assets. *Id*. Like DB in *In re Hellas*,

NBE's presence in New York is, therefore, not merely transitory but so continuous and systematic as to render it essentially at home in New York. *Daimler*, 134 S.Ct. at 761. Accordingly, general personal jurisdiction over NBE does not contravene any due process protections it may have, and it is properly before the court in New York.

**VI. The Court has specific personal jurisdiction over each Defendant because some of Plaintiffs' claims arise in connection with Defendants' nationwide contacts with the United States**

So far as some of Plaintiffs claims arise in connection with NBE's visit to Dr. Bahgat in Atlanta, Georgia, the court may exercise specific jurisdiction. Courts applying a minimum contacts analysis in FSIA cases consider the nationwide contacts of the defendant. *Arriba Ltd. v. Petroleos Mexicanos,* 962 F.2d 528, 530 (5th Cir. 1992). In this case, some of Plaintiffs' claims arise in connection with NBE's conduct in Atlanta, Georgia. Applying the FSIA's nationwide contacts standard, specific personal jurisdiction is proper.

**D. The CRCICA Arbitration and Subsequent Annulment Proceedings Do Not Bar Any of the Claims or Issues in This Litigation**

Both Defendants wrongly maintain that all of Plaintiffs claims must be dismissed as *res judicata* as a result of some plaintiffs' prior submission of some claims to arbitration in Egypt before the Cairo Regional Centre for the International Court of Arbitration ("CRCICA") and subsequently attempting to annul the arbitration award before Egyptian courts. Egypt's Mot. at 26-28; NBE's Mot. at 6-9.

In their substantially duplicative submissions, Defendants rely on multiple authorities pertaining to the *res judicata* effect of *domestic* judgments and arbitral

awards. They, however, fail to articulate the standard applicable to foreign judgments and arbitral awards. In so doing, Defendants failed to meet their burden of proving that the issues or claims pursued by Plaintiffs in this litigation are precluded by the prior submission of foreign proceedings. Even if the court were to consider the applicable standard, which Defendants wholly ignore, or even the standards wrongly proposed by Defendants themselves, none of Plaintiffs' claims or issues are barred as res judicata on the facts presented.

Defendants' assertion of claim and issue preclusion must, therefore, fail because: **(I)** Defendants failed to articulate an applicable standard for claim and issue preclusion; **(II)** Defendants failed to meet their burden of proof that comity mandates claim and issue preclusion in the case at bar; **(III)** Defendants failed to meet their burden of proof of Egyptian law on claim and issue preclusion; and **(IV)** Defendants failed to meet their burden of proof of federal law on claim and issue preclusion. In the alternative, claim and issue preclusion do not apply because: **(V)** The parties to this litigation are different from the parties to the prior proceedings in Egypt; **(VI)** The issues in this litigation are different from the issues in the prior proceedings in Egypt; **(VII)** Plaintiffs could not have raised in the course of the prior Egyptian proceedings any of the claims asserted in the present litigation; **(VIII)** The agreement to arbitrate is tainted by duress so the court may refuse to give it any preclusive value; and **(IX)** Issue and claim preclusion, in this case, would violate fundamental public policy of the United States.

I. **Defendants failed to articulate a proper standard for claim and issue preclusion applicable to foreign judgments or awards**

Neither Egypt nor NBE has articulated in their submissions any applicable standard this court can apply in order to give any preclusive effect to the Egyptian arbitration or the subsequent judicial annulment proceedings in Egypt.

In their submissions, Egypt and NBE cite various Supreme Court and Second Circuit authorities pertaining to the general framework for issue and claim preclusion. NBE's Mot. at 6, quoting *Allen v. McCurry*, 449 U.S. 90, 94 (1980) ("a final judgment on the merits of an action precludes the parties or their privies from re-litigating issues that were or could have been raised in that action"); Egypt's Mot. at 26, citing *Ball v. A.O. Smith Corp.*, 451 F.3d 66, 69 (2d Cir. 2006) (setting forth four conditions required for the application of claim and issue preclusion); NBE Mot. at 7, quoting *Jacobson v. Fireman's Fund Ins. Co.*, 111 F.3d 261, 265 (2d Cir. 1997) (for the proposition that New York's transactional approach bars "a later claim that arises out of the same factual grouping as an earlier litigated claim even if the later claim is based on different legal theories or seeks dissimilar or additional relief"); Egypt's Mot. at 26, citing *Legnani v. Alitalia Linee Aree Italiane, S. P. A.*, 400 F.3d 139, 141 (2d Cir. 2005) (for the proposition that all claims that could have arisen out of the same transaction or series of transactions, even if based on different legal theories, are precluded).

Defendants' reliance on the aforementioned authorities is entirely misplaced, as each of those cases pertained to the preclusive effect of domestic court judgments, founded on the Full Faith and Credit Clause of the U.S. Constitution, rather than foreign judgments or awards. Those cases are inapplicable to foreign judgments or awards. While judgments of domestic courts are entitled to *mandatory* full faith and credit of all other courts of the United States and States of the Union, "[n]o such right, privilege, or

immunity, however, is conferred by the Constitution or by any statute of the United States in respect to the judgments of foreign states or nations, and we are referred to no treaty relative to such a right." *Aetna Life Ins. Co. v. Tremblay*, 223 U.S. 185, 190 (1912).

United States courts, therefore, are under no obligation to uphold foreign country judgments. However, "United States courts may choose to give res judicata effect to foreign judgments on the basis of comity, but are not obligated to do so." *Cunard S.S. Co. v. Salen Reefer Serv.* AB, 773 F.2d 452, 457 (2d Cir. 1985). Instead, "[c]omity will be granted to the decision or judgment of a foreign court if it is shown that the foreign court is a court of competent jurisdiction, and that the laws and public policy of the forum state…will not be violated." *Id*. Neither Egypt nor NBE asserted comity as the basis for their *res judicata* challenge and, therefore, Defendants have not met their burden of proving comity.

With respect to arbitral awards, Egypt and NBE cite similarly inapplicable Second Circuit authorities for the proposition that prior foreign arbitral awards are entitled to a preclusive effect. Egypt's Mot. at 27, citing *Khandhar v. Elfenbein*, 943 F.2d 244, 247 (2d Cir. 1991) (for the proposition that collateral estoppel, or issue preclusion, applies to issues resolved by a prior arbitration); NBE's Mot. at 7, quoting *American Exp. Bank Ltd. v. Banco Espanol de Credito, S.A.*, 597 F.Supp.2d 394, 404 (S.D.N.Y. 2009) ("Since at least 1980, New York courts have recognized that a final and conclusive international arbitral award is *res judicata* as to a party that fully participated in the proceeding").

The two aforementioned cases are distinguishable and inapplicable to this case. First, *Khandhar*, upon which Egypt relies, did not examine a foreign arbitral award, but a domestic arbitral award issued by the American Arbitration Association, pertaining to a

domestic transaction, and confirmed by the New York State Supreme Court, applying New York principles of collateral estoppel. *Khandhar*, 943 F.2d at 247. *Khandhar*, a case dealing with a *domestic* arbitral award is, therefore, immediately distinguishable from the case at bar where the preclusive effect of a *foreign* arbitral award is in question,

Second, while *American Exp. Bank*, upon which NBE relies, addressed an international arbitral award, that case, like *Khandhar*, examined only New York's state law on *res judicata. American Exp. Bank*, 597 F.Supp.2d at 404. Application of New York law was apparently uncontested in both *Khandhar* and *American Exp. Bank.* In the case at bar, by contrast, New York's state principles of issue and claim preclusion are challenged and inapplicable as follows.

In line with well-settled federal practice, collateral estoppel is governed by the rules applicable in the jurisdiction rendering the original judgment upon which estoppel is founded, and not the law of the reviewing court. *Khandhar*, cited by Egypt, itself recognizes "that a federal court must give to a state court judgment the same preclusive effect as would be given that judgment under the law of the State in which the judgment was rendered," *Khandhar,* 943 F.2d at 247. *See, also, Guzzello v. Venteau*, 789 F. Supp. 112, 116 (E.D.N.Y. 1992) ("a federal court is required to apply the rules of collateral estoppel of the state in which a prior judgment was rendered, where the same issues are later raised in federal court"). Therefore, if collateral estoppel is at all applicable, then Egyptian principles of preclusion are to govern as law of the rendering state rather than New York state law. Neither Egypt nor NBE made any reference to Egyptian law on preclusion.

Alternatively, "[t]he preclusive effect of an arbitration Award depends on the basis of the federal court's subject matter jurisdiction". *In re Drexel Burnham Lambert Grp., Inc.,* 161 B.R. 902, 906 (S.D.N.Y. 1993) (applying federal common law to determine the preclusive effect of an arbitral award where the court's jurisdiction was based on federal question). It is well founded that when a court's jurisdiction is based on federal question, rather than diversity jurisdiction, federal law, rather than state law, applies to determine questions of *res judicata. Blonder Tongue Laboratories v. Univ. of Illinois Foundation,* 402 U.S. 313, 324 n. 12 (1971) ("In federal question cases, the law applied is federal law [in determining the preclusive effect of a prior judgment]."); *Cullen v. Paine Webber Group, Inc.,* 689 F.Supp. 269, 278 n. 12 (S.D.N.Y. 1988) ("Because the basis for this court's jurisdiction is a federal question, rather than diversity, the federal courts' rule of res judicata governs.")

This court's jurisdiction is based on the FSIA 28 U.S.C. §1601 *et. seq.*, a federal statute, and therefore jurisdiction is founded on federal question. In their extensive misguided reliance on New York law, neither Egypt nor NBE references any federal law pertaining to the preclusive effect of a foreign arbitral award.

While NBE implies that the New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 21 U.S.T. 2517 (U.S. Treaty) (the "**New York Convention**" or the "**Convention**") enshrines a preclusive effect upon foreign arbitral awards, NBE Mot. at 7-8, the New York Convention "does not expressly speak to the *res judicata* effect of an international arbitral award". *Am. Exp. Bank Ltd.*, 597 F. Supp. 2d at 403. Therefore, although a foreign arbitral award "presumptively establishes the rights and liabilities of the parties to the arbitration," *Id.*, the New York Convention only

prescribes the rules, limitations, and exceptions a signatory state must in order to recognize and enforce a foreign arbitral award. It does not address any of the essential elements of *res judicata* including, *inter alia*, whether: an award is binding on non-parties to the arbitration; an award precludes subsequent litigation of similar facts but on different legal theories; an award precludes the subsequent litigation of any claims that could have been brought before the tribunal in the original arbitration; and what law governs collateral estoppel.

Assuming, *arguendo*, as NBE argues that the New York Convention constitutes a bar to subsequent litigation, the New York Convention is limited by its own exceptions. Thus, while NBE correctly recites one portion of Article III of the Convention that "[e]ach Contracting State shall recognize arbitral awards as binding and enforce them in accordance with the rules of procedure of the territory where the award is relied upon," it fails to quote the remaining restrictive section of that sentence that recognition is to be made "under the conditions laid down in the following articles."

The subsequent Article IV sets forth the three procedural required for such recognition of the foreign arbitral award, which Defendants have not satisfied. Article V enumerates seven exceptions pursuant to which a court, including this court, is to deny recognition or enforcement. In its discussion, NBE selectively emphasized that only one of those seven exceptions is inapplicable. NBE Mot. at 8-9. The availability of 3 conditions precedent to recognition and enforcement, and 7 exceptions to said recognition or enforcement clearly elucidates that the New York Convention does not enshrine the *per se* preclusive effect which NBE advocates.

Even if the New York Convention implies some preclusive effect, *res judicata* does not preclude Plaintiffs' claims in this instance because, as discussed hereunder, Defendants have not complied with the Convention's Article IV requirements, and because important exceptions apply pursuant to Article V.

## II. Defendants failed to meet their burden of proof that comity mandates claim and issue preclusion in the case at bar

By wrongly advocating general notions of *res judicata* applicable only to domestic proceedings, Defendants failed to address, even tangentially, governing principles of comity. Section D.I. *supra*. In their misguided analysis, Defendants, therefore failed to meet their burden of proof. *Maersk, Inc. v. Neewra, Inc.,* 2010 WL 2836134, at *10 (S.D.N.Y. July 9, 2010) ("The decision to grant comity is a matter within a court's discretion and the burden of proof to establish its appropriateness is on the moving party"). Indeed, comity is a complex and unsettled standard. *Gordon & Breach Sci. Publishers S.A. v. Am. Inst. of Physics*, 905 F. Supp. 169, 179 (S.D.N.Y. 1995) ("The law is unsettled, however, as to what exactly 'comity' entails"). Defendants' complete failure to prove comity, conceptually and factually, warrants denial of their issue and claim preclusion arguments.

## III. Defendants failed to meet their burden of proof of Egyptian law on claim and issue preclusion

Even if comity triggers issue and claim preclusion in this case, Defendants failed to invoke the relevant jurisdiction's law applicable to *res judicata*. *Guzzello*, 789 F. Supp. at 116 ("a federal court is required to apply the rules of collateral estoppel of the state in

which a prior judgment was rendered, where the same issues are later raised in federal court"); Restatement (Third) of the Foreign Relations Law of the United States §481 RN 3 ("It is generally stated that a judgment will not be given greater effect in other states than it has in the state of origin").

New York law, therefore is irrelevant under any theory and, instead, Egyptian law on *res judicata* is applicable as the jurisdiction which rendered the prior judgment and arbitral award. The burden is on Defendants, as the moving parties, to prove Egyptian law on res judicata. *S. Ionian Shipping Co. v. Hugo Neu & Sons Int'l Sales Corp.*, 545 F. Supp. 323, 324-25 (S.D.N.Y. 1982) ("Respondent is under an obligation to prove Greek law before this court will recognize a foreign judgment). Since neither Egypt nor NBE offered any proof of Egyptian law on *res judicata*, or any facts applying Egyptian law, their issue and claim preclusion arguments must be denied.


### IV.     Defendants failed to meet their burden of proof of federal law on claim and issue preclusion

Similarly, Defendants wrongly applied New York law to establish the res judicata effect of the CRCICA arbitration as well as to the standard for determining "identity of issues" for purposes of issue preclusion. New York law has no application in this case. Alternative to application of Egyptian law of *res judicata*, federal courts apply federal law of *res judicata* where the court's jurisdiction is based on federal question. *Cullen*, 689 F.Supp. at 278 n. 12 ("Because the basis for this court's jurisdiction is a federal question, rather than diversity, the federal courts' rule of *res judicata* governs"). Since the court's jurisdiction arises pursuant to the FSIA, a federal statute, the court's jurisdiction is based on federal question. Therefore, federal law of res judicata applies. Since neither

Egypt nor NBE offered any proof of federal law or supporting factual allegations or evidence, they have not met their requisite burden of proof. Defendants' issue and claim preclusion arguments, therefore, must be denied.

### V. The issues in this litigation are different from the issues in the prior proceedings in Egypt

Assuming, *arguendo*, and without any admission, that Defendants have met their burden of proving applicable law, and that federal law, rather than Egyptian law, governs, Defendants' issue and claim preclusion arguments must still be denied because the issues in this litigation are different from the issues in the prior proceedings.

Egypt asserts that "substantially all of the factual allegations made in Plaintiffs' Complaint herein were litigated, or could have been litigated, by Plaintiffs in Egypt." Egypt's Mot. at 28. Similarly, NBE asserts that "Plaintiffs' are now seeking to re-litigate the same issues – namely, the alleged impropriety and unenforceability of the 2004 Agreement and the 2007 Amendment – that were or could have been raised in the Cairo Centre arbitration." NBE's Mot. at 7. Both parties, consequently, argue that all of Plaintiffs' claims in this action are precluded by their purported prior adjudication in Egypt, even if brought under different legal theories or seeking different relief. NBE's Mot. at 7, quoting *Jacobson v. Fireman's Fund Ins. Co.*, 111 F.3d 261, 265 (2d Cir. 1997) (for the proposition that New York's transactional approach bars "a later claim that arises out of the same factual grouping as an earlier litigated claim even if the later claim is based on different legal theories or seeks dissimilar or additional relief"); Egypt's Mot. at 26, citing *Legnani v. Alitalia Linee Aree Italiane, S. P. A.*, 400 F.3d 139, 141 (2d Cir. 2005) (for the proposition that all claims that could have arisen out of the same

transaction or series of transactions, even if based on different legal theories, are precluded).

Both Defendants' duplicative arguments must be denied because: **(1)** the factual allegations in the present litigation are materially different from the factual allegations in the prior Egyptian proceedings; and **(2)** the issues in the present litigation are not barred by the applicable law even if, *arguendo*, they relate to the same nucleus of operative facts. Whether any of Plaintiffs' claims could have been submitted in the same proceedings in Egypt is addressed separately.

1. **The factual allegations in the present litigation are materially different from the factual allegations in the prior Egyptian proceedings**

Neither Egypt nor NBE points to a single set of facts common between this litigation and the prior Egyptian proceedings, nor do they accurately describe the Egyptian proceedings to which they refer. Relying on vague and conclusory statements, Defendants, once again, failed to meet their burden of proving which claims or issues are precluded by the prior proceedings.

The facts addressed by the Cairo arbitrators and the Cairo Court of Appeals are markedly different from the facts alleged in the present litigation, except for one set of facts. At the CRCICA Arbitration, Dr. Bahgat and various Bahgat Group companies presented facts to prove that (a) NBE was in breach of the specific terms of the 2004 Settlement Agreement, and (b) the 2007 Addendum was void as a result of NBE's duress

in obtaining Dr. Bahgat's signature thereto while at the ICU unit of Emory Hospital following his near fatal heart transplant procedure.

While facts pertaining to the 2007 Addendum's impropriety are common to the present litigation and the CRCICA Arbitration, no allegation was ever made, or any related facts presented, in any Egyptian proceeding that Egypt and NBE coerced Dr. Bahgat into the 2004 Settlement Agreement. Defendants do not even attempt to show, nor can they, that any of the Plaintiffs ever alleged in Egypt that the Mubarak regime retaliated against Dream TV's broadcasting of a television program critical of the power Succession Plan by coercing Dr. Bahgat into assuming personal liability for debts he did not owe, under threat of imprisonment, confiscation, and travel bans calculated to prevent necessary medical treatment, in order to coerce Plaintiffs into the unfair 2004 Settlement Agreement and subsequent Addenda.

The allegations and gravamen of the present litigation, therefore, are markedly different from the facts and issues addressed by the CRCICA arbitrators and the Cairo Court of Appeals: the CRCICA arbitration was a contractual dispute, governed by Egyptian law, pertaining to breach of contract and invalidity of the 2007 Addendum; the Cairo Court of Appeals addressed only whether the CRCICA award should be annulled, pursuant to the narrow grounds enumerated in the Egyptian Arbitration Law; the gravamen of this litigation is whether Egypt, in an effort to punish Plaintiffs and suppress their freedom of speech, retaliated by coercing Dr. Bahgat into signing the 2004 Settlement Agreement and its subsequent Addenda, thereby expropriating substantially all of Plaintiffs' investments in Egypt in violation of international law, the RICO Act, and various other United States laws.

**2. The issues in the present litigation are not barred by the applicable law even if, *arguendo*, they relate to the same nucleus of operative facts.**

Even if any factual grouping is similar among all claims, res judicata still will not bar Plaintiffs' Complaint because the issues, nevertheless, are different. Relying on *Jacobson* and *Legnani*, both defendants argue, essentially, that an issue is precluded from litigation if a prior court or tribunal decided an issue pertaining to the same nucleus of operative facts, even if the subsequent litigation is founded on a different legal standard or seeks different or additional relief. Egypt's Mot. at 26; NBE's Mot. at 7.

Defendants' reliance on *Jacobson* and *Legnani* is, however, misplaced. The rule which both Defendants distill from each of these cases pertains to New York's law on *res judicata*, particularly New York's transactional approach to identity of issues. As set forth in in the preceding sections, New York's law on *res judicata* does not govern this case, but, rather, either Egyptian law or federal law controls. While Egyptian law definitively will not bar any of the claims in Plaintiffs' Complaint, the court in this case need not address complex issues of foreign law when Defendants have not met their burden of proving Egyptian law, and when, as we show hereunder, federal law similarly will not bar any of Plaintiffs' claims.

Applying federal law to address the *res judicata* effect of a Russian judgment confirming an ICC arbitral award, the Second Circuit recently maintained that "[i]ssues are not identical if the second action involves application of a different legal standard, even though the factual setting of both suits be the same". *Yukos Capital S.A.R.L. v. OAO*

*Samaraneftegaz,* 963 F. Supp. 2d 289, 295 (S.D.N.Y. 2013) quoting *Peterson v. Clark Leasing Corp.,* 451 F.2d 1291, 1292 (9th Cir.1971). *see, also, Jim Beam Brands Co. v. Beamish & Crawford Ltd.*, 937 F.2d 729, 734 (2d Cir. 1991) ("Issues that may bear the same label are nonetheless not identical if the standards governing them are significantly different"). Relying on *Jim Beam*, the S.D.N.Y. recently refused to give any preclusive effect to a prior foreign arbitral award based on the same nucleus of facts as the lawsuit before that court, where the prior arbitration was based on Canadian contract and tort law while the subsequent litigation was premised on United States securities law on insider trading. *Veleron Holding, B.V. v. Stanley*, 2014 WL 1569610, at *10-11 (S.D.N.Y. Apr. 16, 2014).

Similarly here, while Plaintiffs allege facts pertaining to coercion in procuring Dr. Bahgat's signature to the 2007 Addendum similar to factual allegations made in the CRCICA arbitration, the Egyptian legal standard applied by the CRCICA tribunal is different from the international and federal law standards to be applied in the instant litigation, and the relief sought in both proceedings is different. In Egypt, Dr. Bahgat did not seek monetary damages in connection with the 2007 Addendum allegations as in this litigation, but merely declaratory relief that the 2007 Addendum was void as a result of duress.

Additionally, the facts pertaining to the 2007 Addendum are offered to corroborate multiple claims founded not on contractual claims, but on statutory, tort, international law, and treaty claims. *Inter alia*, the 2007 Addendum is offered as a material part of Plaintiffs' RICO claim. Even New York law, which Defendants wrongly advocate, maintains that RICO claims are not barred by prior adjudication. *Cullen v.*

*Margiotta*, 811 F.2d 698, 732 (2d Cir. 1987) ("under New York's preclusion principles, a judgment in a prior New York state court action does not bar the subsequent assertion of civil RICO claims").

To state a claim under RICO, Plaintiffs, as they do in the Complaint, must assert multiple acts of coercion, duress, extortion, and/or racketeering. The stand alone-duress claim asserted by Dr. Bahgat and the Bahgat Group companies at CRCICA requires no showing of an enterprise or multiple unlawful acts over a prolonged period of time. These elements are clearly different from the legal standard for a stand-alone duress claim under Egyptian law.

Moreover, the CRCICA arbitration found that even if the 2007 Addendum was coercive, Dr. Bahgat ratified it by virtue of the 2008 Addendum and the Bahgat Group companies' general assemblies' ratification thereof. Unlike the CRCICA arbitration Plaintiffs, many of which not parties to the CRCICA arbitration, assert in this litigation that Egypt's and NBE's coercion was continuous until 2012 and therefore the purported subsequent ratification thereof is likewise void.

Finally, Plaintiffs assert in their Complaint various international law claims. It is well settled that international law and treaties of the United States are federal common law supreme to the law of the several states. *The Paquete Habana,* 175 U.S. 677, 700, (1900). ("International law is part of our law ...."); Restatement (Third) of the Foreign Relations Law of the United States §111, §111 note *d*. Under prevailing international legal principles, international expropriation claims are fundamentally different from domestic commercial law claims because, as Defendants confirm, expropriation requires some showing of sovereign action and, therefore, a domestic judicial or arbitral

proceeding, governed by national contract law, will not bar Plaintiffs subsequent claims governed by international law or treaty. *Compania de Aguas del Aconquija S.A. and Vivendi Universal S.A. v. Argentine Republic*, ICSID Case No. ARB/97/3 (Award dated 21 November 2000), ¶53. The prior CRCICA arbitration and judicial annulment proceeding were all governed by Egyptian law. Those proceedings, governed by Egyptian law, have no preclusive effect over any of Plaintiffs claims governed by international law.

## VI.    The parties to this litigation are different from the parties to the prior proceedings in Egypt

Assuming, *arguendo*, and without any admission, that Defendants have met their burden of proving applicable law, and that federal law, rather than Egyptian law, governs, Defendants' issue and claim preclusion arguments must still be denied because the parties in this litigation are different from the parties in the prior proceedings.

Specifically, neither Plaintiff Global One nor Defendant Egypt were parties to any of the prior proceedings. Relying on a <u>footnote</u> to *Bartang Bank & Trust Co. v. Caiola*, 2006 WL2708453, at *6, n.6 (S.D.N.Y. 2006), citing the <u>dissenting</u> opinion in *Hanson v. Denckla*, 357 U.S. 235, 262 (1958), NBE seeks to establish that some of the Plaintiffs' participation in legal proceedings is binding on Global One. It is beyond doubt that a footnote relying on a dissenting opinion cannot form powerful authority so as to abandon the corporate form of Global One to preclude its claims. Moreover, *Bartang* is materially distinguishable: it did not raise any *res judicata* issues, but, rather whether Plaintiff, as shareholder in another company, had standing to sue a third party in connection with its dealings with the company. The court found that Plaintiffs, as investors in the company, had no standing to sue. Here, Global One is suing for its own direct losses. That some

76

Plaintiffs' adjudicated some claims, not as beneficiaries or principles of Global One, cannot be imputed to Global One, particularly when NBE has not made any allegations warranting disregard for Global One's separate personhood.

### VII. Plaintiffs could not have raised in the course of the prior Egyptian proceedings any of the claims asserted in the present litigation

Beyond a broad assertion that the same issues to this litigation were or could have been brought in the prior proceedings in Egypt, neither Defendant makes any showing that Plaintiffs claims in this case could have been brought in those prior actions. Certainly, not one of the claims alleged in the present litigation could have been brought to arbitration in Cairo nor raised before the Cairo Court of Appeals in the annulment proceedings.

At the outset, neither Egypt nor Global One is a party to the arbitration agreement pursuant to which the CRCICA arbitration was governed. Therefore, no claim involving either of those parties could have been submitted to arbitration. With respect to all Plaintiffs' international, federal, state and RICO claims, those claims are foreclosed by the arbitration clause acting in tandem with the selection of Egypt as governing law and could not have been raised in the course of the Cairo arbitration. The arbitration clause provides:

"This agreement shall be subject in its formation and explanation to the provisions of the Egyptian law, and every dispute arising out of the agreement or the implementation of its provisions shall be finally settled by way of arbitration and according to the rules of the Cairo Regional Centre for International Commercial Arbitration…and the arbitration shall take place in Cairo and be conducted in the Arabic language." Zulficar Decl., Exhibit 2 page 28, DKT 13

Pursuant to this arbitration agreement, the parties thereto selected Egyptian law as governing, and arbitration to take place in Cairo, Egypt. When an agreement designates Egyptian law as governing an arbitration taking place in Egypt, the Egyptian Arbitration Law mandates that the choice excludes Egypt's conflicts of law rules and, therefore, precludes application of any law other than the laws of Egypt. Article 39(1) of the Egyptian Arbitration Law No. 27/1994 provides: "The Arbitral Tribunal shall apply the rules agreed by the parties to the subject matter of the dispute. If they agree to apply the law of a specific state, then the substantive rules of that law, shall be followed not those governing conflict of laws, unless the parties agree otherwise." Therefore, an arbitrator applying this arbitration agreement cannot rely on conflict of law rules to import and apply American law or international law. Since all of Plaintiffs' claims in the Complaint call for the application of either American law or international law, none of the claims in this litigation could have been asserted in the prior Cairo arbitration.

Additionally, all of Plaintiffs' claims in the present action either describe sovereign acts, as Defendants concede, or commercial acts of a sovereign. Undoubtedly, Plaintiffs' expropriation claims all implicate public international law rather than ordinary commercial standards. Egyptian law permits arbitration of only commercial disputes rather than public law or public policy disputes. Clearly, none of Plaintiffs' claims, therefore, could have been raised before the Cairo arbitral tribunal.

With respect to the Cairo court actions, those were all actions before the Cairo Appellate Court to annul the arbitration award. As that court recognized, the annulment court could not review any factual or legal determinations, and the "[p]arties to the arbitral dispute may not raise the subject of such dispute again before the invalidity

court". Zulficar Decl., Exh. 3 at 24, DKT 13. The scope of the court's jurisdiction in that case was limited only to annulment on grounds akin to those available under the Federal Arbitration Act. Accordingly, none of Plaintiffs' claims could have been raised in the course of the Cairo Appellate Court proceedings.


## VIII. The agreement to arbitrate is tainted by duress so the court may refuse to give it any preclusive value

Because the agreement to arbitrate is tainted by coercion and duress, the court should not enforce either that agreement or any subsequent award. *Changzhou Amec E. Tools & Equip. CP. V. Eastern Tools & Equip, Inc.*, 2012 WL 3106620 (C.D. Cal. July 30, 2012), *aff'd sub nom Xuchu Dai v. E. Tools & Equip.*, 2014 WL 1678002 (9th Cir. Apr. 29, 2014). The United States will not recognize or enforce a contract or arbitration award that has been procured through violation of fundamental norms of United States public policy, such as due process. *Ameropa AG v. Havi Ocean Co.*, No. 10 Civ. 3240 slip op. at 5, (S.D.N.Y. 2011). Agreements exacted by duress contravene the public policy of the nation, *Transmarine Seaways Corp. v. Marc Rich,* 480 F.Supp. 352, 358-359 (S.D.N.Y. 1979).

Defendants threatened to imprison Dr. Bahgat and to prevent travel for life saving surgery, far exceeding the threshold for duress in New York. Restatement (Second) of Contracts §175-176 (1981). Where an authoritarian regime and for-profit enterprise are so intertwined that they conspire to work in concert to defraud the plaintiff, fundamental notions of justice prevent courts from abetting the enforcement of this fraud. *Gusinsky v. Sagi Genger*, No. 31824, slip op. at 2 (N.Y. Sup. Ct. 2009) ("*Gusinsky I*"); *see also Gusinsky v. Russia*, 2004-IV Eur. Ct. H.R. ¶ 69. Thus, the Court's review of this dispute

is not precluded. Plaintiffs merely seek a decision from a neutral tribunal on the merits of his case.

It is against the fundamental norms of our system of justice to enforce a contract tainted by coercion and duress. "Actual violence is not necessary to constitute duress even at common law… because consent is the very essence of a contract… moral compulsion, such as that produced by… imprisonment, is sufficient to destroy free agency, without which there can be no contract." *Baker v. Morton*, 79 U.S. 150 (1870). In New York "[a] contract is voidable on the ground of duress when it is established that the party making the claim was forced to agree to it by means of a wrongful threat precluding the exercise of his free will." *Austin Instrument, Inc. v. Loral Corp.*, 272 N.E.2d 533, 535 (N.Y. 1971). Threat of imprisonment constitutes improper duress. Restatement (Second) of Contracts §175 cmt. a; *see also Parker v. Chrysler Corp.*, 929 F. Supp. 162 (S.D.N.Y. 1996) (stating duress by physical compulsion and duress by threat are both defenses to a contract).

Not only does enforcement of a contract procured by duress violate the fundamental norms of our judicial system, enforcing an arbitration award procured by duress violates these norms as well. *Ameropa*, No. 10 Civ. 3240 slip op. at 5. When a court decides that the agreement to arbitrate was the product of coercion, it can and should disregard subsequent arbitral proceedings. *Changzhou*, at 53. The New York Convention recognized that corrupt and coercive contracts that produce arbitration agreements or awards shall not be recognized. New York Convention 21 U.S.T. 2517 Art. V. §2(b) ("Recognition and enforcement of an arbitral award may also be refused if… the recognition or enforcement of the award would be contrary to the public policy

of that country"). Where an authoritarian regime and a for-profit enterprise are so intertwined that they conspire to work in concert to defraud the plaintiff, fundamental notions of justice prevent courts from abetting the enforcement of this fraud. *Changzhou*, at 49; *Gusinsky I*, at 8. Thus, this court can, and should, disregard the decision by a majority of the arbitrators that duress was not present. *Transmarine Seaways Corp. v. Marc Rich*, 480 F. Supp. 352, 358 (S.D.N.Y. 1979). When the plaintiff alleges duress, the court must make its own decision. *Id.*

Here, Plaintiffs have pled sufficient facts to support allegations of duress. Like Vladimir Gusinsky, Dr. Baghat owned a media company that offended an authoritarian regime. *Gusinsky I*, at 6; Compl. ¶¶ 47-53. While Dr. Baghat was not imprisoned like Gusinsky, he was threatened with imprisonment and a ban on travel to lifesaving surgery. *Gusinsky I*, at 6-7; Compl. ¶ 50, 52, 57. Like Gusinsky, Dr. Baghat was left with no choice but to sign away his rights to his companies. *Gusinsky I*, at 7-8; Compl. ¶ 59. Here, like in *Changzhou* and *Gusinsky*, the regime and a company acted in concert to extract economic concessions using threats of imprisonment. *Changzhou*, at 18-20; *Gusinsky I*, at 6-7; Compl. ¶ 57. Like in *Changzhou*, this alone was not enough to sate the regime and soon Dr. Baghat was forced to sign away additional rights. *Changzhou*, at 22; Compl. ¶ 64. Like in *Changzhou*, Dr. Baghat attempted to use arbitration to nullify these coercive contracts. *Changzhou*, at 24; Compl. ¶ 62. But the Egyptian regime outdid the Chinese, by banning Dr. Baghat from life-saving travel and freezing his assets within a month of Dr. Baghat instituting arbitration. *Id.* Because of that ban, Dr. Baghat actually died, albeit temporarily. *Id.* at ¶ 63. While Gusinsky's divestment was quick, Dr. Baghat has battled valiantly for over a decade against concerted collusion and corruption.

The European Court of Human Rights invalidated the contract Gusinsky was coerced into signing. The Ninth Circuit invalidated the coerced contract in *Changzhou* and refused to enforce the subsequent award. Plaintiffs desire only the chance to prove that this court should invalidate a coerced contract. Because Plaintiffs have plead sufficient factual allegations, "the court should assume their veracity and then determine whether they plausibly give rise to an entitlement of relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). Thus, Defendants' motions to dismiss must be denied.

### IX.    Issue and claim preclusion, in this case, would violate fundamental public policy of the United States

Issue and claim preclusion are not warranted when their application would violate public policy of the United States. A foreign judgment will receive *res judicata* effect only on the basis of comity. In turn, "[c]omity will be granted to the decision or judgment of a foreign court if it is shown that the foreign court is a court of competent jurisdiction, and that the laws and public policy of the forum state ... will not be violated." *Cunard S.S. Co. v. Salen Reefer Serv. AB,* 773 F.2d 452, 457 (2d Cir.1985). *See, also JP Morgan Chase Bank v. Altos Hornos de Mexico, S.A.,* 412 F.3d 418, 424 (2d Cir.2005) ("deference to the foreign court is appropriate so long as the foreign proceedings are procedurally fair and ... do not contravene the laws or public policy of the United States").

Similarly, with respect to foreign arbitral awards, Article V (2) of the New York Convention states, "Recognition and enforcement of an arbitral award may also be refused if the competent authority *in the country where recognition and enforcement is*

*sought* finds that… (b) recognition or enforcement of the award would be contrary to the public policy of that country." 21 U.S.T. 2517 Art. V. §2(b) (emphasis added). "When public policy is asserted as the basis for vacating an arbitration award, the court is required to make its own, independent evaluation." *Transmarine*, 480 F. Supp. at 358; *see also Changzhou*, at 34 ("If a successful duress defense would undermine the court's ability to compel arbitration under the Convention, it would be unjust for the court to be unable to consider this defense in confirming the award.").

NBE argues that the New York Convention constitutes a bar to subsequent litigation, Article III of the Convention states that "[e]ach Contracting State shall recognize arbitral awards as binding and enforce them in accordance with the rules of procedure of the territory where the award is relied upon." NBE's Mot. at 7.

Interestingly, however NBE fails to quote the remaining restrictive section of that sentence that recognition is to be made "under the conditions laid down in the following articles," and seeks to avoid altogether the public policy exception enumerated in Article V(2)(b). Instead, NBE engages in a curiously misleading argument that a public policy review of the award is tantamount to set aside or modification of the award, and that set aside is within the exclusive domain of the jurisdiction where the award was issued. NBE's Mot. at 8. In so arguing, NBE confuses the public policy exception of Article V(2)(b) with the set aside exception of Article V(1)(e). Those two exceptions are wholly distinct, and Plaintiffs. The public policy exception to recognition of Article V(2)(b) upon which Plaintiffs rely hereunder refers to the "law of that country," and "that country" refers to "the country where recognition and enforcement is sought." In this case, "that country" refers to the United States.

Therefore, this court may not recognize foreign judgments as a matter of comity, or recognize a foreign arbitral award as NBE seeks, if that foreign judgment or award violates United States public policy.

It is well settled that a contract exacted by duress violates the fundamental public policy of the United States, and Plaintiffs sufficiently allege that all transactions at issue in this litigation, including the 2007 Addendum, were exacted by duress. Section D.VIII., *supra*. On the contrary, the CRCICA award made a specific finding that the 2007 Addendum was not marred by duress. Recognizing the CRCICA award on duress and honoring it with preclusive effect would, therefore, give force to an agreement exacted by duress, a result which cannot stand as violative of U.S. public policy. *Transmarine*, 480 F. Supp. at 358. The court is, therefore, required to make its own, independent evaluation of the issue of duress, notwithstanding the prior adjudication of a purportedly similar issue by the CRCICA arbitration. *Id*.

## E.  Plaintiffs Have Not Failed To Join Any Necessary Party

Contrary to NBE's contentions, Plaintiffs need not join Banque Misr, the New Urban Communities Agency, the Al Ahly Real Estate Company, or any other party for this action to proceed. NBE's Mot. at 12. NBE takes the unsupportable position that Plaintiffs must join any entities that were even incidentally involved in the alleged wrongful acts, and, in so doing, distorts and oversimplifies the governing rules and case law.

In assessing joinder, the court must (1) initially determine whether the allegedly absent parties are required under FRCP 19(a); and (2) decide whether, in the absence of such required parties, the action should be dismissed pursuant to FRCP 19(b). Fed. R.

Civ. P. 19; *Fed. Ins. Co. Safenet, Inc.*, 758 F. Supp. 2d 251, 258-59 (S.D.N.Y. 2010) ("To be clear…a case cannot be dismissed for failure to join an indispensible party unless it is a required party under Rule 19(a)."). As we demonstrate below, NBE fails to make either of the requisite showings because: **(I)** None of the entities referenced by Defendants are required parties pursuant to FRCP 19(a); and **(II)** Even if the entities referenced by Defendants are required parties, this case may nevertheless proceed in their absence under FRCP 19(b).

## I. None of the entities referenced by NBE are required parties pursuant to FRCP 19(a)

Under Rule 19(a)(1), a party is "required" if, and only if, (A) "in that person's absence, the court cannot accord complete relief among existing parties"; (B) the absentee "claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may as a practical matter impair or impede the person's ability to protect the interest"; or (C) "claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may leave an existing party subject to substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest." Fed. R. Civ. P. 19(a)(1)(A)-(B).

NBE contends that the aforementioned entities fall within category (A), as well as what appears to be a conflated hybrid of categories (B) and (C). NBE's Mot. at 12-13. We address these arguments in turn.

### 1. Complete relief can be accorded in the absence of the unnamed entities

As to NBE's argument that "complete relief cannot be accorded among the existing parties," this contention is vague, conclusory, and ultimately fatally flawed. Def. NBE's Mot. at 12-13. NBE contends that complete relief cannot be afforded absent the aforementioned entities simply because these entities "were involved in the conduct giving rise to the allegations." NBE's. Mot. at 13 (citing, *inter alia, In re Toyota Motor Corp.*, 785 F. Supp. 2d 883, 906 (C.D. Cal. 2011). Above and beyond NBE's failure to cite any Second Circuit or S.D.N.Y. case law for this proposition, NBE fails to adequately explain how the single case on which it does rely applies. In *In re Toyota*, the Central District of California held that subsidiaries of Toyota were required parties for two reasons – because were independently responsible for some of the conduct alleged by the plaintiffs, and because they could be sued in a separate action if plaintiffs lost, in which case Toyota would be forced to re-litigate. 785 F. Supp. 2d at 906.

If NBE means to imply that the first of these grounds applies here, that case is distinguishable from this one on this point. Unlike in *In re Toyota*, in which Toyota engaged in only some of the alleged wrongdoing and the subsidiaries conducted the rest, here Plaintiffs allege that NBE was involved in *all* of the alleged wrongdoing, and were merely assisted at points by the unnamed entities. 785 F. Supp. 2d at 906; Comp. ¶¶ 53-72.

If, alternatively, NBE means to imply that the latter applies, this argument also fails for various reasons. First, the Second Circuit has held in no uncertain terms that FRCP 19(a)(1)(A) is "concerned only with those who are already parties." *See*

*MasterCard Int'l v. Visa Int'l Serv. Ass'n*, 471 F.3d 377, 385 (2d Cir. 2006). Per this standard, an absent party is not required so long as the court can resolve the *present* dispute by awarding or denying the requested relief to the *present* parties, irrespective of what happens after the suit. *Id.* at 380-82 (holding, where FIFA had entered into separate contracts with both MasterCard and Visa for exclusive World Cup sponsorship rights, that VISA was not a required party for MasterCard's breach of contract claim because VISA could simply sue FIFA for breach of contract in a subsequent action). Second, even if the standard from *In re Toyota* somehow applied here, none of these entities are subsidiaries of NBE; at most, they are affiliates on whose behalf NBE would not be forced to litigate if Plaintiffs prevailed. 785 F. Supp. 2d at 906; Comp. ¶¶ 45, 58, 65, 69.

## 2. NBE cannot demonstrate that the unnamed entities have claimed a legally protected interest

Moreover, NBE's vague contention that the aforementioned entities have "a legally protected interest in this lawsuit" is similarly vague and conclusory. NBE's Mot. at 12. As a threshold matter, for a defendant to assert an interest on behalf of an absent party, the absent party must affirmatively claim this interest through attempted intervenor or some other means. Fed. Civ. Pro. 19(a)(1); *Safenet*, 758 F. Supp. 2d at 258; *Peregrine Myanmar Ltd. v. Segal*, 89 F.3d 41, 49 (2d Cir. 1996). However, even if an absent entity claims a demonstrable legally protected interest, it still will not qualify as a required party if its interest is "adequately represented by an existing party." *Safenet*, 758 F. Supp. 2d at 258. This means, for all practical purposes, that an absentee is not required

where "there is another party in the suit with virtually identical interests who would be advancing virtually the same legal and factual positions." *Id.*

Here, leaving aside NBE's apparent inability to identify exactly which clause of FRCP 19(a) applies, NBE fails to even meet the threshold requirements of the "legally protected interest" requirement of these clauses because it has not shown that any of the unnamed entities has itself claimed such an interest. NBE's Mot. at 12-14. Even assuming *arguendo* that Al Ahly, the Egyptian Arab Development Company, or the unnamed NBE affiliate had asserted a claim to the former Bahgat Group land assets in which NBE contends they have an interest, this interest would be "adequately represented" by NBE or Egypt. NBE's Mot. at 12-13. Both NBE and Egypt share a common interest with these entities in their retention of the disputed property, given that Defendants stand to gain financially from an arrangement benefiting their affiliates and subsidiaries. Comp. ¶¶ 69, 70, 72. Moreover, because these entities were co-parties of NBE and Egypt in the Egyptian arbitration as to the specific issue of the ownership of the disputed property, Defendants will inevitably take the same factual and legal positions that these entities would take if they were joined. Def. NBE's Mot. to Dismiss at 12; Zulcifar Decl. Exh. 2.

In summary, these entities simply are not necessary for the full and fair resolution of Plaintiffs' claims, and this case can therefore proceed without them under FRCP 19(a).

## II. Even if the Entities Referenced by NBE Were Required Parties, This Case May Nevertheless Proceed in Their Absence Under FRCP 19(b)

Even if the unnamed entities were somehow required pursuant to FRCP 19(a), Plaintiffs' failure to join them should not result in dismissal of the entire action under FRCP 19(b). While the court certainly would have discretion to do so, the U.S. Supreme Court has endorsed the use of "alternative forms of relief" so as to avoid dismissal. *Republic of Phil. v. Pimentel*, 553 U.S. 851, 870 (2008). These include, for example, the "granting of money damages rather than specific performance" where such options are available. *Id.* Moreover, the Second Circuit has repeatedly instructed district courts to "take a flexible approach to the Rule 19(b) analysis" and that "very few cases should be terminated…unless…nonjoinder makes just resolution of the action impossible." *Safenet*, 758 F. Supp. 2d at 259 (citing *Jaser v. New York Prop. Ins. Underwriting Ass'n*, 815 F.2d 240, 242 (2d Cir. 1987)) (quotations omitted).

Here, NBE contends that the entities now in possession of former Bahgat Group land assets "would be prejudiced if this Court imposed a constructive trust on that land." NBE's Mot. at 13. Even if this argument had merit, the Court could simply "shape relief" per the Supreme Court's and Second Circuit's instructions to deny the prayer for the imposition of the constructive trust while retaining the requests for monetary relief, which take into account the calculated losses to Plaintiffs arising from the alleged liquidation of land assets. This would enable just resolution of the case in the Plaintiffs' favor while avoiding the alleged prejudice to any absent entities and, most importantly, avoiding an unwarranted dismissal of the entire action.

Finally, in contending that, absent joinder of the unnamed entities, it will be prejudiced in its defense because Egypt will not accept requests for pre-trial discovery,

NBE fails to demonstrate just how joinder of the unnamed entities would remedy this situation. NBE's. Mot. at 13. NBE cites a number of cases holding that a party in possession of discoverable evidence must be joined, yet makes no attempt to connect this proposition to Egypt's prospective refusal to comply with discovery orders. *Id.* Even assuming *arguendo* that NBE means to imply that Al Ahly, the Egyptian Arab Development Company, or the unnamed NBE affiliate must be joined because they are in possession of such discoverable evidence, an argument that NBE does not even advance, it is highly unlikely that NBE does not share access to this very same evidence. This is because, as Plaintiffs allege, NBE was the very entity that ordered and oversaw the auctioneering of assets to these entities. Comp. ¶¶ 65-72.

### F. Dismissal is Not Warranted on the Basis of *Forum Non Conveniens*

Both Defendants seek to dismiss the Complaint on the basis of *forum non conveniens.* Egypt's Mot. at 28-32; NBE's Mot. at 14-23. "The doctrine of forum non conveniens is a discretionary device permitting a court, in rare instances, to dismiss an action". *A.P. Moller-Maersk A/S v. Ocean Express Miami*, 550 F. Supp. 2d 454, 467 (S.D.N.Y. 2008) In the "rare instances" where dismissal on the basis of *forum non conveniens* is permissible, the Defendants must show each of three requirements that: the Plaintiffs' choice of a New York forum merits relatively little deference; an adequate alternative forum is available; and the balance of public and private interests weighs in favor of dismissal. *Iragorri v. United Technologies Corp.*, 274 F.3d 65, 70-75 (2d. Cir. 2001) (en banc) (citing *Piper Aircraft Co. v. Reyno*, 454 U.S. 235 (1981)); *Norex*

*Petroleum Ltd. v. Access Indus.*, 416 F.3d 146, 153 (2d. Cir. 2005) (summarizing

Circuit's three-step FNC analysis).


### I. Plaintiffs' choice of forum

A court reviewing a *forum non conveniens* motion must determine the degree of

deference to afford the plaintiff's choice of forum. *Piper Aircraft v. Reyno*, 454 U.S. at

255. In *Iragorri*, the Second Circuit, sitting *en banc*, held that as a general presumption,

the plaintiff's choice of forum merits a high degree of deference, but that a reviewing

court must conduct a "sliding-scale analysis" to determine the correct degree of

deference. 274 F.3d at 70-72.

Although the degree of deference to be afforded to Plaintiffs' choice of forum is

a necessary element that Defendants must prove, Egypt appears to have completely

ignored the issue altogether. NBE, on the other hand, asserts that a contractual forum

selection clause forecloses Plaintiffs' choice of a New York forum, and summarily

suggests that Plaintiffs' choice of New York is motivated by forum shopping.


### 1. The contractual forum selection clause is inoperative and merits no weight

Plaintiffs concede that, ordinarily, a forum selection clause in a commercial

agreement should control. A forum selection clause, however, does not control if

Plaintiffs make a strong showing that it is inoperative. *Chasser v. Achille Lauro Lines,*

844 F.2d 50, 54 (2d Cir.1988). In this case, the forum selection clause contained in the

2004 Settlement Agreement, merits no weight. Article II of the New York Convention provides that:

> "3. The court of a Contracting State, when seized of an action in a
> mater in respect of which the parties have made an agreement
> within the meaning of this article, shall, at the request of one of the
> parties, refer the parties to arbitration, _unless it finds_ that the said
> agreement is null and void, inoperative or incapable of being
> performed." (_emphasis added_).

The plain language of Article II(3) of the convention ("unless _it_ finds", referring to the court) clearly authorizes the court, rather than arbitrators, to deny a request to compel arbitration for defenses relating to formation of the arbitration agreement. Interpreting Article II(3) of the New York Convention and §4 of the Federal Arbitration Act, 9 U.S.C. §1 _e.t seq._, the 2nd Circuit held in _Telenor Mobile Communications v. Storm LLC.,_ 584 F.3d 396, 406 (2nd Cir., 2008) (quoting _Sphere Drake Insurance Limited v. Clarendon National Insurance Company_, 263 F.3d 26, 30 (2d Cir. 2001)) that "If the making of the agreement to arbitrate is in issue – as Sphere Drake attempts to do by alleging that the contracts in which the arbitration provisions are found never came into existence – the court must set the issue for trial".

_First_, as a threshold matter, neither of the Defendants cited the proposed arbitration agreement, nor explained to what extent its scope governs any of Plaintiffs' claims, or upon whom it is binding. Plaintiffs submit that the arbitration clause is contained in the 2004 Settlement Agreement, the only parties to which are: Dr. Bahgat,

several specified companies of the Bahgat Group, and Dr. Bahgat as legal guardian to his *minor children* on the one side; and NBE, Banque Misr, and Bank of Alexandria on the other. Neither Plaintiff Global One nor Defendant Egypt is a party to the arbitration agreement. The forum selection clause is, therefore, non-binding on any of these non-signatories. NBE's argument that the forum selection clause precludes New York as a forum, consequently, does not apply to any of these parties.

*Second*, the arbitration clause is unenforceable by this court because its formation is tainted with duress as explained fully in Section D.VIII, *supra*.

*Finally*, the arbitration clause would violate strong U.S. public policy and, therefore, merits no weight. "A contractual choice of forum clause should be held unenforceable if enforcement would contravene a strong public policy of the forum in which suit is brought, whether declared by statute or by judicial decision." *The Bremen v. Zapata Off-Shore Co.,* 407 U.S. 1, 15-16 (1972). Addressing such public policy considerations, the Supreme Court declared in *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.,* 473 U.S. 614, 637 n. 19 (1985), that "in the event the choice of forum and choice of law clauses operated in tandem as a prospective waiver of a party's right to pursue statutory remedies…we would have little hesitation in condemning the agreement as against public policy." Following this line of cases, the S.D.N.Y. in *Dumitru v. Princess Cruise Lines, Ltd.,* 732 F.Supp. 2d 328 (S.D.N.Y., 2010), invalidated forum selection and choice of law provisions which provided for arbitration in Bermuda under Bermudan law. The court found these provisions operated in tandem as a prospective waiver of plaintiff's Jones Act claim.

Like *Dumitru*, honoring the arbitration clause, including its choice of law provision, contained in the 2004 Settlement Agreement, would operate in tandem as a prospective waiver of Plaintiffs' otherwise available statutory remedies arising under the RICO Act, which has no equivalent in Egyptian law. As set forth in Section D.VII, *supra*, the choice of Egyptian law as governing, in tandem with the arbitration clause, would preclude application of the RICO Act as well as international law. As such, the contractual forum selection clause is to be given no effect since its operation, in tandem with the choice of law provision, would act as a prospective waiver of Plaintiffs' statutory remedies and, therefore, violates federal public policy.

### 2. Defendants conclusory statements do not establish forum shopping

NBE, in very broad and conclusory terms, attempts to paint Plaintiffs' choice of a New York venue as an attempt at forum shopping. NBE's Mot. at 15. In very broad terms, NBE alleges that Dr. Bahgat, dissatisfied with decisions of the Egyptian courts, now brings this claim in an attempt to shop for a forum. Indeed, NBE makes an extraordinary leap in reaching its conclusion. NBE conveniently ignores that: Dr. Bahgat is only one of five plaintiffs in this action; four of the five plaintiffs are U.S. nationals; two of the Plaintiffs reside in the United States; the fifth plaintiff, Global One, is not an Egyptian entity; important coercion occurred on United States soil implicating fundamental U.S. public policy; important non-party evidence pertaining to the coercive 2007 Addendum is only available at Emory Hospital in the United States; Egypt's main culprit in the coercive 2007 Addendum, its Consul, remains in office in the United States;

and that both Defendants have significant presence in New York. Comp. ¶¶6, 8, 9, 10, 12, 63-65.

Apart from failing to recite sufficient facts in support of its unfounded forum shopping theory, NBE failed to even elucidate a legal standard applicable to the bounds of their own argument. In so doing Defendants do not contend that Plaintiffs' choice was motivated by "attempts to win a tactical advantage resulting from local laws, the habitual generosity of juries in… the forum district, the plaintiff[s'] popularity or defendant[s'] popularity in the region, or the inconvenience and expense to the defendant[s]." *Irragori*, 274 F.3d at 72.

Certainly, in FSIA cases as this one, "generosity of juries" is in no way available as there is no right to jury trial in cases involving foreign sovereign, and Plaintiffs' have not attempted to demand a jury.

The fact that some of the Plaintiffs, although United States citizens, now reside in Egypt does not diminish the strong presumption in favor of Plaintiffs' choice of a United States forum. *Gibbons v. Udaras na Gaeltachta*, 549 F. Supp. 1094, 1121 (S.D.N.Y. 1982). Furthermore, any expense of litigating in New York would certainly be offset by the costs of arbitrating in Egypt, as NBE advocates, where CRCICA and arbitrator fees, exclusive of attorneys fees, experts and document production, are calculated as a percentage of the approximately $5 billion demanded hereunder. Per CRCICA's cost calculator, those costs amount to an astounding US$4,093,803 on average, or $6,921,081 at the maximum for three arbitrator tribunals.[1] No amount of document production,

---

[1] *See* the Cairo Regional Centre for the International Court of Arbitration's fee calculator, available at http://www.crcica.org/feescalc.html . Estimate based on a $5 billion claim with three arbitrator panel presiding.

translation, interpretation, or travel associated with this litigation in New York is likely to approach a fraction of the arbitration cost in Egypt.

Further, NBE has significant resources with $1.6 billion in assets under management at its New York branch alone, and has successfully litigated in United States courts before. El Ghorab Decl. ¶¶5-6; *Norex*, 416 F.3d 156 (finding neither plaintiff nor defendants, both with substantial resources, gained or lost advantage in the quality of legal representation available in New York). Finally, Plaintiffs' choice is entitled to a high degree of deference, particularly when its choice of New York is statutorily granted as proper pursuant to the FSIA's venue provisions. 28 U.S.C. 1391(f)(3).

## II.  Egypt is not an adequate forum

Even if the court affords Plaintiffs' choice of forum no deference, Defendants' motions to dismiss based on *forum non conveniens* fail because Egypt is not an adequate alternative forum.  To secure dismissal on the grounds of *forum non conveniens*, a movant must demonstrate the adequacy of an alternative forum. *Aguinda v. Texaco, Inc.*, 303 F.3d 470, 476 (2d Cir. 2002).  Defendants fail to carry their burden of proving that courts of Egypt are available to hear these disputes and provide comparable relief. *Norex*, 416 F.2d at 158.[2]  Further, Defendants failed to show that relief is *presently* available in the foreign forum. *Id*. at 158-160.  Finally, the current turmoil in Egypt undermines Defendants' arguments that the political unrest has not had an adverse effect on the

---

[2] Defendants seem to hope to confuse the court by improperly stating the burden of proof for the inadequacy element. NBE's Mot. to Dismiss, 16. While it is true that in practice the plaintiff bears the burden of proving the justice system of the foreign forum is suspect, Defendants bear the burden of proving that the foreign forum provides relief for this category of dispute and that relief is presently available.

judicial system. *See* The Robert F. Kennedy Center for Justice & Human Rights, *Rule of law Backsliding in Egypt* (April 3, 2014), http://rfkcenter.org/rule-of-law-backsliding-in-egypt.

Defendants must show that the foreign forum makes available claims that provide the same type of relief available in the United States forum. *Norex*, 416 F.3d at 158. First and foremost, Defendants' argument for dismissal must fail because they have not even attempted to prove that similar claims and remedies exist in Egypt. Defendants argue, circularly, that because Dr. Bahgat has instituted claims in Egypt and NBE has submitted to jurisdiction, the forum must be adequate. NBE's Mot. at 16. But that is not the test. Defendants cannot bear their burden to prove the foreign forum is adequate by simply showing that it is possible for Plaintiffs to sue there. *Norex*, 416 F.3d at 158. Instead, Defendants must show that the foreign jurisdiction provides claims and remedies similar to those Plaintiffs have plead. *Id*. The fact that Defendant has not attempted to prove or even argue the existence of similar claims and relief fatally undermines their motions for dismissal on the grounds of *forum non conveniens*.

While the failure to show comparable claims and remedies is, alone, sufficient to doom Defendants' *forum non conveniens* argument, Defendants provide additional grounds to reject the argument by failing to prove those claims and relief are *presently* available. *Id*. at 416 F.3d at 159. "A case cannot be dismissed on the grounds of *forum non conveniens* unless there is a presently available… alternative forum that will permit [the plaintiff] to litigate the subject matter of the dispute." *Id*. This analysis does not "concern itself with the reason why an alternative forum is no longer available; its singular concern is the fact of present availability." *Id*. Where the legal actions abroad

would otherwise be sufficient, which Defendants have not proven, the forum is not presently available when they are precluded by a prior adjudication in that forum, or when they are time barred. *Id*. (finding Russian courts inadequate where claims would have been barred by a prior default judgment) *see also Bank of Credit & Commerce Int'l (Overseas) Ltd. v. Bank of Pakistan*, 273 F.3d 241, 246 (2d Cir. 2001) (finding foreign forum inadequate where statute of limitations barred bringing case in foreign forum that could be brought in the United States). Defendants argue stridently for preclusion, but fail to carry their burden of proving this same preclusion does not make the foreign forum inadequate. As such, the motion for dismissal on the grounds of *forum non conveniens* must be denied.

Finally, Egypt is an inadequate forum because the political strife has undermined the rule of law. "The current state of political unrest in Egypt warrants consideration in the *forum non conveniens* adequacy analysis." *Miralda v. Tidewater, Inc.*, CIV.A. No. 11-1170, at 6 (E.D. La. Aug. 23, 2012). By initiating an action in Egypt, Dr. Bahgat has not tacitly admitted the adequacy of that forum. *Tradimpex Egypt Co. v. Biomune Co.*, 777 F. Supp.2d 802, 807 (D. Del. 2011) (refusing to find Egypt an adequate forum in light of revolutionary events). Conversely, the inability of Dr. Bahgat to obtain relief in Egypt is an indicator of the forum's inadequacy. *Id*. Defendants argue that a constitution exists and the courts are open, while failing mention that this constitution is the third in three years, was approved by 98.1% of voters, the constitutionally mandate for electing a legislature has not yet been honored, and the press and media outlets remain suppressed[3].

---

[3] David D. Kirkpatrick, *Egyptians Vote on New Constitution in Referendum*, N.Y. Times, http://www.nytimes.com/2014/01/15/world/middleeast/egypt.html (Jan. 14, 2014) (Government declared main opposition a terrorist organization, shut down sympathetic media outlets, and arrested activists. "This time it has surpassed Mubarak at the height of his authoritarianism."); *Egypt Const. Approved by 98.1*

Moreover, the judiciary has on multiple occasions condemned, wholesale, hundreds of dissidents to the death penalty in summary mass trials.

In Plaintiffs' case, in retaliation for Dream TV's biting criticism of former President Morsy's administration, the Egyptian media regulators unilaterally revoked its permits to broadcast live from its own studios at Dreamland, requiring it to broadcast only from the government owned Egyptian Media Production City ("EMPC"). Bahgat Decl. ¶26. Although Dream Media obtained an immediately enforceable court order allowing it to broadcast live from its Dreamland studios on November 24, 2012, the regulator, to this date has yet to enforce that order. Declaration of Rageh El Sheikh ("El Sheikh Decl.) ¶8. That order, under Egyptian law, is enforceable notwithstanding any subsequent challenge or appeal thereto. El Sheikh Decl. ¶11.

In *Miralda*, the plaintiffs failed to, "put forth evidence that Egypt's political unrest and strife has or will affect the judicial system." *Miralda* CIV. A. No. 11-1170 at 8. Two years later that link is clear. The deterioration of rule of law in Egypt since *Miralda* has been widely reported[4], and now a specific threat to Dr. Baghat's ability to obtain justice has surfaced, ironically on the same day Defendant submitted its brief.

---

*Percent*, Al Jazeera, http://www.aljazeera.com/news/middleeast/2014/01/egypt-constitution-approved-981-percent-201411816326470532.html (last updated Jan. 24, 2014).
[4] Khaled Al-Qazzaz, *Why is the World Silent?*, N.Y. Times http://www.nytimes.com/2014/06/28/opinion/khaled-al-qazzaz-disappeared-by-egypts-military.html?hp&action=click&pgtype=Homepage&module=c-column-top-span-region&region=c-column-top-span-region&WT.nav=c-column-top-span-region (June 27, 2014) (opinion piece from disappeared former Foreign Relations Secretary now incarcerated without trial in maximum security prison); Hend Kortam & Aaron T. Rose, *One Year of Crackdowns*, Daily News Egypt, http://www.dailynewsegypt.com/2014/06/30/one-year-crackdowns/ (June 30, 2014) (detailing mass killings, arrests and trials lacking due process since military coup); *Freedom in the World 2014 – Egypt*, Freedom House http://www.freedomhouse.org/report/freedom-world/2014/egypt-0#.U7FztJSwJHF (last visited June 30, 2014) (rating Rule of Law four out of sixteen and Functioning of Government two out of twelve); *Egypt Under 'Undeclared State of Emergency', No Rule of Law: Rights Groups Call on UN to Take Action*, http://www.ansamed.info/ansamed/en/news/sections/politics/2014/02/17/Egypt-undeclared-state-emergency-rule-law_10092795.html (last visited June 30, 2014) (noting undermining of principle of separation of powers and control exercised by police and Homeland Security over prosecutors and judiciary);

*Canadian Overseas Ores Ltd. v. Compania, Ect*, 528 F. Supp. 1337, 1343 (S.D.N.Y.

1983) (finding questions of independence of judiciary sufficiently serious to place burden

on party asserting the appropriateness of the foreign forum to prove its adequateness);

*Tradimpex*, 777 F. Supp.2d at 807. On June 23, 2014, a Cairo court sentenced three Al

Jazeera journalists to between seven and ten years in prison in what has been called "an

act of intimidation against all journalists." *Egypt Trial: Outcry Over Al-Jazeera Trio's

Sentencing*, BBC News Middle East, http://www.bbc.com/news/world-middle-east-

27982732 (last updated June 23, 2014, 14:49 ET) (Convicting eleven other defendants

tried in absentia to ten years each). These trials were not only a direct attack on the

freedom of the press, the prosecuted journalists were pawns in an "ongoing row" between

Egypt and Qatar. *Id*. Dr. Baghat's control of a media empire is at the heart of this case.

Compl. ¶¶ 47-53. Given the substantial stakes of this litigation, the recent politicized

prosecutions of media, and the history of extra-judicial pressure on Dr. Bahgat, Egypt is

an inadequate forum due to the very real danger that Dr. Bahgat, his employees or his

family would become pawns used by the government as leverage.


**III.    Public and private interests**

Because "the balance of the public and private factors does not tilt heavily in

favor of [Egypt]," this court should reject Defendants' motions to dismiss based on *forum

non conveniens*. *Abdullahi v. Pfizer, Inc.*, 562 F.3d 163, 189 (2d Cir. 2009). Defendants

would not bear significant hardship due to retention of jurisdiction and Plaintiffs would

bear significant hardship if this action were dismissed, so the private factors weigh

against dismissal. *Irragori*, 274 F.3d at 73. The courts of Egypt are significantly

congested[5] and the Foreign Sovereign Immunity Act specifically contemplated similar suits in the United States, so the public factors also weigh against dismissal. *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, n. 6 (1981) (considering court congestion as a factor). Thus, the court should reject the motions to dismiss.

Defendants have significant resources at their disposal, have control over most of the important documentary pieces of evidence and can compel the presence of many important witnesses. By contrast, Plaintiffs' need access to evidence in the United States, including evidence of the coerced agreement signed while he was in the hospital in Atlanta, Georgia. Comp. ¶¶ 63-65. Such evidence is in the possession of non-party American persons and witnesses, specifically Emory Hospital personnel, located in the United States who would be unduly overburdened if requested to travel to Egypt to testify. While Defendants argue that certain witnesses may not be within the compulsory process of the United States, Defendants together have control over many if not all of their own key witnesses to this dispute, and have not named any non-party witnesses that would be outside the court's jurisdiction. Section E., *supra*. Further, all of the documents exist already and would require only that Defendant collect them to bring them before the court. The cost of transporting witnesses from Egypt, translating and producing those documents would represent only a small fraction of the nearly $7 million it would cost to arbitrate this case in Cairo.[6]

---

[5] Leila Fadel, *In Egypt, A New Courtroom Drama Every Day*, http://www.npr.org/blogs/parallels/2014/03/14/289815812/in-egypt-a-new-courtroom-drama-every-day (Mar. 14, 2014) (noting the overburdened court system must deal with politically motivated trials with no guarantee of a fair trial).

[6] *See* the Cairo Regional Centre for the International Court of Arbitration's fee calculator, available at http://www.crcica.org/feescalc.html . Estimate based on a $5 billion claim with three arbitrator panel presiding.

While Egypt cites *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 508-509 (1947), to import a rule that application of foreign law is a factor weighing in favor of dismissal, Egypt's Mot. at 30, nothing in *Gilbert* makes any reference to foreign law. NBE cites *Piper* for the same proposition, which seems more directly on point. NBE's Mot. at 22. *Piper*, however, was decided in 1981 relying on a case from 1947, when access to foreign legal advice was highly limited and inconvenient. Plaintiffs do not allege any claims in violation of Egyptian law, but rather violations of international law, federal, and state law. The need to apply Egyptian law in this case is minimal and incidental at best. Since foreign law does not govern Plaintiffs' claims in their entirety, application of foreign law does not weigh in favor of dismissal. *Manu International, S.A. v. Avon Products, Inc.,* 641 F.2d 62, 67 (2d Cir.1981); *Gibbons v. Udaras na Gaeltachta,* 549 F. Supp. 1094, 1123 (S.D.N.Y. 1982).

Further, the United States has strong interest in hearing expropriation cases. The FSIA's expropriation exception specifically enables the court to hear cases where the expropriation took place abroad, so long as the nexus requirements are satisfied. 28 U.S.C. §1605(a)(3). Likewise, the Hickenlooper Amendment to the Foreign Relations Authorization Act specifically abolished the Act of State Doctrine as a defense with respect to expropriation cases. 22 U.S.C. §2370(c). The Act of State Doctrine was traditionally the strongest defense available to foreign expropriating states, and barred litigation in the United States against foreign states for their sovereign acts occurring within their own boundaries. Similarly, the Helms Amendment to the Foreign Relations Authorization Act prohibits the United States Government from granting foreign aid to recipient states which expropriate property of Americans without prompt and effective

compensation. 22 U.S.C. 2370a(a). Egypt is the second largest recipient of American foreign aid, and this case, therefore, is of particular United States interest. Comp. ¶15.

Finally, the FSIA eased the hurdles of personal jurisdiction against expropriating foreign sovereigns by enacting a long arm statute in cases falling under the expropriation exception, and provided specific venue provisions therefor. 28 U.S.C. 1330(b); 28 U.S.C. 1391(f)(3). These legislations embody compelling foreign policy considerations of the United States. Section A.I., *supra*. If *forum non conveniens* dismissal is warranted on the basis that the expropriation took place abroad and, arguably, most of the evidence and witnesses are abroad, then *forum non conveniens* would completely subsume the compelling congressional intent and foreign policy considerations in permitting litigation in the U.S. of particularly this type of foreign expropriation cases which, naturally, would involve the same practical considerations.

At the very least, the public and private factors do not tilt *heavily* in favor of the foreign forum so this court should reject Defendants' motion to dismiss based on *forum non conveniens*.

### G. Contrary to NBE's Contentions, RICO Does Apply Because NBE Performed Sufficient Predicate Acts in the United States to Render the Alleged Racketeering Scheme Domestic, Rather than Extraterritorial

NBE's attack on Plaintiffs' RICO claim must fail because the racketeering conduct alleged by Plaintiffs is sufficiently domestic, rather than extraterritorial. We do not contest NBE's assertion that, pursuant to *Norex Petroleum v. Access Industries*, RICO generally lacks extraterritorial application. 631 F.3d 29, 32 (2d Cir. 2010); NBE's Mot. at 23. We disagree, however, with how NBE defines "extraterritorial" application of

RICO, as juxtaposed with "domestic" application of the statute, and with how NBE applies this standard to the present facts.

While the Second Circuit has yet to decide whether the location of the enterprise or, alternatively, the location of the alleged racketeering conduct governs the "extraterritoriality" or "domesticity" of a RICO claim, we submit that the latter is the proper determinative factor. *Republic of Iraq v. ABB AG*, 920 F. Supp. 2d 517, 544 (S.D.N.Y. 2013). Courts that have ruled on this issue, including the Ninth Circuit, have consistently held that focus on the location of the alleged conduct, rather than the enterprise, is more consistent with RICO's plain text and its legislative purpose of preventing racketeering within U.S. borders. *See*, *e.g.*, *U.S. v. Chao Fan Xu*, 706 F.3d 965, 978 (9th Cir. 2013) ("It is highly unlikely that Congress was unconcerned with the actions of enterprises where those actions violated the laws of this country while defendants were in this country."); *European Community v. RJR Nabisco, Inc.*, 2014 WL 1613878, at *16 (2d Cir. Apr. 29, 2014) ("Surely the presumption against extraterritorial application of United States laws does not command giving foreigners carte blanche to violate the laws of the United States in the United States."). Appropriately, the trend among federal courts, including the S.D.N.Y., has been toward adoption of a "focus on the conduct" standard. *See*, *e.g.*, *Chao Fan Xu*, 706 F.3d at 978. *Chevron v. Donzinger*, 871 F. Supp. 2d 229, 242-45 (S.D.N.Y. 2010); *CGC Holding Co. v. Hutchens*, 824 F. Supp. 2d 1193, 1209 (D. Colo. 2011); *Borich v. BP Prods. N. Am., Inc.*, No 12 C 2367 (N.D. Ill. May 28, 2012); *Hourani v. Mirtchev*, Civ. No. 10-1618, at 12-13 (D.D.C. May 7, 2013). It only makes sense that this court follow suit and direct its focus to the location of the alleged conduct for the purpose of assessing Plaintiffs' RICO.

Under such a standard, the occurrence of alleged "key acts" within the U.S. is adequate to render a RICO claim domestic. *Chao Fan Xu*, 706 F.3d at 978-79; *Chevron v. Donzinger*, at 360-62. We agree with NBE's contention that, per *Norex*, mere tangential or incidental contact with the U.S. will not support a RICO claim. *Norex Petroleum Ltd. v. Access Industries, Inc.*, 540 F. Supp. 2d 438, 444 (S.D.N.Y. 2007) (aff'd *Norex*, 631 F.3d at 32-33) (dismissing RICO claim where alleged U.S. contact consisted of defendants' use of U.S.-based banks for bribery, tax fraud, and money laundering because these acts were unrelated to underlying fraud allegations). However, as NBE fails to mention, both the S.D.N.Y. and Ninth Circuit have held that even isolated contact with the U.S. will suffice for a RICO claim where this contact is indispensable to the execution of the alleged scheme. *See Chao Fan Xu*, 706 F.3d at 978-79 (upholding RICO claim where defendants used fraudulent visas to enter the U.S. after embezzling funds from banks in China because "without the immigration fraud, the bank fraud would have been a dangerous failure"); *see also Chevron v. Donzinger*, at 360-62 (relying on *Chao Fan Xu* in upholding RICO claim alleging Ecuador-based racketeering on grounds that "absent the U.S. activity, there would have been no scheme").

The latter is the case here: Although NBE's contact with the U.S. in the course of its alleged racketeering scheme was admittedly scarce, it was sufficiently integral so as to render the scheme domestic for RICO purposes. As NBE concedes, Plaintiffs allege wrongful U.S.-based activity in the form of the NBE representative's use of threats to induce Dr. Bahgat's signature of the 2004 addendum, which constitutes the RICO predicate of "an act or threat involving . . . extortion." Comp. ¶ 64; 18 U.S.C. § 1961(1)(A)-(B). Like the immigration fraud in *Chao Fan Xu*, this act was indispensable

105

to NBE's scheme because NBE would not have been able to sell the Bahgat Group companies' assets to its affiliates and destroy the value of these companies but for Dr. Bahgat's apparent grant of authorization for asset liquidation to NBE. Comp. ¶¶ 64-65. This is evident in NBE's continuous exertion of pressure on Dr. Bahgat to sign the addendum in the months prior to the Emory Hospital incident, and NBE's reluctance to being liquidating the companies' assets before this point. *Id.* ¶¶ 61-62.

Finally, NBE reliance on *Republic of Iraq* in contending that its alleged scheme must be deemed extraterritorial because it was "directed towards assets and property located in Egypt" is misplaced. 920 F. Supp. 2d at 545-46; Def. Mot. at 25. In that case, the court held that the alleged scheme was extraterritorial not only because the contested assets and property were located abroad, but also because the scheme's victims were foreign. *Republic of Iraq*, 920 F. Supp. 2d at 546. In so doing, it distinguished the action before it from *CGC Holding Co. v. Hutchens*, 824 F. Supp. 2d 1193 (D. Colo. 2011), a case in which "defendants aimed to 'extract monies from victims in the United States and engaged in conduct in the United States – including dispatching an agent of the scheme to Colorado." *Republic of Iraq*, 920 F. Supp. 2d at 546. The court thus insinuated that allegations similar to the facts of *CGC Holding* would be sufficient to support a RICO claim. *Id.* This is the case here, as Plaintiffs are U.S. citizens, most of the Plaintiffs are U.S. residents, and Plaintiffs' complaint alleges that NBE dispatched an agent within the U.S. to carry out an essential step of its scheme. Comp. ¶¶ 6-9, 64. Therefore, Plaintiffs have alleged domestic conduct sufficient to support their RICO claim.

**H. New York Law Claims**

NBE maintains that Plaintiffs plead multiple claims that do not exist as separate tort causes of action in New York. Plaintiffs hereby withdraw Claim 5 ("Theft"), Claim 8 ("Extortion"), Claim 9 ("Racketeering") because they are reflected in other of Plaintiffs' claims. With respect to Claim 16 ("Intentional Infliction of Emotional Distress"), NBE maintains that it cannot exist as an independent claim if the conduct falls within other tort liability. NBE does not reference other torts which would bar this claim. Assuming, *arguendo*, that Claim 16 is reflected within other of Plaintiffs' claims, Plaintiffs can maintain it as an alternative claim, and dismissal is unwarranted.

## I.  Plaintiffs Have Sufficiently Alleged Requisite RICO Intent

NBE, but not Egypt, argues that Plaintiffs failed to allege criminal intent as required by RICO. NBE's Mot. at 41-42. NBE relies on a line of Second Circuit holding that RICO claims cannot be pursued against government entities, including municipalities and municipal corporations, because those entities are not capable of criminal intent. NBE seeks to apply the same logic to preclude its RICO liability for its purported incapability of criminal intent.

Plaintiffs do not challenge the line of cases cited by NBE. Although NBE's argument may be persuasive with respect to *domestic* governmental entities, not one of those cases, however, relates to or is applicable to *foreign* states, their political subdivisions, or their agencies or instrumentalities. NBE's failure to cite any authorities pertaining to foreign sovereigns is understandable: the specific question of whether a foreign, rather than domestic, sovereign is capable of criminal intent for purposes of the RICO Act appears to have never been directly addressed by federal courts. The threshold

inquiry relevant hereto is not whether a sovereign is capable of criminal intent, but, rather, whether a foreign sovereign is to be treated upon the same standard as a local sovereign for purposes of RICO.

It is true that the FSIA treats foreign sovereigns as the equals of the United States government with respect to immunity and jurisdiction. On issues of liability, however, the FSIA explicitly treats foreign sovereigns, once an exception to immunity is shown, as the juridical equals of *private* individuals. 28 U.S.C. §1606 ("As to any claim for relief with respect to which a foreign state is not entitled to immunity under section 1605 or 1607 of this chapter, the foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances"); Section A.I., *supra.*

One S.D.N.Y. case addressing the issue applied §1606 to hold a foreign sovereign liable for Title VII violations in the same manner and to the same extent as a private employer, even though Title VII specifically excludes United States government employers from and does not explicitly include foreign governments in its definition of "employer" subject to liability thereunder. *Mukaddam v. Permanent Mission of Saudi Arabia,* 111 F.Supp.2d 457, 470 (S.D.N.Y. 2000) (foreign state "is liable under Title VII in the same manner and to the same extent as a private employer would be in like circumstances"); 42 U.S.C.A. § 2000e ("(b) The term "employer"…does not include (1) the United States, a corporation wholly owned by the Government of the United States"). Therefore, "[w]here plaintiffs would be able to bring federal claims against a private individual in like circumstances, and where such a result would not be inconsistent with the will of Congress, courts have not hesitated to permit those claims to proceed against

foreign states as well." *Dammarell v. Islamic Republic of Iran,* 2005 WL 756090, at *9 (D.D.C. Mar. 29, 2005).

In light of these principles, federal courts have found that Congress did not intend to bar RICO claims against foreign sovereigns and permitted their litigation so long as an exception to immunity applied. *Southway v. Cent. Bank of Nigeria,* 198 F.3d 1210, 1216 (10th Cir.1999) (RICO claim permissible against foreign sovereign whether or not the same claim is indictable); see also *Kensington Int'l Ltd. v. Societe Nationale Des Petroles Du Congo*, 2006 WL 846351, at *10 (S.D.N.Y. Mar. 31, 2006).

Applying §1606's "in the same manner and to the same extent as a private individual under like circumstances", Plaintiffs have alleged sufficient facts relating to Defendants' criminal intent. "RICO…does not include a scienter element over and above that required by the predicate crimes", *United States v. Boylan*, 620 F.2d 359, 361-62 (2d Cir. 1980). One of the crimes Plaintiffs allege as a RICO predicate is extortion under 18 U.S.C. §1951. Extortion is a general intent crime and no specific intent of the Defendants need be shown. *United States v. Furey, 491 F. Supp. 1048, 1061 (E.D. Pa.) aff'd sub nom. United States v. Ronald Furey*, 636 F.2d 1211 (3d Cir. 1980). To establish general intent for extortion, plaintiffs need only allege sufficient facts to support a reasonable inference that the "defendant played upon or exploited the fear of the victim and, by doing so, wrongfully obtained the property of the victim with his consent but involuntarily." ***Id.***

Here, at the very least, Plaintiffs allege that Defendants: threatened Dr. Bahgat with confiscation and imprisonment to obtain his signature to unjustified asset pledges in 2002; unjustly imposed a travel ban on Dr. Bahgat in 2003, knowing of his severe heart condition requiring medical care abroad, to obtain his signature to an unjust Settlement

Agreement in 2004; knowing of his dangerous heart transplant procedure, traveled to his hospital bed and threatened him with confiscation and imprisonment in order to obtain his signature to the 2007 Addendum; that Plaintiffs, in fear of Defendants' threats directed at Dr. Bahgat, transferred majority control of their assets in Egypt to Defendants. These allegations certainly satisfy the intent required for the RICO predicate act of extortion.

**J. None of Plaintiffs Claims are Time Barred Because the Applicable Statute of Limitations Has Been Tolled By The Doctrine of Continuing Violation**

NBE's final defense is that all of Plaintiffs' claims are barred by New York's statute of limitations. NBE's Mot. at 42-43. Plaintiffs allege continuing duress through and until at least April 2012. Comp. ¶ 72; Bahgat Decl. ¶ 27. "Where during the period of acquiescence or at the time of the alleged ratification the disaffirming party is still under the same continuing duress, he has no obligation to repudiate until the duress has ceased." *Sosnoff v. Carter*, 568 N.Y.S.2d 43, at 47 (N.Y. App. Div. 1991). "The test for determining whether a party ratified a contract through acquiescence is whether the party claiming duress acted reasonably under the circumstances in asserting the claim. *Industrial Recycling Syst. v. Ahneman Associates, PC.*, 892 F. Supp. 547, 551 (S.D.N.Y. 1995). "When duress is part of the causes of action alleged, the Statute of Limitations is tolled until the duress terminates as such conduct is considered a continuous wrong." *Zoe G. v. Frederick F.G.*, 617 N.Y.S.2d 370, 371 (N.Y. App. Div. 1989); *Baratta v. Kozlowski*, 464 N.Y.S.2d 803, 806 (N.Y.A.D. 2 Dept., 1983). In *Sosnoff*, the plaintiff threatened to abandon a contract, and thereby force defendant's financial ruin, unless the defendant agreed significant financial concessions. *Sosnoff*, 568 N.Y.S.2d at 45-46. Once

the defendant judged that his creditors would not view his actions as a default, he refused to pay his obligations to plaintiff under the coerced contract. *Id*. at 47.

Plaintiffs faced continuing duress until April of 2012 when NBE publicly announced that NBE owned all of Dreamland's assets despite no formal transfer of title. Compl. ¶ 72. Plaintiffs initiated arbitration in 2011 to repudiate the contracts made under duress and filed this case in December of 2013. Plaintiffs resisted the efforts of NBE to seize control of the Bahgat Group Companies at every opportunity for a decade. *Id.* at ¶ 52, 55, 59, 62-4, 66, 69-71. Once NBE moved to assume complete ownership of Dreamland's assets, Plaintiffs realized that attempting to negotiate with NBE was futile and repudiated the coerced contracts by instituting arbitration. *Id*. at ¶ 70-72. As NBE admits, the applicable Statute of Limitations for each claim is between three and six years. NBE's Mot., 42-43. Because Plaintiffs instituted this action in 2013 and the last wrongful acts occurred in 2011, it is not untimely. Because Plaintiffs instituted arbitration to repudiate the coerced contracts immediately once divested, they have not ratified those contracts.

Finally, because Plaintiffs claim that Defendants expropriated their property, and no just compensation has yet been paid, the Defendants are engaged in a continuing violation of international law. *Banco Nacional de Cuba v. Chase Manhattan Bank,* 658 F.2d 875, 891 (2d Cir. 1981) ("failure to pay compensation to the victim of an expropriation constitutes a violation of international law.") Thus, under the continuing violation doctrine, "the limitations period for a continuing offense does not begin until the offense is complete." *United States v. Rivera–Ventura,* 72 F.3d 277, 281 (2d Cir.1995). Plaintiffs' claims expropriation claims are not barred by the applicable

limitations period because Defendants are engaged in a continuing violation of international law until just compensation is paid to Plaintiffs. *Bodner v. Banque Paribas,* 114 F. Supp. 2d 117, 134-35 (E.D.N.Y. 2000) (Defendant engaged in a continuing violation of international law by not returning expropriated assets to plaintiff and therefore plaintiff's claim not time barred approximately 50 years after the property was seized.)

## CLOSING

WHEREUPON, for all the foregoing reasons, Plaintiffs set forth hereinabove, Plaintiffs respectfully request that Defendants' motions to dismiss the complaint be denied in their entirety and if granted, in whole or in part, Plaintiffs respectfully request leave to amend.

On: February 23, 2015                                    Respectfully submitted,


                                                         Ahmed M. Elmokadem